UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

KNOW YOUR IX, a project of Advocates for Youth;
COUNCIL OF PARENT ATTORNEYS AND
ADVOCATES, INC.; GIRLS FOR GENDER EQUITY;
and STOP SEXUAL ASSAULT IN SCHOOLS,

                                        Plaintiffs,

-against-

ELISABETH D. DEVOS, in her official capacity as
United States Secretary of Education; KENNETH L.
MARCUS, in his official capacity as Assistant Secretary
for Civil Rights at the United States Department of
Education; and UNITED STATES DEPARTMENT OF
EDUCATION,

                                        Defendants.

Civil No.

_____

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

## INTRODUCTION

1.      Nearly half a century since the passage of Title IX of the Education Amendments

of 1972 ("Title IX"), sexual harassment and assault remain a widespread problem for students of

all ages. In 1972, Congress delegated to Defendant U.S. Department of Education ("ED" or "the

Agency") the power and responsibility to hold educational institutions receiving federal funds

accountable for their responses to sex discrimination. Since 1997, the Agency has set standards

governing the responsibilities of funding recipients to address sexual harassment, including

sexual assault, and to take steps to prevent it. Under statutes imposing virtually identical

obligations, schools that receive federal funding have also been required to respond to and

prevent harassment and assault on the basis of race, national origin, and disability.[1] Until now,

_____

[1] Title VI of the Civil Rights Act of 1964 ("Title VI"); Section 504 of the Rehabilitation Act of 1973
("Section 504"); Title II of the Americans with Disabilities Act of 1990 ("Title II"). *Compare* Title VI, 42

ED has imposed the same responsibilities on recipients to respond to harassment based on sex that it imposes on them to respond to harassment based on race, national origin, and disability. With the promulgation of the Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance regulation (RIN 1870-AA14, Docket No. ED-2018-OCR-0064) (the "Rule"), however, the Agency has radically reduced the responsibility of schools to respond to complaints of sexual harassment and assault, creating an arbitrary and wholly unexplained disparity between its treatment of sex discrimination on the one hand, and race, national origin, and disability discrimination on the other.

2.      Defendant ED Secretary Elisabeth DeVos has discarded decades of ED's experience addressing sexual harassment and assault by promulgating regulatory provisions that sharply limit educational institutions' obligations to respond to reports of sexual harassment and assault. If allowed to be implemented at educational institutions nationwide, these provisions will make the promise of equal educational opportunities irrespective of sex even more elusive. This is true for all students, including students of color, LGBTQ students, and students with and without disabilities, in grade school, high school, and higher education.

3.      Public statements by ED Secretary DeVos and former Deputy Assistant Secretary Candice Jackson echo the historical justifications and stereotypes that once animated the second-

---

U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."); *with* Title IX, 20 U.S.C. § 1681 ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity."); *and* Section 504, 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."); *and* Title II, 42 U.S.C. § 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.").

class legal treatment of women's and girls' accounts of sexual harassment or assault and enabled these accounts to be dismissed, belittled, and ignored.

4.      For example, Jackson, who also led the Office for Civil Rights ("OCR") as the Acting Assistant Secretary for Civil Rights, said that in most investigations, there is "not even an accusation that these accused students overrode the will of a young woman. Rather, the accusations—90 percent of them—fall into the category of 'we were both drunk,' 'we broke up, and six months later I found myself under a Title IX investigation because she just decided that our last sleeping together was not quite right.'"[2]

5.      Secretary DeVos similarly suggested that Title IX reports of sexual harassment are often frivolous: "Too many cases involve students and faculty who have faced investigation and punishment simply for speaking their minds or teaching their classes. Any perceived offense can become a full-blown Title IX investigation. But if everything is harassment, then nothing is."[3]

6.      Despite Secretary DeVos and former Deputy Assistant Secretary Jackson's purported anecdotal evidence, neither ED nor public comments submitted in response to the Agency's Notice of Proposed Rulemaking ("Proposed Rule") cite evidence to support the notion that false accusations are common or that Title IX investigations are routinely used to police speech. In fact, the government data, research studies, and personal accounts presented to ED in response to the Proposed Rule show that the real problem is not false reports, which the Agency

[2] Erica L. Green & Sheryl Gay Stolberg, *Campus Rape Policies Get a New Look as the Accused Get DeVos's Ear*, N.Y. Times (July 12, 2017), https://www.nytimes.com/2017/07/12/us/politics/campus-rape-betsy-devos-title-iv-education-trump-candice-jackson.html.

[3] Prepared Remarks by Secretary DeVos at the Independent Women's Forum Annual Awards Gala, U.S. Dep't of Educ. (Nov. 13, 2019), https://www.ed.gov/news/speeches/prepared-remarks-secretary-devos-independent-womens-forum-annual-awards-gala.

now acknowledges happen only "infrequently," but underreporting: just 5% of student sexual assaults are reported.[4]

7.     This new federal effort to weaken Title IX makes it more difficult for victims of sexual harassment or sexual assault to continue their educations and needlessly comes amid a global pandemic—wherein tens of millions of students across the United States are already struggling to learn despite the closure of schools, a shift to online learning, and numerous other disruptions caused by COVID-19. Instead of focusing on how to help these students, the Agency has prioritized gutting protections against sexual harassment and assault that many of them currently rely on.

8.     Nearly 12% of university students have reported nonconsensual sexual touching or penetration by force or incapacitation since enrolling at their school.[5] Elementary, middle, and high school students also experience sexual harassment and assault at alarming rates, with 21% of middle schoolers in one study reporting they had been pinched, touched, or grabbed in a sexual way.[6] Students of color; lesbian, gay, bisexual, transgender, and queer ("LGBTQ")

---

[4] Ann Cahill, Comment on Proposed Rule (ED-2018-OCR-0064-10709) (citing Christine H. Lindquist et al., *The Context and Consequences of Sexual Assault Among Undergraduate Women at Historically Black Colleges and Universities (HBCUS)*, 28 J. Interpersonal Violence 2437 (2013)); Nat'l Ass'n of Graduate and Prof'l Students, Comment on Proposed Rule (ED-2018-OCR-0064-30381); Am. Soc'y of Criminology, Div. on Women & Crime, Comment on Proposed Rule (ED-2018-OCR-0064-6883) (citing Bonnie S. Fisher et al., *Reporting Sexual Victimization to the Police and Others: Results From a National-Level Study of College Women*, 30 Crim. Just. & Behav. 6 (2003)); Northeastern Sexual Assault Response Coalition, Comment on Proposed Rule (ED-2018-OCR-0064-104491).

[5] David Cantor et al., Ass'n of Am. Univs., Report on the AAU Campus Climate Survey on Sexual Assault and Sexual Misconduct vii (Sept. 2015), https://www.aau.edu/sites/default/files/%40%20Files/Climate%20Survey/AAU_Campus_Climate_Survey_12_14_15.pdf.

[6] Univ. of Ill. at Urbana-Champaign, *Sexual Harassment Common Among Middle School Children, Study Finds*, Phys. Org. (Dec. 9, 2016), https://phys.org/news/2016-12-sexual-common-middle-school-children.html; Dorothy L. Espelage et al., *Understanding Types, Locations, & Perpetrators of Peer-To-Peer Sexual Harassment in U.S. Middle Schools: A Focus On Sex, Racial, And Grade Differences*, 71 Child & Youth Servs. Rev. 174 (2016), https://www.sciencedirect.com/science/article/pii/S0190740916304145?via%3Dihub.

students; and students with disabilities are subjected to sexual violence and harassment with even greater frequency.

9.      The impact of sexual harassment and violence can be severe and long-term, with consequences including declines in grades, missed classes, increased risk of dropping out, withdrawal from academic and social life, depression, anxiety, and suicidality.

10.     Recognizing this impact, ED previously worked with institutions to prevent and redress sexual harassment and assault by issuing guidance and enforcement letters over the past two decades. It did so, moreover, in a manner that treated as parallel the obligations on schools to respond to harassment based on sex, race, national origin, and disability equally, imposing similar standards for each.

11.     The newly issued Rule, however, includes several provisions that are contrary to both the language and spirit of Title IX, and depart significantly not only from consistent past practice, but create a double standard, in which educational institutions have dramatically different obligations to respond to harassment based on sex, on the one hand, and race, national origin, and disability on the other. Despite issuing a 2,000 page "preamble," ED never adequately explains why it is treating sexual and racial/national origin/disability harassment differently, despite similar statutory prohibitions. This double standard will have a devastating effect on survivors of sexual harassment and assault and their educations. These provisions will also result in fewer institutions taking much-needed affirmative steps to prevent sexual harassment and assault before it happens. These unlawful provisions include:

a.      Redefining sexual harassment to exclude many instances of misconduct that currently fall within the Agency's definition, and that continue to fall under the Agency's definition of harassment based on race, national origin, and disability (*see* ¶¶ 64-75; 83-86);

b.      Directing schools to ignore many Title IX reports of sexual assault that occur off campus/school grounds, including in off-campus housing or during study abroad, regardless of the effect they have on-campus and on survivors' educations (*see* ¶¶ 76-82);

c.      Relieving colleges and universities of the obligation to address sexual harassment unless reports of sexual harassment are made to a limited number of school officials, while requiring those same officials to respond to all harassment on the basis of race, national origin, or disability of which they knew or should have known (*see* ¶¶ 87-97);

d.      Permitting, and in some cases requiring, schools to apply a higher standard of proof in sexual harassment hearings than has been required in hearings involving other forms of harassment committed by students (*see* ¶¶ 106-111); and

e.      Holding schools accountable for their failed responses to sexual harassment only when they are "deliberately indifferent," while requiring schools to "take prompt and effective steps reasonably calculated to end harassment, eliminate the hostile environment, prevent its recurrence, and remedy its effects" in cases of harassment based on race, national origin, or disability (*see* ¶¶ 98-105).

12.     None of the reductions in schools' responsibility to respond to sexual harassment applies to the schools' parallel responsibilities to respond to harassment and assault based on race, national origin, or disability. ED anticipates the Rule will result in a significant reduction in the number of sexual harassment and assault-related investigations by schools.[7]

13.     Throughout the Rule, the Agency excuses the dramatic limits it places on Title IX's applicability by noting that schools may in their discretion address sexual misconduct under

---

[7] U.S. Dep't of Educ., Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance 1985 (Doc. No. 2020-10512) (May 12, 2020), federalregister.gov/d/2020-10512 (scheduled to be published May 19, 2020) [hereinafter Rule]; *see* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 83 Fed. Reg. 61,462, 61,487 (Proposed Nov. 29, 2018) [hereinafter Proposed Rule].

their own codes of conduct. But that is equally true of racial, national origin-based, and disability-based incidents. The Agency never adequately explains why schools have lower civil rights obligations to address sexual harassment than racial, national origin-based, and disability-based harassment.

14.     Through these provisions, ED has now imposed uniquely reduced responsibilities to investigating reports of sexual harassment, without making any meaningful effort to explain the double standard beyond asserting that it believes such a distinction is lawful. This inadequately explained double standard recalls a time when reports of sexual assault and rape were legally discarded unless they met demanding standards that were not applied to other complaints.

15.     Plaintiffs Know Your IX, a project of Advocates for Youth, Council of Parent Attorneys and Advocates, Inc., Girls for Gender Equity, and Stop Sexual Assault in Schools are organizations that directly or through their members are dedicated to helping students who experience sexual harassment and assault continue their educations. Many of them provide technical assistance to institutions about how to address sexual harassment and assault, engage in political advocacy on behalf of survivors, and raise public awareness about the impact of sexual violence on students. The organizations or their members advocate on behalf of K–12, college, and/or graduate and professional students, including students of color, students with disabilities, and LGBTQ and nonbinary students, affected by sexual harassment and violence in education. Plaintiffs raised numerous concerns about the Rule (in its proposed form) to the Department in their comments on the Notice of Proposed Rulemaking, but ED failed to adequately address those concerns.

16.     The provisions of the Rule that Plaintiffs challenge are contrary to Title IX, unreasonable departures from longstanding ED policy and practice, and create an arbitrary, capricious, and insufficiently explained double standard, enabling institutions to ignore sexual harassment and assault that they could not ignore if the same alleged harassment were based on race, national origin, or disability. They also fail to address alarming evidence presented during the comment period about the impact these provisions would have on survivors of sexual harassment and assault and their educations.

17.     The above provisions dramatically reduce schools' responsibility to respond to sexual harassment and assault and should be declared invalid. By promulgating them, the Agency has thwarted its mandate to ensure that every student has equal educational opportunity regardless of sex.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the claims alleged in this Complaint pursuant to 5 U.S.C. §§ 701–706 (Administrative Procedure Act ("APA")), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 2202 (injunctive relief).

19.     ED's issuance of the Rule on May 6, 2020, constitutes an agency action within the meaning of the APA, 5 U.S.C. §§ 702, 704, and therefore, the Rule is judicially reviewable. Each Plaintiff is a "person" within the meaning of the APA, 5 U.S.C. § 551(2), and is authorized to bring suit under that statute, 5 U.S.C. § 702.

20.     Venue in this judicial district is proper under 28 U.S.C. § 1391(e) because Plaintiff Council of Parent Attorneys and Advocates, Inc. has its principal place of business in this judicial district.

## PARTIES

21.     Plaintiffs are nonprofit organizations whose missions and work relate to educating, supporting, and providing a variety of services to and advocacy on behalf of students who have experienced sexual harassment and assault.

22.     Plaintiff Know Your IX is a survivor-and-youth-led project of Advocates for Youth. Advocates for Youth is a nonprofit education and advocacy organization based in Washington, D.C., that works alongside young people and their adult allies to champion young people's rights to sexual health information and services and the opportunities and resources that drive sexual health equity for all youth. Know Your IX's mission is to empower high school and college students to end sexual and dating violence in their schools. It seeks to accomplish this goal through: legal rights education; training, organizing, and supporting student-survivor activists; and advocating for campus, state, and federal policy change. The project is managed by an Advocates for Youth staff person and a youth leadership team comprised of 16 college and high school students and recent graduates. The project also has a campus action network of 125 additional students from across the United States.

23.     Plaintiff the Council of Parent Attorneys and Advocates, Inc. ("COPAA") is a nonprofit membership organization that aims to protect and enforce the legal and civil rights of students with disabilities and their families. Through the provision of education, training, and technical assistance to professionals and laypersons, COPAA works to secure high-quality educational services for students with disabilities and to promote excellence in special education advocacy. COPAA's over 2,600 dues-paying members, who are located across the country, are parents of children with disabilities, their attorneys and advocates, and dedicated students. Some of COPAA's attorney and advocate members represent complainants and respondents, including

students with disabilities, in Title IX processes. COPAA is incorporated in Florida and operates out of Baltimore County, Maryland (within the Northern Division of the District of Maryland).

24.     Plaintiff Girls for Gender Equity ("GGE") is a 501(c)(3) nonprofit corporation based in Brooklyn, New York, that was founded to create opportunities for, and to remove systemic barriers from, the development of girls (cisgender and transgender) and non-binary youth of color. GGE furthers its mission locally and nationally through direct service, policy advocacy and organizing, and culture change.

25.     Plaintiff Stop Sexual Assault in Schools ("SSAIS") is a nonprofit education and advocacy organization based in Lacey, Washington, with a network of student and professional advisors and volunteers across the country. SSAIS's mission is to prevent sexual harassment and assault in K–12 schools by educating students, families, and schools about K–12 students' right to an education free from sex discrimination.

26.     Defendant Elisabeth D. DeVos is the U.S. Secretary of Education. She is sued in her official capacity, as are her successors.

27.     Defendant Kenneth L. Marcus is the Assistant Secretary for Civil Rights at the Department of Education. He is sued in his official capacity, as are his successors.

28.     Defendant U.S. Department of Education is a cabinet agency within the executive branch of the United States government and is an agency within the meaning of 5 U.S.C. § 552(f). The Agency promulgated the Rule and is responsible for its enforcement. The OCR is the office within ED to which ED has delegated its responsibility for enforcing the Rule.

## FACTUAL BACKGROUND

29.     Title IX of the Education Amendments of 1972 prohibits discrimination on the basis of sex in educational institutions receiving federal funds. It is predicated on the proposition

that the prevalence of sexual harassment and assault in educational settings requires ED, and schools themselves, to respond appropriately so that those experiencing such violence are not denied educational opportunities based on sex.

## I.   Widespread Sexual Harassment and Assault in Education

30.     National studies, local surveys, and individual accounts confirm that sexual harassment in education is widespread. Students of all ages and across institutions are regularly subjected to sexual harassment, undermining their equal access to educations.

31.     In 2015, the Association of American Universities ("AAU") found that between 48% and 74% of women undergraduates reported they had been sexually harassed without physical contact,[8] and 13% to 30% responded that they had been raped or sexually assaulted through physical force, violence, or incapacitation.[9]

32.     An Associated Press review of sexual assault reports from state education agencies and federal databases identified roughly 17,000 official reports of peer sexual assault in grades K–12, filed between fall 2011 and spring 2015.[10] More than 85% of those reporting sexual assault were girls.[11]

---

[8] Am. Acad. of Pediatrics & Soc'y for Adolescent Health & Medicine, Comment on Proposed Rule (ED-2018-OCR-0064-10650) (citing David Cantor et al., Ass'n of Am. Univs., Report on the AAU Campus Climate Survey on Sexual Assault and Sexual Misconduct xvi (Sept. 2015, reissued Oct. 2017), https://www.aau.edu/sites/default/files/AAU-Files/Key-Issues/Campus-Safety/AAU-Campus-Climate-Survey-FINAL-10-20-17.pdf); *see* Jane Doe Inc., Comment on Proposed Rule (ED-2018-OCR-0064-10408).

[9] Cantor et al., *supra* note 8, at xvi.

[10] Robin McDowell et al., *Hidden Horror of School Sex Assaults Revealed by AP*, Associated Press (May 1, 2017), https://www.ap.org/explore/schoolhouse-sex-assault/hidden-horror-of-school-sex-assaults-revealed-by-ap.html.

[11] *Stats Revealed by AP Investigation of Student Sex Assaults*, Associated Press (May 1, 2017), https://www.ap.org/explore/schoolhouse-sex-assault/stats-revealed-by-ap-investigation-of-student-sex-assaults.html.

33.      Girls and women are sexually harassed and assaulted at school more often than

boys and men, and the rates of sexual harassment and assault are even higher among students of

color, students with disabilities, LGBTQ students, and non-binary students. A 2013 study found

that among Black women in school, 16.5% reported being raped in high school and 36%

reported being raped in college.[12] At the university level, the 2015 AAU survey showed that

31.6% of undergraduate women with disabilities reported nonconsensual sexual contact

involving physical force or incapacitation, compared to 18.4% of undergraduate women without

a disability.[13] A national school-based survey conducted by the Centers for Disease Control and

Prevention with state, territorial, and local education and health agencies and tribal governments

from 2007 to 2017 found that LGBTQ students are at greater risk for violence, including being

threatened or feeling unsafe at school and being forced to have sex.[14]

**II.      Reporting of Sexual Harassment and Assault, and Dismissive or Punitive Responses
by Schools**

34.      Research consistently demonstrates that students experiencing sexual harassment

and assault rarely file official reports.[15]

35.      In a qualitative study of college students at a Midwestern college, the most

commonly cited reason for not seeking help from campus resources or reporting a sexual assault

---

[12] Carolyn M. West & Kalimah Johnson, *Sexual Violence in the Lives of African American Women: Risk, Response, and Resilience*, VAWnet 14 (Mar. 2013), https://vawnet.org/sites/default/files/materials/files/2016-09/AR_SVAAWomenRevised.pdf.

[13] Cantor et al., *supra* note 8, at xx, 35.

[14] Lambda Legal, Comment on Proposed Rule (ED-2018-OCR-0064-18240) (citing Ctrs. for Disease Control & Prevention, Youth Risk Behavior Survey Data Summary & Trends Report: 2007-2017, at 78 (2018), https://www.cdc.gov/healthyyouth/data/yrbs/pdf/trendsreport.pdf); *see* Nat'l Ctr. for Transgender Equal., Comment on Proposed Rule (ED-2018-OCR-0064-11557); Nat'l LGBTQ Task Force, Comment on Proposed Rule (ED-2018-OCR-0064-18438).

[15] *See supra* note 4.

through official university channels was a concern that the sexual assault would be seen as "insufficiently severe," confirming the findings of earlier student surveys.[16]

36.      Numerous studies have found that stereotypes in the minds of decision-makers often result in disbelief or punitive responses toward sexual harassment complaints.

37.      At the same time that students of color, students with disabilities, and LGBTQ and non-binary students experience sexual harassment and assault at higher rates than their peers, they are also less likely to report or to be believed when they do report.

38.      Students of color "may avoid reporting incidents of sexual misconduct because of a lack of trust in adjudicatory systems."[17] Such mistrust is widespread, even at institutions where students of color are the majority. Black girls and women who tried to defend themselves against sexual harassment or assault are more likely than their white peers to be punished when seeking school support after sexual harassment or assault, in part because of stereotypes that they are "angry" or "aggressive."[18]

39.      Students with disabilities are less likely to report because of concerns about being "less likely to be taken seriously when they make a report of sexual assault or abuse,"

---

[16] Am. Acad. of Pediatrics & Soc'y for Adolescent Health & Medicine, Comment on Proposed Rule (ED-2018-OCR-0064-10650) (citing Kathryn J. Holland & Lilia M. Cortina, "*It Happens to Girls All the Time": Examining Sexual Assault Survivors' Reasons for Not Using Campus Supports*, 59 Am. J. Community Psychol. 50 (2017)).

[17] Georgetown Univ., Comment on Proposed Rule (ED-2018-OCR-0064-17722); *see, e.g.*, Equal Rights Advocates, Comment on Proposed Rule (ED-2018-OCR-0064-104092) (citing Lauren Rosenblatt, *Q&A with Chardonnay Madkins, Why It's Harder for African American Women To Report Campus Sexual Assaults, Even at Mostly Black Schools*, L.A. Times (Aug. 28, 2017), https://www.latimes.com/politics/la-na-pol-black-women-sexual-assault-20170828-story.html).

[18] Tyler Kingkade, *Schools Keep Punishing Girls—Especially Students of Color—Who Report Sexual Assaults, and the Trump Administration's Title IX Reforms Won't Stop It*, The 74 (Aug. 6, 2019), https://www.the74million.org/article/schools-keep-punishing-girls-especially-students-of-color-who-report-sexual-assaults-and-the-trump-administrations-title-ix-reforms-wont-stop-it/.

"challenges in accessing services to make a report in the first place," and a lack of "information about healthy sexuality and the types of touching that are appropriate or inappropriate."[19] Students with disabilities may be less likely to be believed, and thus have their complaints dismissed, because of discriminatory stereotypes that they "are not sexual" or are "sexual deviants."[20]

40.     One study found that a majority of LGBTQ students harassed or assaulted at school did not report these incidents to school staff because of concerns that school officials would not help, that reporting would make the situation worse, and that "they would be mistreated, disbelieved, or blamed for their own assault, often because of discriminatory school policies or practices."[21]

### III.     Impact of Sexual Harassment in Schools on Students' Educations and Lives

41.     Sexual harassment profoundly undermines students' educations and lives.

42.     Students who have experienced sexual harassment and violence have higher rates of withdrawal from school—34% drop out of college[22]—and lower GPAs than those who have

---

[19] Council of Parent Attorneys & Advocates, Comment on Proposed Rule (ED-2018-OCR-0064-104680). *See also* The Leadership Council on Civil and Human Rights, Comment on Proposed Rule (ED-2018-OCR-0064-12002) (citing National Council on Disabilities, *Not on the Radar: Sexual Assault of College Students with Disabilities* (Jan. 2018)).

[20] Consortium for Citizens with Disabilities, Comment on Proposed Rule (ED-2018-OCR-0064-14977).

[21] Lambda Legal, Comment on Proposed Rule (ED-2018-OCR-0064-18240) (citing Tyler Kingkade, *When Colleges Threaten to Punish Students who Report Sexual Violence*, Huffington Post (Sept. 9, 2015), https://www.huffingtonpost.com/entry/sexual-assault-victims-punishment_us_55ada33de4b0caf721b3b61c; Sandy E. James et al., Nat'l Ctr. for Transgender Equal., The Report of the 2015 U.S. Transgender Survey 12 (2016)).

[22] Am. Psychogical Ass'n, Comment on Proposed Rule (ED-2018-OCR-0064-30626) (citing Cecilia Mengo & Beverly M. Black, *Violence Victimization on a College Campus: Impact on GPA and School Dropout*, 18 J. of Coll. Student Retention: Research Theory & Practice 234 (2016)).

not experienced harassment or violence. According to one report, 68% of survivors struggle to focus in class.[23]

43.     In the K–12 context, estimates demonstrate that upwards of 60% of girls who have been pushed out of school are victims of rape or the threat of rape.[24] Further, in the 2010–11 school year, 30% of students in grades 7–12 experienced online harassment; of these, 18% reported that it made them not want to go to school; 13% found it hard to study; and 17% had trouble sleeping.[25]

44.     LGBTQ students who had been harassed had lower GPAs, were more than three times as likely to have missed school in the month prior, were almost twice as likely to report that they did not plan on pursuing a secondary education, and experienced lower self-esteem and higher levels of depression than their counterparts.[26]

45.     In adolescents and young adults, sexual assault is associated with higher rates of depression, anxiety, posttraumatic stress disorder, suicidality, self-mutilation, and eating

---

[23] Nat'l LGBTQ Task Force, Comment on Proposed Rule (ED-2018-OCR-0064-18438) (citing Nat'l Women's Law Ctr*., Let Her Learn: Stopping School Pushout for Girls who Have Suffered Harassment and Sexual Violence* (2017), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/04/final_nwlc_Gates_HarassmentViolence.pdf)).

[24] Equal Rights Advocates, Comment on Proposed Rule (ED-2018-OCR-0064-104091) (citing Monique W. Morris, *Pushout: The Criminalization of Black Girls in Schools* 136 (2016)).

[25] Am. Psychogical Ass'n, Comment on Proposed Rule (ED-2018-OCR-0064-30626) (citing Catherine Hill & Holly Kearl, Am. Ass'n of Univ. Women, *Crossing the Line: Sexual Harassment at School* (2011), https://www.aauw.org/app/uploads/2020/03/Crossing-the-Line-Sexual-Harassment-at-School.pdf).

[26] Human Rights Campaign, Comment on Proposed Rule (ED-2018-OCR-0064-11375) (citing Joseph G. Kosciw et al., GLSEN, *The 2017 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* 43 (2018), https://www.glsen.org/sites/default/files/2019-10/GLSEN-2017-National-School-Climate-Survey-NSCS-Full-Report.pdf).

disorders.[27] Four out of five rape victims subsequently experience chronic physical or psychological conditions.[28]

46.     Students with limited access to financial resources who experience sexual harassment and violence are particularly disadvantaged. They often bear the immediate financial stress of sexual harassment, such as the cost of counseling, lost course credits or scholarships, and moving residences.[29] Over a lifetime, the estimated financial cost of sexual assault to the individual victim is between $87,000 and $240,776.[30] This estimate includes the costs of lower educational attainment, lost wages, and job instability.

## TITLE IX AND THE AGENCY'S GUIDANCE AND ACTIONS ON SEXUAL HARASSMENT AND ASSAULT

47.     Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). Congress directed the Agency to "effectuate" the mandate of Title IX by "issuing

---

[27] Am. Acad. of Pediatrics & Soc'y for Adolescent Health & Med., Comment on Proposed Rule (ED-2018-OCR-0064-10650) (citing American College of Obstetricians and Gynecologists, *Committee Opinion No. 499: Sexual Assault*, 118 Obstetrics & Gynecology 396 (2011)).

[28] Am. Psychogical Ass'n, Comment on Proposed Rule (ED-2018-OCR-0064-30626) (citing Joseph G. Kosciw et al., GLSEN, *The 2017 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* (2018), https://www.glsen.org/sites/default/files/2019-10/GLSEN-2017-National-School-Climate-Survey-NSCS-Full-Report.pdf).

[29] Ctr. for Survivor Agency & Justice, Comment on Proposed Rule (ED-2018-OCR-0064-31005).

[30] Legal Momentum, Comment on Proposed Rule (ED-2018-OCR-0064-10640) (citing Cora Peterson, et al., *Lifetime Economic Burden of Rape Among U.S. Adults*, 52 Am. J. Preventive Med. 691 (2017)); *see also* Ctr. for Survivor Agency & Justice, Comment on Proposed Rule (ED-2018-OCR-0064-31005).

rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute." 20 U.S.C. § 1682.

48.     Title IX was modeled on Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, which prohibits discrimination based on race, color, or national origin in programs receiving federal funding. Title IX and Title VI are generally interpreted *in pari materia*, and until it issued this Rule, ED consistently imposed parallel obligations on schools to respond to claims of harassment based on sex and race.

49.     Most colleges and universities, grades K–12 public schools, and many other educational and vocational programs are recipients of federal funding ("recipients" or "institutions"), and therefore are subject to Title IX and Title VI's mandates. The U.S. Supreme Court has explained that: "Title IX, like its model Title VI [] sought to accomplish two related, but nevertheless somewhat different, objectives. First, Congress wanted to avoid the use of federal resources to support discriminatory practices; second, it wanted to provide individual citizens effective protection against those practices. Both of these purposes were repeatedly identified in the debates on the two statutes."[31]

50.     As the U.S. Supreme Court has recognized, sexual assault and sexual harassment are forms of sex discrimination under Title IX.[32]

51.     Sexual harassment and assault have long impeded educational opportunities and professional advancement of students, especially girls and women. The impact of this harassment and violence on students can be severe and long-term, including declines in grades, missed

---

[31] *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979).

[32] *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998).

classes, increased risk of dropping out, withdrawal from academic life and social activities, depression, anxiety, and suicidality.

52.     Since 1997, the Agency has set standards governing the responsibilities of recipients to address sexual harassment and assault to ensure their institutions do not tolerate sex discrimination.

53.     Through guidance and enforcement documents spanning twenty years and multiple administrations, the Agency articulated consistent standards under Title IX governing the definition of sexual harassment, the requirements for what constitutes notice of harassment to recipients, the standard of proof applicable in disciplinary hearings, and the obligation of institutions to take prompt and effective steps to end harassment, eliminate the hostile environment and its effects, prevent recurrence, and as appropriate, remedy its effects.[33] These

---

[33] *See* U.S. Dep't of Educ., *Sexual Harassment Guidance: Peer Sexual Harassment, Draft Document and Request for Comments*, 61 Fed. Reg. 42,728 (Aug. 16, 1996); U.S. Dep't of Educ., *Sexual Harassment Guidance: Harassment of Students by School Employees*, 61 Fed. Reg. 52,172 (Oct. 4, 1996); U.S. Dep't of Educ., *Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 62 Fed. Reg. 12,034 (Mar. 13, 1997) [hereinafter *1997 Guidance*]; U.S. Dep't of Educ., *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 66 Fed. Reg. 5512 (Jan. 19, 2001) [hereinafter *2001 Guidance*]; U.S. Dep't of Educ., *Dear Colleague Letter – First Amendment* (July 28, 2003), https://www2.ed.gov/about/offices/list/ocr/firstamend.html [hereinafter *2003 Dear Colleague Letter*]; U.S. Dep't of Educ., *Dear Colleague Letter – Sexual Harassment Issues* (Jan. 25, 2006), https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.pdf [hereinafter *2006 Dear Colleague Letter*]; U.S. Dep't of Educ., *Sexual Harassment: It's Not Academic* (Sept. 2008), https://files.eric.ed.gov/fulltext/ED504206.pdf [hereinafter *2008 Q&A*]; U.S. Dep't of Educ., *Dear Colleague Letter: Harassment and Bullying* (Oct. 26, 2010), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.html [hereinafter *2010 Dear Colleague Letter*]; U.S. Dep't of Educ., *Dear Colleague Letter on Sexual Violence* (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf, *withdrawn* on Sept. 22, 2017, https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf [hereinafter *2011 Dear Colleague Letter*]; U.S. Dep't of Educ., *Questions and Answers on Title IX and Sexual Violence* (Apr. 29, 2014), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf, *withdrawn* on Sept. 22, 2017, https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf [hereinafter *2014 Q&A*]; U.S. Dep't of Educ., *Investigation Letter in Evergreen State College Case No. 10922064* (Apr. 4, 1995), https://www.ncherm.org/documents/193- EvergreenStateCollege10922064.pdf; U.S. Dep't of Educ., *Letter to Georgetown University Counsel* (Oct. 16, 2003), https://cdn.tngconsulting.com/website-media/ncherm.org/unoffloaded/2017/08/202-GeorgetownUniversity--110302017Genster.pdf.

standards mirrored those applicable to recipients of federal funds under Title VI, prohibiting

discrimination on the basis of race and national origin, and on the basis of disability under

Section 504 of the Rehabilitation Act and Title II of the ADA.

54.     When the Agency determines that an institution is in violation of Title IX, it first

provides notice to the recipient of its failure to comply and seeks informal resolution. 20 U.S.C.

§ 1682; 34 C.F.R. § 100.8. Informal resolution agreements regularly provide for changes in

institutions' policies, such as dissemination of information, training, climate assessments,

complaint tracking, formation of a campus-based committee, as well as provision of remedies to

complainants, such as counseling services, academic and living accommodations, reimbursement

for reasonably related expenses such as the cost of books and registration fees, and assurances

that retaliation is prohibited. The same process is used for enforcement of Title VI, Title II, and

Section 504.

55.     If recipients fail to comply and the noncompliance cannot be corrected by

informal means, the Agency may seek the suspension or termination of federal funding.

34 C.F.R. § 100.8. To the best of Plaintiffs' knowledge, in its history of Title IX enforcement,

the Agency has only once taken the ultimate step of suspending an institution's funding based on

a recipient's response to sexual harassment, and that suspension only affected part of the

recipient's funding.

### CURRENT ADMINISTRATION'S CHANGE IN TITLE IX POLICY

56.     On September 22, 2017, the Agency withdrew guidance documents that it had

issued in 2011 and 2014 and released a new Dear Colleague Letter and Q & A on Campus

Sexual Misconduct. The 2017 guidance documents articulated radically different views on the

standard of evidence to be used in grievance proceedings and the obligation of institutions to

investigate off-campus sexual harassment from those held by the Agency in the prior decades.

57.     On November 29, 2018, the Agency published its Notice of Proposed Rulemaking

("Proposed Rule") titled "Nondiscrimination on the Basis of Sex in Education Programs or

Activities Receiving Federal Financial Assistance." *See* 83 Fed. Reg. 61,462.

58.     The Agency received 124,196 comments during the comment period on the

Proposed Rule, which closed on February 15, 2019.

59.     Since the close of the comment period more than a year ago, the education system

in the United States, at both the K–12 and university level, has experienced the largest disruption

and transformation in its history as a result of the COVID-19 pandemic. Almost every recipient

or institution in the nation has dramatically shifted its operations to entirely remote, virtual

classrooms and communities.

60.     On May 6, 2020, the Agency released the Rule.

## CHALLENGED PROVISIONS OF THE RULE

61.     As stated previously, the Rule includes several provisions that are contrary to

Title IX and arbitrary and capricious.

62.     These provisions are a significant departure from ED's prior standards and create

a double standard, treating sexual harassment less seriously than harassment on the basis of race,

national origin, and disability.

63.     Moreover, the Agency failed to adequately consider important aspects of the

problem and provided justifications that were contrary to the evidence before it.

**I.      Definition of Sexual Harassment to Which Institutions Must Respond**

64.     Sections 106.30, 106.44, and 106.45 of the Rule arbitrarily limit the definition of

sexual harassment to which institutions must respond in ways that exclude conduct ED

historically recognized as denying equal access to education because of sex and in the face of substantial evidence that institutions have not sufficiently responded to reports.

65.     Section 106.30 of the Rule limits "sexual harassment" to conduct on the basis of sex that amounts to: "(1) An employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct; (2) Unwelcome conduct determined by a reasonable person to be so severe, pervasive, *and* objectively offensive that it effectively denies a person equal access to the recipient's education program or activity; or (3) 'Sexual assault' as defined in 20 U.S.C. 1092(f)(6)(A)(v), 'dating violence' as defined in 34 U.S.C. 12291(a)(10), 'domestic violence' as defined in 34 U.S.C. 12291(a)(8), or 'stalking' as defined in 34 U.S.C. 12291(a)(30)." § 106.30 (emphasis added).

66.     Sexual assault is defined in 20 U.S.C. § 1092(f)(6)(A)(v) as: "an offense classified as a forcible or nonforcible sex offense under the uniform crime reporting system of the Federal Bureau of Investigation." This definition does not include unwelcome physical touching unless it is "[t]he touching of the private body parts of another person for the purpose of sexual gratification." *See* Rule at 42 ("In these final regulations, the Department *retains* reference to sexual assault under the Clery Act . . . ." (emphasis added)); Rule at 447 n.631 ("Under the Clery Act (referring to the FBI's Uniform Crime Reporting system), fondling is a sex offense that means the 'touching of the private body parts of another person *for the purpose of sexual gratification*, without the consent of the victim[.]'" (emphasis and alteration in original)).

67.     Sections 106.44 and 106.45 of the Rule further limit sexual harassment to which recipients must respond to conduct that occurred in an "education program or activity" of the institution and "against a person in the U.S." *See also* § 106.8(d).

A. <u>Severe, Pervasive, *and* Objectively Offensive</u>

68.     Section 106.30 of the Rule limits the conduct that gives rise to institutions' responsibilities to act by changing the definition of harassment from a disjunctive list of "severe, pervasive, *or* objectively offensive"—consistently used by the Agency since 1997—to a conjunctive list by replacing "or" with "and," thus requiring *all three* conditions to be satisfied as a condition of administrative enforcement for the first time since Title IX's passage in 1972.

69.     The Rule further orders institutions that they "must dismiss" Title IX complaints that do not meet this heightened threshold. § 106.45(b)(3).

70.     Moreover, ED added an express preemption provision, § 106.6(h), compelling schools to dismiss Title IX complaints of sexual harassment that do not meet the Agency's definition, even if it qualifies as harassment under state or local law.

71.      The new standard is also inconsistent with the definitions used for racial, national origin, and disability harassment, which use the disjunctive rather than the conjunctive. This ensures many fewer incidents of sexual harassment will trigger schools' responsibility to respond compared to these other forms of harassment.

72.     In an express acknowledgment of the different standards imposed on complaints of sexual harassment but not racial or other forms of harassment, ED gives institutions the choice of standards to apply in cases involving harassment based on both sex and race, but it requires institutions to use the heightened standard in cases involving harassment based on sex alone. Rule at 1590.

73.     Requiring institutions to respond only when conduct is "severe" *and* "pervasive" *and* "objectively offensive" allows recipients to ignore a substantial range of conduct that causes a student to be "denied the benefits of" education or "subjected to discrimination" because of sex. 20 U.S.C. § 1681(a). Institutions would not have to respond to—and indeed, "must dismiss"

Title IX complaints filed on the basis of—repeated harassing comments or conduct that are pervasive but might not be severe, or conduct that is severe but not pervasive. For example, in some K–12 schools, students hit the body parts of other students regularly as part of what they refer to as "Titty Tap Tuesday" or "Slap-ass Friday." Because each separate incident may not be considered severe or pervasive, depending on the nature of the touching or how often any particular student was touched, schools would have no obligation to address this misconduct under Title IX.

74.     Section 106.30 permits institutions to ignore complaints of a range of physical touching. It excludes unwanted touching, even of "private body parts," for any reason other than sexual gratification, such as to humiliate, threaten or exert power, from its definition of sexual harassment, unless it is "severe, pervasive, and objectively offensive." An institution would thus not be obligated to investigate if a student complained that their peer had touched her breast while mocking her, because that would arguably not be for "sexual gratification."

75.     Mandating that recipients "must dismiss" formal Title IX complaints where the harassment does not qualify as "severe, pervasive, and objectively offensive" allows institutions to ignore sexual harassment at early stages, before it escalates and causes greater harms to students and the educational community. In effect, it will enable schools to dismiss multiple complaints of "severe" and "objectively offensive" harassment, even if, considered together, they establish a pattern or practice that is "pervasive." And it denies victims of these forms of harassment recourse to the full panoply of remedies offered by their institutions in connection with Title IX.

B.     Off-Campus Conduct and Study Abroad

76.     Sections 106.44 and 106.45 limit sexual harassment to which a school must respond to conduct that occurred in its "education program or activity," meaning that a school

"must dismiss" many Title IX reports of assault that happen off campus without taking into account the on-campus effects on its students. In conjunction with Section 106.30's definition of sexual harassment, these provisions direct schools to ignore under Title IX the effect of many instances of sexual harassment or assault that are perpetrated off campus, despite ED's noting a study showing that over 40% of sexual assaults at the university level occur off campus.

77.     Previous guidance made clear that institutions had the obligation to respond to a hostile environment that exists at school or on campus even where some of the conduct that culminated in that environment occurred off campus.[34]

78.     The Rule's approach requires schools to ignore conduct when assessing a hostile environment under Title IX and is a change in Agency policy.[35]

79.     It is estimated that only 8% of all sexual assaults involving middle school, high school, and college students occur on school property.[36] Approximately 87 percent of college students live off campus, and many college sexual assaults occur at off-campus parties.[37] One

---

[34] U.S. Dep't of Educ., *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf; *see also 2011 Dear Colleague Letter* at 14 ("Schools may have an obligation to respond to student-on-student sexual harassment that initially occurred off school grounds, outside a school's education program or activity. . . . Because students often experience the continuing effects of off-campus sexual harassment in the educational setting, schools should consider the effects of the off-campus conduct when evaluating whether there is a hostile environment on campus."); *2014 Q&A* ("[A] school must process all complaints of sexual violence, regardless of where the conduct occurred, to determine whether the conduct occurred in the context of an education program or activity or had continuing effects on campus or in an off-campus education program or activity.").

[35] The impact of off-campus harassment on on-campus learning in settings controlled by the recipient was the topic of many comments to the Rule, as required to bring an APA claim. *See, e.g.*, The City Univ. of N.Y. (CUNY), Comment on Proposed Rule (ED-2018-OCR-0064-11739); Girls Inc., Comment on Proposed Rule (ED-2018-OCR-0064-11341).

[36] End Rape on Campus, Comment on Proposed Rule (ED-2018-OCR-0064-104527); Equal Rights Advocates, Comment on Proposed Rule (ED-2018-OCR-0064-104091).

[37] *See* Equal Rights Advocates, Comment on Proposed Rule (ED-2018-OCR-0064-104091); Legal Voice, Comment on Proposed Rule (ED-2018-OCR-0064-102843).

study found that 38% of women undergraduates experienced sexual harassment and assault while studying abroad.[38] These assaults often have continuing effects when students return to campus that can limit or deny a student's equal access to education. Yet many are precluded from consideration by the challenged sections.

80.     Although the Agency itself recognized that approximately 41% of college sexual assaults occur off campus, 83 Fed. Reg. at 61,487 n.27, it did so only in considering *the cost savings for institutions* resulting from having to conduct fewer investigations.[39] It did not address the impact on the victims of these off-campus sexual assaults if their claims were not investigated. Despite many comments criticizing this aspect of the Proposed Rule, ED has not sufficiently explained how reducing the number of sexual assaults that institutions are required to investigate, only because they include some off-campus conduct, is consistent with Title IX.

81.     The Agency also completely excluded sexual harassment committed abroad from Title IX protections, requiring that it be perpetrated "against a person in the United States." §§ 106.44(a), 106.8(d) ("[R]equirements . . . apply only to sex discrimination occurring against a person in the United States."). Its explanation for this exclusion is inadequate, particularly because the Agency has interpreted Title VI to apply to discriminatory conduct outside the United States in some situations.[40]

---

[38] Am. Soc'y of Criminology, Div. of Women & Crime, Comment on Proposed Rule (ED-2018-OCR-0064-6883).

[39] 83 Fed. Reg. at 61,487 & n.27.

[40] U.S. Dep't of Justice, *Title VI Legal Manual, Section V: Defining Title VI* 6 (Sept. 27, 2016) ("Title VI may apply to discriminatory conduct outside the United States in certain narrow circumstances, depending on how much control the recipient exercises over the overseas operation and how integral the overseas operation is to the recipient's program in the U.S.").

82.     Allowing institutions to ignore hostile environments in their educational programs simply because they may stem from off-site harassment or assault, or from study abroad, is contrary to Title IX. OCR recently found that a Chicago public school violated Title IX based on its insufficient response to a student's report that she was raped by schoolmates while walking home from school.[41] Under sections 106.44 and 106.45, the school could entirely ignore the same report today with no adverse consequences to the school, despite ED's conclusory assertion to the contrary. Similarly, institutions could ignore reports of sexual harassment committed in programs they sponsor abroad, even when they exercise substantial control over both the respondent and the context in which the sexual harassment occurs. The educational consequences to the students of having their reports ignored do not appear to have been adequately considered by the Agency when it adopted the Rule.

C.     Unlawful Departure from Consistent Definitions of Harassment

83.     Section 106.30 defines "sexual harassment" under Title IX differently than harassment based on race, national origin, and disability under analogous civil rights laws. Despite receiving comments to this effect, ED has not sufficiently explained its rationale for this double standard or for its adoption of this double standard for the first time in the history of Title IX.

84.     ED consistently defines harassment on the basis of characteristics other than sex (such as race, national origin, and disability) to include conduct that is "sufficiently severe,

---

[41] OCR Case #05-15-1178 and 05-17-1062 (Sept. 12, 2019), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/05151178-a.pdf ("The evidence establishes that the District violated Title IX when it failed to conclude the investigation of the complaint that Student B had been raped by XXX male XXXX students [while walking home from school], assess the potential danger to the XXXX community raised by Student B's complaint and take action as necessary to ensure the community's safety, and provide appropriate support services to Student B as she struggled to continue her education.").

pervasive, *or* persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by" an educational institution.[42]

85.     Section 106.30's different definition of sexual harassment means ED requires institutions to address some conduct if based on race, national origin, or disability, but not if based on sex.

86.     Moreover, Title VII and the Fair Housing Act define harassment, including sexual harassment, to reach conduct that is severe *or* pervasive.[43] Recipients are subject to all three statutes because they act as educators and employers and housing providers. For the first time, the Rule subjects them to divergent definitions of sexual harassment under Title IX than under either Title VII or the Fair Housing Act, which would lead to different consequences and obligations for the exact same conduct.

## II.     **Notice to the Institution**

87.     Sections 106.30 and 106.44 of the Rule allow colleges and universities to ignore complaints of sexual harassment unless they are made to one of a very limited number of

---

[42] *See, e.g.*, U.S. Dep't of Educ*., Investigative Guidance on Racial Incidents and Harassment Against Students* (Mar. 10, 1994), https://www2.ed.gov/about/offices/list/ocr/docs/race394.html [hereinafter *1994 Racial Harassment Guidance*]; U.S. Dep't of Educ., *2000 Dear Colleague Letter, Prohibited Disability Harassment* (July 25, 2000), https://www2.ed.gov/about/offices/list/ocr/docs/disabharassltr.html [hereinafter *2000 Dear Colleague Letter*].

[43] *See Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986) (sexual harassment is actionable when it is "sufficiently severe *or* pervasive to alter or the conditions of the victim's employment") (emphasis added and internal quotation marks, alterations, and citation omitted); 24 C.F.R. § 100.600 (HUD defines harassment to include "unwelcome conduct that is sufficiently severe *or* pervasive" (emphasis added)).

individuals. As a practical matter, this means that reports made to the vast majority of a higher

education institution's staff will never be investigated—a result that ED itself predicts.

88.     Section 106.44(a) provides that "[a] recipient with *actual knowledge* of sexual

harassment in an education program or activity of the recipient against a person in the United

States, must respond promptly in a manner that is not deliberately indifferent." (emphasis added).

89.     Section 106.30 provides that:

> *Actual knowledge* means notice of sexual harassment or allegations
> of sexual harassment to a recipient's Title IX Coordinator or any
> official of the recipient who has authority to institute corrective
> measures on behalf of the recipient, or to any employee of an
> elementary and secondary school. Imputation of knowledge based
> solely on vicarious liability or constructive notice is insufficient to
> constitute actual knowledge. This standard is not met when the only
> official of the recipient with actual knowledge is the respondent. The
> mere ability or obligation to report sexual harassment or to inform a
> student about how to report sexual harassment, or having been
> trained to do so, does not qualify an individual as one who has
> authority to institute corrective measures on behalf of the recipient.
> "Notice" as used in this paragraph includes, but is not limited to, a
> report of sexual harassment to the Title IX Coordinator as described
> in § 106.8(a).

90.     Sections 106.30 and 106.44(a) specify that a recipient is required to respond to

sexual harassment only if it has "actual knowledge."

91.     Under these provisions, a college or university would be deemed to have actual

knowledge only if notice is provided to its Title IX Coordinator or any official with the authority

to institute corrective measures on behalf of the institution. The result of this requirement is that

colleges and universities would have no obligations under federal law to address even egregious

examples of misconduct—such as the sexual abuse by Larry Nassar reported to athletic coaches.

In the elementary and secondary school context, but not colleges and universities, "actual

knowledge" includes notice to any employees.

92.     The requirement that college and graduate students contact the "right" employee before an institution has any obligation is a sharp departure from prior ED guidance.

93.     The Agency previously required a recipient to respond to sexual harassment if "the school knows or should have known of the harassment," including harassment the school would have found out about through a "reasonably diligent inquiry."[44] Under the prior standard, institutions could be on notice if students reported the conduct to trusted adults such as a campus security officer, professor, or athletic coach, if staff themselves witnessed the harassment, or if the incident was publicized in the media or flyers about the incident widely posted at the college.[45] No longer.

94.     The new notice requirement creates a disincentive for higher education institutions to learn about possible harassment on campus because without "actual knowledge," they can avoid liability for failure to respond at all, let alone adequately.[46]

95.     The narrow definition of who must receive notice is also inconsistent with institutions' obligations under analogous civil rights statutes. ED continues to require recipients to respond to claims of racial, national origin, or disability harassment where the institution "knows or reasonably should know of possible" harassment.[47]

---

[44] 1997 Guidance, 62 Fed. Reg. at 12,039–12,040, 12,042.

[45] *Id.*; *2010 Dear Colleague* Letter at 2.

[46] The City Univ. of N.Y. (CUNY), Comment on Proposed Rule (ED-2018-OCR-0064-11739); Girls for Gender Equity (GGE), Comment on Proposed Rule (ED-2018-OCR-0064-14976); Human Rights Campaign, Comment on Proposed Rule (ED-2018-OCR-0064-11375); Wash. State School Dirs.' Ass'n, Comment on Proposed Rule (ED-2018-OCR-0064-30979).

[47] *See 2014 Dear Colleague Letter, Responding to Bullying of Students with Disabilities* (Oct. 21, 2014), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-bullying-201410.pdf; *2010 Dear Colleague Letter*; *1994 Racial Harassment Guidance.*

96.     The "actual notice" requirement makes institutions *less* responsible for addressing sexual harassment committed against students than against its adult employees under Title VII.[48]

97.     ED failed to adequately consider evidence that students are unlikely to report sexual harassment and assault, and if they report at all they report to adults that they have relationships with, regardless of whether that adult has the authority to institute corrective measures.[49] This is especially true for students with disabilities.

## III.     **Deliberate Indifference Provision**

98.     Section 106.44 of the Rule dramatically limits institutions' obligations to respond to conduct that constitutes sexual harassment by allowing them to act in a manner that is unreasonable, as long as they are not "deliberately indifferent."

99.     This provision heightens the level of indifference to sexual harassment and assault that a school must exhibit before it violates Title IX; it also eliminates, or at least changes, institutions' obligations to address certain circumstances of sexual assault, including when the effect of sexual harassment is campus-wide. This reduction in institutional accountability is not adequately explained, even though these concerns were raised in the comments before the agency.

### A.   Heightened Level of Indifference

100.     Under Section 106.44(a), "A recipient with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States, must respond in a manner that is not deliberately indifferent. A recipient is deliberately

---

[48] *See* 29 C.F.R. § 1604.11(d).

[49] *See, e.g.*, Am. Psychological Ass'n, Comment on Proposed Rule (ED-2018-OCR-0064-30626).

indifferent only if its response to sexual harassment is clearly unreasonable in light of the known circumstances."

101.    Under prior guidance, recipients were affirmatively obligated to "take immediate and appropriate steps to investigate or otherwise determine what occurred and take steps reasonably calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again . . . [I]n appropriate circumstances, the school [was] also . . . responsible for taking steps to remedy the effects of the harassment on the individual student or students who were harassed." 1997 Guidance, 62 Fed. Reg. at 12,042.[50]

102.    By providing that even if a recipient has actual knowledge of sexual harassment, it need only respond in a manner that is not "deliberately indifferent," the Rule imposes a much more lenient standard on institutions than is applicable in other types of harassment cases.

B.    Campus-Wide Effects

103.    The Rule removes the prior obligation on institutions to address a hostile environment beyond the effects on an individual complainant or respondent without acknowledgement or good reason.

---

[50] *See also 2001 Guidance* at 14 (listing factors OCR would review when receiving complaints about school's treatment of sexual harassment including whether "the school appropriately investigated or otherwise responded to allegations of sexual harassment; and [whether] the school had taken immediate corrective action."); *2006 Dear Colleague Letter* ("[A]n educational institution's responsibility, as a condition of receiving Federal financial assistance, to take immediate and effective steps to end sexual harassment when it occurs, prevent its recurrence, and remedy its effects."); *2008 Q&A* at 11; *2010 Dear Colleague Letter* at 2.

Under the Rule, a school faces the Department's intervention not when its actions fail to be "appropriate" or "effective," and not even when its response to sexual harassment and assault is "unreasonable," but only when its actions are so grossly below acceptable conduct that they were "clearly unreasonable."

104.     The Agency has long instructed institutions that they must take steps "to eliminate any hostile environment that has been created," which may include interventions for an entire class "to repair the educational environment" or for an "entire school or campus."

105.     The Rule, by contrast, imposes no obligation on institutions to remedy a hostile educational environment beyond providing specific remedies for an individual student who files a complaint.[51] This is inconsistent with Title VI, Title II, and Section 504.

## IV.     **Evidentiary Standard**

106.     Section 106.45(b)(1)(vii) of the Rule allows institutions to adopt a "clear and convincing evidence" standard of proof, more stringent than typically required when evaluating complaints brought under other civil rights laws, including private damages actions under Title IX. This places a heavier burden on those alleging sexual harassment than on students who allege other forms of harassment. Moreover, in some situations, the provision will force schools to use a "clear and convincing evidence" standard for sexual harassment claims, even though they will be free to use "preponderance of the evidence" for harassment based on race, national origin, or disability.

107.     Section 106.45(b)(1)(vii) requires institutions to "[s]tate whether the standard of evidence to be used to determine responsibility is the preponderance of the evidence standard or the clear and convincing evidence standard, apply the same standard of evidence for formal complaints against students as for formal complaints against employees, including faculty, and apply the same standard of evidence to all formal complaints of sexual harassment."

---

[51] *See, e.g.*, Ass'n of Title IX Adm'rs (ATIXA), Comment on Proposed Rule (ED-2018-OCR-0064-104725).

108.    Institutions are now free to adopt a clear and convincing evidence standard for cases involving sexual harassment and assault even if they employ a preponderance of the evidence standard in all other kinds of proceedings. Moreover, institutions are now *required* to adopt the higher standard if they use it for sexual harassment complaints against faculty. § 106.45(b)(1)(vii). Many institutions are required to use the clear and convincing standard for faculty disciplinary proceedings under collective bargaining agreements or other employment contracts.[52] The Rule now selectively requires uniformity across the employment and student disciplinary contexts for sexual harassment, but not other forms of harassment.

109.    This provision breaks with twenty years of prior policy by effectively requiring that institutions use a "clear and convincing" standard of proof in many circumstances. The Agency has failed to provide good reasons for this dramatic shift.

110.    Promoting the use of a clear and convincing standard of proof for sexual harassment complaints is internally inconsistent with other provisions of the Rule that require that institutions "[t]reat complainants and respondents equitably," § 106.45(a)(1)(i), and adopt grievance procedures that provide for an "equitable resolution" of student complaints, § 106.8(c). OCR interpreted the Title IX regulations to mandate recipients' use of the preponderance of the evidence standard for "equitable resolution" of sexual harassment complaints as early as 1995.[53]

111.    Under the clear and convincing evidence standard, institutions have no obligation to provide complainants remedies that might impact a respondent, such as a transfer in

---

[52] *See, e.g.*, The City Univ. of N.Y. (CUNY), Comment on Proposed Rule (ED-2018-OCR-0064-11739); Mass. Dep't of Higher Educ., Comment on Proposed Rule (ED-2018-OCR-0064-17538); Nat'l Ass'n of Clery Compliance Officers & Prof'ls, Comment on Proposed Rule (ED-2018-OCR-0064-104911).

[53] U.S. Dep't of Educ., *Investigation Letter in Evergreen State College Case. No. 10922064*, at 9 (Apr. 4, 1995), https://www.ncherm.org/documents/193-EvergreenStateCollege10922064.pdf.

classrooms or dormitories, where it is more likely than not that the respondent sexually harassed or assaulted a complainant.

## V.    Cumulative Effect of Challenged Provisions

112.    Taken together, the provisions described above radically undermine Title IX's mandate that institutions prevent and respond to sexual harassment that interferes with students' educational opportunities. Collectively, they impose radically different and reduced responsibilities on schools to address sexual harassment than to address harassment based on race, national origin, and disability, despite the fact that the governing statutes treat these forms of harassment and assault equally. ED has offered no adequate explanation for any of the differential standards, much less for their cumulative impact.

113.    While each of the challenged provisions on its own impermissibly reduces the responsibility of institutions to respond to sexual harassment and assault, their cumulative effect exacerbates the violation.

114.    Under these provisions, institutions may wholly ignore reports of sexual harassment that interfere with a student's educational opportunities unless the following conditions are satisfied: (a) the sexual harassment takes place on campus or school grounds (or in an education program, excluding study abroad); (b) the harassment could qualify as "severe, pervasive, and objectively offensive"; and (c) the student reports the harassment to an enumerated school official. Even where all of those criteria are met, the institution may be indifferent to the student's report and need only avoid being "deliberately indifferent." In other words, the new standard allows institutions to respond unreasonably to reports of sexual harassment. And the further indirect requirement that many schools adopt the demanding "clear and convincing evidence" standard means that complainants of sexual harassment may face a standard imposed on no others. They will also no longer be entitled to the full range of remedies

that they may need to continue their education free from discrimination, even where it is more likely than not that sexual harassment or assault occurred.

115.     The combination of challenged provisions also vastly changes the incentives of institutions to prioritize preventing and deterring sexual harassment. Under the challenged provisions, an institution's failure to effectively prevent and promptly respond to sexual harassment will be much less likely to carry any consequences than its failure to effectively prevent and promptly respond to any other kind of harassment.

## VI.     ED's Explanations Are Arbitrary and Capricious Because They Are Contrary to Evidence and Fail to Adequately Consider Important Aspects of the Problem

116.     The challenged provisions are particularly arbitrary and capricious because they reduce recipients' responsibilities to address sexual harassment in the face of compelling evidence of the enormous, well-documented problem of underreporting of sexual harassment and assault. The challenged provisions will result in a large percentage of students with bona fide complaints of sexual harassment and assault being turned away or ignored by their institutions.[54]

117.     ED admitted there would be a reduction in investigations of approximately 32 percent. Rule at 1985; Proposed Rule, 83 Fed. Reg. at 61,487.

118.     ED also fails to adequately respond to the concern that the reduction in investigations will chill reporting, and thus undermine institutions' ability to offer educational programs free from sex discrimination. ED fails to respond to the concern that already there is an underreporting of assaults[55] and thus ongoing unaddressed discrimination.

---

[54] *See, e.g.*, Ass'n of Title IX Adm'rs (ATIXA), Comment on Proposed Rule (ED-2018-OCR-0064-104725).

[55] *See, e.g.*, Futures Without Violence, Comment on Proposed Rule (ED-2018-OCR-0064-123900); Ctr. for Survivor Agency & Justice, Comment on Proposed Rule (ED-2018-OCR-0064-31005); Ctr. for Am. Progress, Comment on Proposed Rule (ED-2018-OCR-0064-31283); Bonnie S. Fisher et al., *The Sexual Victimization of College Women*, Nat'l Inst. of Justice, BJS Research Report (2000),

119.     The Agency further fails to adequately address the consequences on the educational opportunities of students whose complaints of sexual harassment are improperly dismissed or discouraged by the challenged provisions.[56]

120.     ED also failed to justify the net costs of the Rule, which are significant: between $48.6 and $62.2 million over the next ten years. The Agency's previous conclusion in the Proposed Rule was that the Rule would result in net *saving*s of $286.4 to $367.7 million. It now recognizes some of the costs of the Rule, but reaches the unreasonable and arbitrary conclusion that these costs are justified.

121.     According to ED, the supposed purpose of the Rule is to make it easier for those experiencing sexual harassment or assault to come forward, with "the goal of encouraging more students to turn to their schools for support in the wake of sexual harassment." 83 Fed. Reg. at 61,462. Evidence submitted in the comments to the Rule overwhelmingly shows that the challenged provisions will in fact have the opposite chilling effect, and ED fails to adequately respond to these concerns.[57]

---

https://www.ncjrs.gov/pdffiles1/nij/182369.pdf; Am. Acad. of Pediatrics & Soc'y for Adolescent Health & Med., Comment on Proposed Rule (ED-2018-OCR-0064-10650); *see also* Sofi Sinozich & Lynn Langton, *Rape and Sexual Assault Victimization among College-Age Females, 1995-2013*, U.S. Dep't of Justice, BJS Special Rep. (2014), https://www.bjs.gov/content/pub/pdf/rsavcaf9513.pdf.

[56] *See, e.g.*, Am. Psychological Ass'n, Comment on Proposed Rule (ED-2018-OCR-0064-30626); Legal Voice, Comment on Proposed Rule (ED-2018-OCR-0064-102843); Am. Acad. of Pediatrics & Soc'y for Adolescent Health & Med., Comment on Proposed Rule (ED-2018-OCR-0064-10650); Equal Rights Advocates, Comment on Proposed Rule (ED-2018-OCR-0064-104092); The City Univ. of N.Y. (CUNY), Comment on Proposed Rule (ED-2018-OCR-0064-11739); Ctr. for Survivor Agency & Justice, Comment on Proposed Rule (ED-2018-OCR-0064-31005); Am. Psychological Ass'n, Comment on Proposed Rule (ED-2018-OCR-0064-30626); Futures Without Violence, Comment on Proposed Rule (ED-2018-OCR-0064-123900).

[57] *See, e.g.*, Am. Psychological Ass'n, Comment on Proposed Rule (ED-2018-OCR-0064-30626); Equal Rights Advocates, Comment on Proposed Rule (ED-2018-OCR-0064-104092); Legal Voice, Comment on Proposed Rule (ED-2018-OCR-0064-102843).

## THE CHALLENGED PROVISIONS HINDER PLAINTIFFS' MISSIONS
## AND DAILY OPERATIONS

122.    If allowed to take effect, the provisions challenged here will inflict significant

harm on students who experience sexual harassment or assault and those who advocate on their

behalf, including Plaintiffs. The challenged provisions dramatically undermine students' civil

rights and will limit their ability to access measures that enable them to continue with their

educations. The challenged provisions' erosion of schools' obligations will also result in fewer

institutions taking proactive measures to prevent, investigate, and address sexual harassment and

assault.

123.    Plaintiffs, themselves or their members, are harmed by the barriers that the

challenged provisions erect against students seeking to report sexual harassment and assault and

to receive supportive measures. Even before issuance of the final rule, the threat that ED would

roll back civil rights protections for students began forcing Plaintiffs to divert resources from

their planned activities, thereby undermining their missions and impairing their daily operations

and resource allocation.

124.    Know Your IX, a project of Advocates for Youth, works directly with high school

and college students in multiple capacities, such as: creating toolkits and resources about Title

IX; providing technical assistance and resources and referrals to student survivors; and

conducting in-person and online trainings on a variety of topics. Additionally, Know Your IX

engages in advocacy to enact proactive policies and defeat harmful measures at the campus,

local, state, and federal levels. Know Your IX works with students to build campaigns for policy

reform at their schools. Know Your IX also helps run multiple networks of legal and non-legal

coalition partners that work to combat sexual harassment in education. In this role, Know Your

37

IX leads calls, facilitates sharing of resources and connections between different stakeholders, and provides webinar trainings.

125.    Following the Agency's issuance of the 2017 Q & A, which rescinded prior guidance and previewed ED's plan to engage in rulemaking on sexual misconduct, Know Your IX experienced an uptick in inquiries from students, including individuals seeking advice about how the regulatory changes would affect their cases and student leaders requesting school trainings. In anticipation of the Rule, Know Your IX received a spike in training requests for Spring 2020.

126.    Know Your IX expects the number of calls and training requests to increase further now that the Rule has been released. This requires Advocates for Youth's Know Your IX project manager to divert core resources to conduct additional trainings, particularly online trainings for national audiences, explaining the Rule and its implications for students wanting to report sexual harassment and assault. Because the challenged provisions reduce schools' obligations to respond to sexual harassment and assault, Know Your IX must devote increased resources to training, to minimize the risk that some students' bona fide complaints will be dismissed for failure to meet the challenged provisions' standards. Moreover, advising each student about their rights to have an education free from sex discrimination, and specifically their rights to accommodations, will be more onerous and time-intensive given that some schools will offer parallel grievance proceedings to handle sexual misconduct complaints that fall outside the Rule's scope. In addition to planning post-Rule trainings for students, Know Your IX has been working with partners to develop a training for state legislators to discuss proactive measures states can take to protect student survivors' legal rights as is necessitated by the Rule's rescission of protections at the federal level.

127.    The demand for national trainings on the Rule's content will necessitate a reduction in Know Your IX's current efforts related to COVID-19 and institutions' moves to distance learning. Presently, Know Your IX is providing support, letter templates, local resources, and organizing strategies to individual students and student groups about what to do if their Title IX cases are being impacted during this period, with, for example, indefinite delays in resolving outstanding complaints and failures to provide, or to facilitate the provision of, supportive measures (e.g., counseling services while off-campus). Now that the Rule has been released, Know Your IX will have to reduce the advocacy it is doing on these subjects. It will also have to dedicate additional time to determining whether the Rule's requirements apply to preexisting Title IX complaints that have been put on hold.

128.    Even before the Rule's release, Know Your IX had to dedicate time to developing resources in anticipation of the final Rule. These resources include materials about which provisions of the Rule are mandatory or permissive for schools to implement and a guide for individuals looking to shortly file a complaint. With the Rule now issued, Know Your IX expects to shift a significant amount of time to recreating its library of educational materials.

129.    In order to meet the increased work demands presented by the Rule's challenged provisions, Advocates for Youth will have to spend time that it otherwise would not have to applying for additional grants for Know Your IX and engaging in greater fundraising efforts so as to hire additional Know Your IX staff to lead the trainings that are now necessary.

130.    To respond to the increase in student outreach, to conduct trainings, and to create educational materials about the final Rule, Know Your IX will need to forgo many of its planned activities for 2020, including Fall 2020 regional trainings focused on building local resource networks for students and translation of its resources into five languages and Braille. For

example, Know Your IX had recently begun a new project on creating financial and legal education resources for survivors experiencing retaliation. Because of the Rule, members of the Know Your IX team will reduce the time and effort spent on this new project from what was planned.

131.    COPAA's work centers on the protection of the rights of students with disabilities, who are far too often the targets of sexual harassment and assault. COPAA's members who advocate on behalf of students will be injured by the challenged provisions of the Rule. One of COPAA's members whose work will be negatively affected is a Michigan attorney who joined COPAA in 2018. Her private practice primarily entails representing K–12 and college students, as well as higher education staff and faculty, in Title IX proceedings and advocating on behalf of K–12 special education students seeking services in their public schools. She also takes family and employment law cases.

132.    Because of the changes in the Rule, student complainants will face more hurdles and be less likely to succeed in the Title IX administrative proceedings. As a result, this COPAA member will file fewer administrative complaints. Those she pursues will be more difficult and take more time to resolve.

133.    Since the changes to Rule provisions reduce clients' incentives to pursue administrative relief, this COPAA member will likely focus more on seeking relief in court. Due to the more resource-intensive nature of litigation, this COPAA member will be forced to take on fewer clients, particularly, fewer pro bono representations.

134.    Because this COPAA member's Title IX work will demand increased time and resources under the Rule, she will have to take on fewer cases in her other practice areas. The decrease she anticipates in her special education caseload is especially troubling because she is

one of the few attorneys representing students with disabilities in her geographic area and in

Michigan more broadly. This trade-off between dedicating resources to Title IX and special

education matters runs counter to COPAA's mission, including through legal representation, that

students with disabilities receive high-quality educational services.

135.    A core part of GGE's work is to end gender-based and racialized violence within

schools, to ensure institutions adopt policies that are responsive to student needs, and to equip

students to support one another and combat these endemic problems. To that end, for over 16

years, GGE has worked with middle and high school students of all genders, to identify their

needs and concerns regarding, in part, their public school educations. GGE has overseen two

participatory research processes involving young people, which confirmed the prevalence of

sexual harassment of students in public schools, the inadequacy of school responses, and the

need to empower students to advocate for themselves. GGE also runs programs for young

students: (a) to develop self-care and healthy relationship practices following sexual abuse

(Sisters in Strength); and (b) to have the tools and opportunities to locally implement their policy

recommendations, including those related to Title IX (Young Women's Advisory Council).

Finally, GGE has led efforts to reform the sexual misconduct policies and practices of the New

York City Department of Education (NYC DOE), the nation's largest public school district.

GGE's multi-year organizing efforts culminated in secured funding for the district to hire seven

more Title IX coordinators, where previously the school district employed only one.

136.    Given the diminished responsibility under federal law for schools to respond to

reports of sexual harassment and assault under the challenged provisions of the final Rule, GGE

will need to dedicate additional staff time and resources to advocate at the local and state levels

for measures that are proven to prevent the occurrence of sexual harassment and assault, such as

comprehensive sex education with an emphasis on consent, and educating NYC school district administrators about their continued obligations to provide educational environments free from sex discrimination under more protective state and local policies. As part of its advocacy pushing the NYC DOE to develop a clear reporting pathway for sexual misconduct, GGE will rely more heavily on its partners in the New York City Council and their ability to hold the district accountable.

137.    SSAIS's educational advocacy takes many forms. SSAIS personnel regularly advise and provide technical assistance to K–12 student survivors and their parents/guardians as they contemplate taking and pursuing remedial action through their schools, the OCR process, or the courts. SSAIS offers K-12 students and families toolkits and resources that promote understanding of their schools' Title IX responsibilities to address sexual harassment, and what responsive measures families can take should schools fail to meet those obligations. And SSAIS collaborates with K–12 administrators to improve their schools' sexual misconduct policies and practices and disseminates best practices to schools nationwide. As one of the few advocacy organizations focused exclusively on the impact of sexual violence for students in K–12, SSAIS has launched media campaigns, such as #MeTooK12, to draw attention to this often-overlooked population. Journalists, educational administrators, and federal policymakers consult SSAIS for its expertise on issues pertaining to addressing K–12 sexual harassment and assault.

138.    Following issuance of the Rule, SSAIS must now dedicate a substantial amount of time to analyzing the Rule (particularly how it applies to cyberharassment in light of the prevalence of distance learning), assessing existing or needed state or local parallel protections to fill in gaps created by the challenged provisions of the Rule, recreating educational materials, and providing technical assistance to students, families, educators, and journalists. While SSAIS

intends to recreate many of its materials, it may not be able to recreate them all, such as its educational film, *Sexual Harassment: Not in Our School!*, absent added funding.

139.    This diversion of resources means that SSAIS will lack the capacity and time to pursue projects it had planned to accomplish in 2020. For example, SSAIS will no longer be able to develop and distribute a restorative justice policy, expand its advocacy on behalf of private school students, start a new project to investigate Title IX compliance nationwide, or launch a protocol on creating gender equity clubs in high schools.

140.    These reallocations of resources and the burdens of the additional work that Plaintiffs must undertake to combat the harmful effects of the Rule frustrate their missions.

141.    All Plaintiffs have already had to divert staff time and resources from their core work in order to draft comments to the Proposed Rule, organize comment-writing efforts, meet with Office of Information and Regulatory Affairs personnel, prepare to challenge the Rule in court, and/or prep for the Rule's aftermath. These activities represent shifts from the organizations' typical activities, especially since Plaintiffs Know Your IX/Advocates for Youth, GGE, and SSAIS have never commented on a federal rulemaking or participated as a plaintiff in litigation.

## CAUSES OF ACTION

**Sections 106.8, 106.30, 106.44, and 106.45 of the Rule Are Contrary to Law, and Arbitrary, Capricious, and an Abuse of Discretion**

**(Administrative Procedure Act, 5 U.S.C. § 706(2))**

142.    The allegations of paragraphs 1 through 141 are incorporated as though fully set forth herein.

143.    Sections 106.8, 106.30, 106.44, and 106.45 of the Rule are contrary to law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2), because they conflict with Title IX by narrowing the meaning of discrimination that is prohibited under Title IX.

144.    Sections 106.8, 106.30, 106.44, and 106.45 are also arbitrary, capricious, and an abuse of discretion in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2) because they do not serve Title IX's objectives; they single out sexual harassment of students for less protection and force students to face higher barriers than students alleging harassment on the basis of race, national origin, and disability, and they break with longstanding policy without good reasons.

145.    The Agency failed to consider important aspects of the problem before it, and its justifications for the challenged provisions were contrary to the evidence before it and/or are implausible.

146.    The Agency failed to conduct an adequate regulatory impact analysis reflecting the considerable costs to students as evinced by the rulemaking record, pursuant to Executive Order 12,866, 58 Fed. Reg. 51,735, and instructions from the Office of Management and Budget's Circular A-4 on Regulatory Analysis (2003).

## PRAYER FOR RELIEF

Plaintiffs pray that this Court:

1.  Declare that the following provisions of the Rule are contrary to law, arbitrary and capricious, and an abuse of discretion, and therefore invalid:

    a.  The definition of "sexual harassment" to which an institution must respond and the provision requiring dismissal of a formal Title IX complaint if it does not on

its face meet that definition or meet the Rule's definition of occurring in the

recipient's education program or activity (§§ 106.30, 106.44, 106.45, 106.8);

b.  The provisions specifying that a recipient is only required to respond to sexual

harassment if it has "actual knowledge" (§§ 106.30, 106.44(a));

c.  The provisions holding an institution accountable under Title IX only for

"deliberate indifference" (§ 106.44(a)-(b)); and

d.  The provision allowing institutions to use a "clear and convincing evidence

standard" and requiring that standard if used for formal complaints of sexual

harassment against employees (§ 106.45(b)(1)(vii));

2.  Enter vacatur as appropriate;

3.  Enter injunctive relief as appropriate;

4.  Award Plaintiffs' attorney's fees, costs, and expenses and any interest allowable by law

under 28 U.S.C. § 2412; and

5.  Grant such other and further relief that this Court deems just and appropriate.


Dated: May 14, 2020                          Respectfully submitted,


                                             */s/ Seamus Curley*
                                             SEAMUS CURLEY
                                             Stroock & Stroock & Lavan LLP
                                             1875 K Street NW
                                             Washington, DC 20006


                                             JENNESA CALVO-FRIEDMAN *
                                             REBECCA A. OJSERKIS *
                                             SANDRA S. PARK *
                                             ANJANA SAMANT *
                                             HILARY LEDWELL *
                                             RIA TABACCO MAR *

American Civil Liberties Union Foundation
Women's Rights Project
125 Broad Street 18th Floor
New York, NY 10004

JOSHUA SOHN *
DANIEL LEWKOWICZ *
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038

*Attorneys for Plaintiffs*

*\* motion for admission pro hac vice
forthcoming*