# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| KNOW YOUR IX, et al., *Plaintiffs*, v. Elisabeth D. DEVOS, in her official capacity as U.S. Secretary of Education, et al., *Defendants*, FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION, INDEPENDENT WOMEN'S LAW CENTER, and SPEECH FIRST, INC., [*Proposed*] *Intervenor-Defendants*. | Civil Action No. 1:20-cv-1224-RDB |

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO INTERVENE AS DEFENDANTS

Plaintiffs ask the Court to throw out provisions of a Department of Education rule that were written, in part, to protect free-speech rights on college campuses. Movants are some of America's largest and most prominent advocacy organizations dedicated to promoting free speech and due process at colleges and universities. They seek to intervene in this case to protect their interests and to advance a legal theory that the Department of Education will not: that expanding the definition of "sexual harassment" under Title IX in the manner Plaintiffs propose would violate the First Amendment. Movants satisfy the Federal Rules' requirements for both intervention as of right and permissive intervention, and they should be allowed to intervene to offer a perspective on the First Amendment that will not otherwise be represented by any party in this case.

## BACKGROUND

On May 6, 2020, the Department of Education announced that it would issue a final rule imposing certain legal obligations under Title IX on federal funding recipients—a category that includes virtually all colleges and universities in the United States. One of the Final Rule's most important provisions is its definition of conduct that qualifies as the kind of "sexual harassment" that Title IX requires funding recipients to investigate and punish. Among other things, the Final Rule defines "sexual harassment" to include "[u]nwelcome conduct determined by a reasonable person" that is "so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity." 85 Fed. Reg. 30026, at 30574 (May 19, 2020). This definition is drawn from the Supreme Court's decision in *Davis v. Monroe County Board of Education*, 562 U.S. 629, 650 (1999), a case where a private plaintiff sued a funding recipient under Title IX for its deliberate indifference to peer sexual harassment.

The Final Rule's adoption of "the *Davis* standard" to define sexual harassment marks a departure from the Department's past guidance, which claimed to follow *Davis* but which described the attributes of actionable sexual harassment in the disjunctive ("severe, pervasive, *or* objectively offensive") and said that conduct that is "persistent" qualifies as harassment (even if it is not objectively offensive). *See, e.g.*, U.S. Dep't of Educ., *Dear Colleague Letter: Harassment and Bullying* at 2 (Oct. 26, 2010), https://bit.ly/2Bp3rg4. One of Plaintiffs' principal prayers for relief is that the Court

throw out the new rule's definition of "sexual harassment" because it differs from the broader and more subjective definition previously used by the Department. *See* Complaint for Declaratory and Injunctive Relief at p. 44–45, Doc. 1 (May 14, 2020) ("Compl.").

Before the Final Rule was promulgated, the Foundation for Individual Rights in Education (FIRE) and the Independent Women's Forum—two of the proposed intervenors—submitted comments to the Department urging it to adopt the *Davis* standard because any broader definition of sexual harassment would violate the First Amendment. *See* Comment of the Foundation for Individual Rights in Education in Support of the Department of Education's Proposed Regulations on Title IX Enforcement (Jan. 30, 2019), https://bit.ly/2Nl6qss; IWF Comments on the Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance (Jan. 30, 2019), https://bit.ly/2Bw54J5. *Davis* itself strongly supports this position. In response to First Amendment concerns raised by Justice Kennedy in dissent, the *Davis* majority took care to define the conduct that funding recipients must punish in a manner that allows public university administrators "to refrain from a form of disciplinary action that would expose [them] to constitutional . . . claims." 562 U.S. at 649. Since *Davis*, courts have looked to that decision for guidance on the scope of "sexual harassment" that public universities may prohibit consistent with the First Amendment. *See, e.g.*, *DeJohn v. Temple Univ.*, 537 F.3d 301, 319 (3d Cir. 2008).

Despite adopting the *Davis* standard in part because it concluded that doing so would help to avoid "a chill on free speech and academic freedom," 85 Fed. Reg. at 30,142, the Department stops short of saying that the *Davis* standard is *required* by the First Amendment. That is an important point of disagreement between the Department and Movants: while the Department purports to have selected one of a range of constitutionally permissible definitions of "sexual harassment," Movants' position is that the Final Rule uses a definition that could not be made broader without violating the First Amendment. This disagreement between Movants and the Department has direct implications for this case. If Movants are correct, Plaintiffs' challenge to the Final Rule's use of the *Davis* standard must be rejected without regard to what Title IX and the Administrative Procedure Act ("APA") might otherwise require. In contrast, if the Department is correct, the lawfulness of the Final Rule's use of the *Davis* standard will depend on whether that standard is consistent with the federal statutes that provide the basis for Plaintiffs' suit.

Movants are nonprofit organizations dedicated to promoting free speech and due process on college campuses.

Proposed Intervenor FIRE is a nonprofit membership organization with approximately 50 employees and a student network with student members on college campuses throughout the United States. FIRE staff work directly with college students and faculty who are subjected to disciplinary proceedings for engaging in conduct that is protected by the First Amendment. In instances when a disciplinary proceeding

4

threatens to chill unpopular but constitutionally protected speech, FIRE staff educate the accused of his or her rights and communicate with university administrators about their obligations under the First Amendment. Considerable staff time and funds are devoted to these activities, and in recent years a significant share of these resources have been used to counter sexual misconduct proceedings at universities with conduct codes that use broad, amorphous definitions of prohibited "sexual harassment." If allowed to go into effect, the Final Rule's use of the *Davis* standard will reduce the frequency with which universities attempt to punish free speech on sensitive issues of gender and sex and thus allow FIRE to shift its resources to addressing other threats to protected speech on campus. FIRE does not have enough staff time or money to assist every student who approaches it for help, and the Final Rule's definition of sexual harassment will free up resources for use in cases that do not involve allegations of sexual harassment.

In addition to its involvement in individual disciplinary proceedings, FIRE also devotes considerable staff time and money to working with its Student Network members to educate college students about their free-speech rights. Members of FIRE's Student Network work to promote their own First Amendment rights as well as the First Amendment rights of other college students through public messaging about the constitutional limits on the authority of public universities to punish speech, including speech on gender, sex, and other controversial topics that are sometimes the basis for discipline under university conduct codes that prohibit "sexual harassment." FIRE also

spends money preparing printed materials on these issues for distribution on college campuses. If the Final Rule's definition of "sexual harassment" is permitted to go into effect, FIRE and its student members will be able to shift these resources and efforts to promoting free speech on other topics.

The Independent Women's Law Center is a project of the Independent Women's Forum, a nonprofit, non-partisan 501(c)(3) organization founded by women to foster education and debate about legal, social, and economic policy issues. The Center supports this mission by devoting time and resources to advocating—in the courts, before administrative agencies, in Congress, and in the media—for equal opportunity, individual liberty, and access to the marketplace of ideas. The Center participates in free-speech litigation challenging universities "bias" and "harassment" policies, and the Forum has long studied and advocated for greater free-speech and due-process protections for college students. *See, e.g.*, Heather Madden, *Title IX and Freedom of Speech on College Campuses*, Policy Focus, Jan. 2016, https://bit.ly/2XgoQPS. Unsurprisingly then, the Center and Forum were leading proponents of the Final Rule. In addition to the comment in support, the Center (along with Speech First) helped defeat proposals to delay the Final Rule in light of the coronavirus. *See* Independent Women's Law Center & Speech First, Letter to Secretary DeVos and Assistant Secretary Marcus (Apr. 9, 2020), https://bit.ly/3e4vEH0.

Speech First is a membership association of college students, parents, faculty, alumni, and concerned citizens. Speech First is committed to restoring the freedom of

speech on college campuses through advocacy, education, and litigation. And its student members are subject to speech codes and disciplinary procedures that violate the First Amendment but that, according to universities, comply with the Title IX guidance that the Final Rule has replaced. For example, Speech First has challenged speech-chilling "harassment" policies at the University of Michigan, *Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019); the University of Texas, *Speech First, Inc. v. Fenves*, No. 19-50529 (5th Cir.); the University of Illinois, *Speech First, Inc. v. Killeen*, No. 19-2807 (7th Cir.); and Iowa State University, *Speech First, Inc. v. Wintersteen*, No. 4:20-cv-2 (S.D. Iowa). If the Final Rule stands, schools will bring their policies in line with it, freeing Speech First to spend its resources on other pressing free-speech concerns.

Proposed intervenors' missions are related and complementary, and their views on the issues in this case are aligned. But still, they are three separate organizations with different counsel, independent resources, and unique missions. To conserve the Court's and the parties' resources, and to minimize their footprint in this case, proposed intervenors have joined forces. They are jointly moving to intervene and, if their intervention is granted, will make their arguments in one consolidated brief. Proposed intervenors will also follow whatever deadlines govern the existing defendants.

## ARGUMENT

The Federal Rules allow "intervention of right" under Rule 24(a) and "permissive intervention" under Rule 24(b). Under either standard, "liberal intervention is desirable to dispose of as much of a controversy involving as many apparently concerned persons

as is compatible with efficiency and due process." *Nat'l Fed'n of the Blind, Inc. v. Lamone*, 2014 WL 4388342, at *4 (D. Md. Sept. 4, 2014) (Bennett, J.) (quoting *Feller v. Brock*, 802 F.2d 722, 729 (4th Cir. 1986)). A liberal approach to intervention is especially appropriate "where the subject matter of the lawsuit is of great public interest, the intervenor has a real stake in the outcome and the intervention may well assist the court in its determination through . . . the framing of issues." *Daggett v. Commission on Government Ethics*, 172 F.3d 104, 116–17 (1st Cir. 1999). Movants satisfy the standards for both intervention as of right and permissive intervention.

**I.    Movants are entitled to intervene as of right.**

Under Rule 24(a), a court "must permit anyone to intervene who" (1) makes a timely motion to intervene, (2) has an "interest relating to the property or transaction that is the subject of the action," (3) is "so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest," and (4) shows that he is not "adequately represent[ed]" by "existing parties." Fed. R. Civ. P. 24(a). Movants meet each of these four requirements.

*First*, Movants have timely filed this motion. Plaintiffs filed the complaint on May 14, and Defendants were served with a copy on June 3, *see* Doc. 19. Attorneys representing Defendants have not yet entered appearances, and nothing of substance has happened in the case. For the timeliness requirement of Rule 24, "[t]he most important consideration is whether the delay has prejudiced the other parties." *Spring Const. Co. v. Harris*, 614 F.2d 374, 377 (4th Cir. 1980). Movants arrived quickly to protect

their interests at stake in this suit, and their intervention would not in any way impede its progress.

*Second*, Movants have a "significantly protectable interest" in the subject of the action. *Teague v. Bakker*, 931 F.2d 259, 261 (4th Cir. 1991) (quoting *Donaldson v. United States*, 400 U.S. 517, 531 (1971)). As the description of Movants' activities provided above makes clear, Movants have an interest in this case that is the "mirror-image" of Plaintiffs'. *Builders Ass'n of Greater Chicago v. City of Chicago*, 170 F.R.D. 435, 440–41 (N.D. Ill. 1996). While Plaintiffs allege that the Final Rule will force them to divert resources from other unrelated programs, exactly the opposite is true for Movants; the Final Rule will allow Movants to reallocate resources to other activities that would otherwise be used to resist disciplinary proceedings aimed at punishing constitutionally protected speech by universities that use vague and overbroad definitions of "sexual harassment." If Plaintiffs have Article III standing to challenge the Final Rule's definition of "sexual harassment" on a diversion-of-resources theory, *see Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), then it necessarily follows that Movants have a significantly protectable interest in defending it.

Wholly apart from the staff time and money that Movants will save if the Final Rule is permitted to go into effect, Movants have a second significantly protectable interest in this action: safeguarding the free-speech rights of themselves and their members. Expansive definitions of "sexual harassment" in university conduct codes have a chilling effect on speech concerning gender, sex, and related topics, and even

9

speech on these subjects that many find offensive is valuable and protected by the First Amendment. *See Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973) ("[T]he mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'"). The First Amendment rights of Movants and their members are at stake in this case, and those rights plainly qualify as an "interest" under Rule 24(a)(2). *Brody ex rel. Sugzdinis v. Spang*, 957 F.2d 1108, 1125 (3d Cir. 1992).

*Third*, Movants' significant interests and their ability to protect those interests may be impaired "as a practical matter" by this action. Fed. R. Civ. P. 24(a)(2). It is a premise of Plaintiffs' lawsuit that the Final Rule's definition of "sexual harassment" will significantly narrow the types of speech and expressive conduct that universities prohibit and punish. If that premise is correct—as it must be for Plaintiffs' injuries to be fairly traceable to the provisions of the rule they seek to challenge—then Movants unquestionably "stand to gain or lose by the direct legal operation" of this Court's ruling. *Teague*, 931 F.2d at 261. For the same reasons that Plaintiffs stand to gain from a decision in their favor, Movants stand to lose.

Moreover, Movants' interests will be affected not only by whether this Court upholds the Final Rule's use of the *Davis* standard but also on what grounds. As Plaintiffs' complaint documents, the Department has not been consistent over time in its position on the definition of "sexual harassment" for purposes of Title IX. Compl. ¶¶ 47–75. If the Court considers and accepts Movants' First Amendment argument, it

will establish that the Department cannot constitutionally revert to the broader definitions it has used in the past. If, on the other hand, the Court upholds the Final Rule's definition of "sexual harassment" as one of a range of approaches that are permissible under Title IX, the Department could in the future abandon its current position. The potential stare decisis effects of this Court's decision provide a basis for intervention as of right here. *See Newport News Shipbuilding and Drydock Co. v. Peninsula Shipbuilders Ass'n*, 646 F.2d 117, 121 (4th Cir. 1981) (citing *Nuesse v. Camp*, 385 F.2d 694, 702 (D.C. Cir. 1967)).

Furthermore, participating in this case as an amicus would not enable Movants to adequately protect their interests in this case. This Court would not be required to consider Movants' First Amendment argument if it were presented only in an amicus brief, and if Movants were only accorded the status of amici they could not file motions or appeal from an adverse judgment. In short, intervention is necessary for Movants to safeguard their significant interests in this case. *See Feller*, 802 F.2d at 730 ("Amicus participants are not able to make motions or to appeal the final judgment in the case. Accordingly, the 'practical impairment' requirement for intervention is satisfied.").

*Fourth*, Movants' interests are not adequately represented by the existing parties. "The requirement of [inadequate representation] is satisfied if the applicant shows that representation of his interest *may* be inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972) (emphasis added; quotation marks omitted). The standard is satisfied when,

11

for example, interests overlap but are not identical. *See United Guaranty Residential Ins. Co. of Iowa v. Philadelphia Sav. Fund Soc.*, 819 F.2d 473, 476 (4th Cir. 1987); *Newport News Shipbuilding & Drydock Co.*, 646 F.2d at 122. Movants clear this low hurdle.[*]

Movants' interests differ from those of the Department. In issuing the Final Rule, the Department explicitly sought to "balance protection from sexual harassment with protection of freedom of speech and expression." 85 Fed. Reg. at 30165. Movants, in contrast, represent interests on one side of those scales: the free-speech rights of university students and faculty. This case is therefore indistinguishable from *In re Sierra Club*, 945 F.2d 776 (4th Cir. 1991), in which the Fourth Circuit held that South Carolina did not adequately represent the Sierra Club because the state was responsible for representing economic as well as environmental interests. As the Fourth Circuit has explained, "when a party to an existing suit is obligated to serve two distinct interests, which, although related, are not identical, another with one of those interests should be entitled to intervene." *United Guaranty Residential Ins. Co.*, 819 F.2d at 475; *see also Kleissler v. United States Forest Service*, 157 F.3d 964, 972 (3d Cir. 1998); *Coalition of Arizona/New*

---

[*] Because Proposed Intervenors' interests diverge from those of the Department, this case is not subject to the presumption of adequate representation that applies when a proposed intervenor's interests fully align with those of a governmental party. *See Stuart v. Huff*, 706 F.3d 345, 352 (4th Cir. 2013). Even when such a presumption arises, however, the Court still must "heed the Supreme Court's determination that the burden on the applicant of demonstrating a lack of adequate representation 'should be treated as minimal.'" *Teague*, 931 F.2d at 262 (quoting *Trbocich*, 404 U.S. at 538 n.10).

12

*Mexico Counties For Stable Econ. Growth v. Dep't of Interior*, 100 F.3d 837, 845 (10th Cir. 1996).

The conclusion that Movants are not adequately represented follows from the Supreme Court's decision in *Trbovich*. In that case, the Secretary of Labor instituted an action to set aside an election of officers of the United Mine Workers of America. The union member whose complaint led the Secretary to sue sought to intervene in the action. The district court denied his motion to intervene and the court of appeals affirmed, but the Supreme Court reversed. The Court reasoned that, while the Secretary of Labor was charged with representing the union member's interest in the litigation, it also was charged with protecting the "vital public interest in assuring free and democratic union elections that transcends the narrower interest of the complaining union member." *Trbovich*, 404 U.S. at 539. Because of the presence of this additional interest and its potential to affect the Secretary's approach to the litigation, it was "clear" to the Court "that in this case there is sufficient doubt about the adequacy of representation to warrant intervention." *Id.* at 538.

The Third Circuit's decision in *Commonwealth of Pennsylvania v. President of the United States*, 888 F.3d 52 (3d Cir. 2018), is also instructive. In that case, the Little Sisters of the Poor, a group of Catholic nuns, sought to intervene to defend provisions of a Department of Health and Human Services rule that created a religious exemption to the Affordable Care Act's contraceptive mandate. The district court denied the Little Sisters' motion to intervene as of right on the grounds that they were adequately

13

represented by the agency, but the Third Circuit reversed. In so ruling, the Third Circuit explained that the agency was tasked with "serving two related interests that are not identical: accommodating the free exercise rights of religious objectors while protecting the broader public interest in access to contraceptive methods and services." *Id.* at 61. Because the agency was charged with balancing the Little Sisters' interest against other, competing interests that were also at stake in the litigation, the agency could not adequately represent the Little Sisters. The same is true here.

Moreover, the divergence of interests between the Department and Movants has direct consequences for the kinds of arguments each will make. In addition to its immediate interest in defending the Final Rule, the Department has a long-term interest in preserving the scope of its discretion to issue rules under Title IX. Consistent with that interest, which Movants do not share, the Department has been careful not to say that the First Amendment required it to use the *Davis* standard in its definition of "sexual harassment." Where, as here, proposed intervenors seek to make arguments that none of the existing parties are prepared to advance, there is a compelling reason to conclude that their interests are not adequately represented. *See, e.g.*, *JLS, Inc. v. Public Service Comm'n*, 321 Fed. App'x 286, 291–92 (4th Cir. 2009); *Feller*, 802 F.2d at 730; *Jones v. Koons Automotive, Inc.*, 752 F. Supp. 2d 670, 692 (D. Md. 2010).

## II. Alternatively, Movants should be allowed to permissively intervene.

Even if Movants could not intervene as of right, they should be granted permissive intervention. Unlike Rule 24(a)(2), Rule 24(b) does not ask whether the

movant has an interest at stake in the litigation. *North Carolina v. Alcoa Power Generating, Inc.*, No. 5:13-CV-633-BO, 2013 WL 12177042, at *1 (E.D.N.C. Oct. 29, 2013) (citing *SEC v. U.S. Realty & Improvement Co.*, 310 U.S. 434, 459 (1940)). And Rule 24(b) does not ask whether the existing parties adequately represent the movant's interests. *Am. Humanist Ass'n v. Md.-Nat'l Capital Park & Planning Comm'n*, 303 F.R.D. 266, 271 (D. Md. 2014); *e.g.*, *CX Reinsurance Co., Ltd. v. Caplan*, 2017 WL 445226, at *1 (D. Md. Feb. 2, 2017) (Bennett, J.) (granting permissive intervention even though the movant was adequately represented). Instead, "Rule 24(b) is just about economy in litigation." *City of Chicago v. FEMA*, 660 F.3d 980, 987 (7th Cir. 2011). Specifically, it asks whether the motion is "timely," whether intervention will "unduly delay or prejudice" the parties, and whether the movant's defense "shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b).

These requirements from Rule 24(b)'s text are all satisfied here. As explained, Movants filed their motion in a timely fashion. And their defenses—which "squarely respond" to Plaintiffs' claims—obviously share common questions with the main action. *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1111 (9th Cir. 2002). Nor will intervention cause any undue delay or prejudice. "Rule 24(b) mentions only *undue* delay; normal delay does not require denying intervention, because adding parties to a case almost always results in some delay." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 323 F.R.D. 553, 561 (E.D. Va. 2018). Yet Movants will not slow this case down at all, since nothing substantive has been filed and Movants will follow whatever briefing schedule governs

Defendants. *First Penn-Pac. Life Ins. Co. v. William R. Evans, Chartered*, 200 F.R.D. 532, 538 (D. Md. 2001); *Cooper Techs., Co. v. Dudas*, 247 F.R.D. 510, 516 (E.D. Va. 2007). Nor could Movants' participation possibly prejudice Plaintiffs (who must prove their case anyway) or Defendants (who should have to grapple with the constitutional implications of their arguments). *League of Women Voters of Michigan v. Johnson*, 902 F.3d 572, 577-79 (6th Cir. 2018). Movants have further reduced any possible burden by joining forces, intervening together, and agreeing to submit consolidated briefs.

Allowing Movants to permissively intervene will have other benefits as well. For one, there is a "substantial possibility" that Movants' participation will "conserve judicial resources" by reducing the need for other litigation. *Brown v. Eckerd Drugs, Inc.*, 564 F. Supp. 1440, 1444 (W.D.N.C. 1983) (citing *Hill v. Western Electric Co.*, 672 F.2d 381 (4th Cir. 1982)). Before the Final Rule, FIRE and Speech First regularly challenged universities' harassment policies in court. But if the Final Rule is upheld—particularly on the constitutional grounds that Movants plan to raise—then many of these lawsuits can be avoided. Most universities accept federal funds, and most universities will adopt the definition of actionable harassment adopted by the Final Rule. Because that definition complies with the First Amendment, Movants can reduce the number of lawsuits they file—conserving substantial resources for the judicial system as a whole. *Students & Parents for Privacy v. U.S. Dep't of Educ.*, 2016 WL 3269001, at *3 (N.D. Ill. June 15, 2016).

For another, "the magnitude of this case is such that [Movants'] intervention will contribute to the equitable resolution of this case." *Kootenai Tribe*, 313 F.3d at 1111. This case "impact[s] large and varied interests" but, without Movants' intervention, important perspectives will be missing. *Id.* For example, only Movants represent the college students who "directly" benefit from the Rule's protections for free speech and due process. *League of Women Voters of Mich.*, 902 F.3d at 579. And as advocacy organizations who *support* the Rule, Movants "represent the 'mirror-image' interests of the plaintiffs" and are thus "uniquely qualified" to permissively intervene. *Democratic Nat'l Comm. v. Bostelmann*, 2020 WL 1505640, at *5 (W.D. Wis. Mar. 28, 2020) (quoting *Builders Ass'n*, 170 F.R.D. at 441).

Movants also have a wealth of experience and expertise to bear on the historical, factual, and legal questions in this case—questions that Movants have been actively studying, discussing, promoting, and litigating for years. As thought leaders and repeat players in this field, Movants' participation as parties will meaningfully assist the Court. *See, e.g.*, *Alcoa Power*, 2013 WL 12177042, at *1 (granting permissive intervention based on the movant's "experience in litigating the question forming the basis of this suit"); *Capacchione v. Charlotte-Mecklenburg Bd. of Educ.*, 179 F.R.D. 505, 510 (W.D.N.C. 1998) (similar); *Defs. of Wildlife*, 281 F.R.D. at 269 (granting permissive intervention because it "will allow the undersigned to proceed fully-informed").

These points should all be familiar to the ACLU, which routinely obtains permissive intervention in similar circumstances. Whether for itself or the individuals

and groups it represents, the ACLU frequently intervenes to defend policies that it supports. There are many examples from the education context:

- Representing individual students and an advocacy group, the ACLU won permissive intervention "to defend … the DOE's interpretation of the term 'sex' in Title IX." *Students & Parents for Privacy*, 2016 WL 3269001, at *3. Because ending the policy would harm "the individual Movants' lives and the Alliance's advocacy work," the ACLU successfully argued that "Movants are uniquely qualified to illuminate the relevant facts and tie them to their legal arguments." Doc. 32 at 14, No. 1:16-cv-4945 (N.D. Ill.).

- Representing an individual student who wanted to defend a school's restroom policy for transgender students, the ACLU asked this Court for permissive intervention because the plaintiff's relief would "have a direct bearing" on the student and "would violate his rights under Title IX and the Equal Protection Clause." Doc. 16-1 at 11-12, *Smith v. Bd. of Educ. of Frederick Cty.*, No. 1:17-cv-2302 (D. Md.). The case was voluntarily dismissed before this Court could rule. Doc. 43, *id.* But other courts accepted the ACLU's arguments and allowed various advocacy groups to permissively intervene in similar cases. *See, e.g.*, Docs. 24, 65, *Parents for Privacy v. Sessions*, No. 3:17-cv-1813 (D. Or.); Docs. 7-2, 29, *Doe v. Boyertown Area Sch. District*, No. 5:17-cv-1249 (E.D. Pa.); Docs. 22, 50, *Privacy Matters v. U.S. Dep't of Educ.*, No. 0:16-cv-3015 (D. Minn.).

- Representing various advocacy groups, the ACLU won intervention to defend New York's admissions policy for certain high schools. After granting intervention of right, the court explained that it would have granted permissive intervention too because the groups' "unique perspective" would "'greatly contribute to the Court's understanding of the case.'" *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 2020 WL 1432213, at *8 (S.D.N.Y. Mar. 24, 2020) (quoting *Miller v. Silbermann*, 832 F. Supp. 663, 674 (S.D.N.Y. 1993)).

This case should come out the same way. Like the movants in the ACLU's cases, Movants have unique perspectives, unique expertise, unique interests, and unique constitutional arguments. This Court should exercise its "broad

discretion over determinations of permissive intervention" and allow Movants to join this case as defendants. *Nat'l Fed'n of the Blind*, 2014 WL 4388342, at *4 (Bennett, J.).

## CONCLUSION

The Court should grant Movants' motion to intervene and allow them to participate in this case as defendants.

Dated: June 24, 2020

Respectfully submitted,

/s/ Nicole J. Moss

/s/ William S. Consovoy

Charles J. Cooper (pro hac vice forthcoming)
Brian W. Barnes (pro hac vice forthcoming)
Nicole J. Moss (#20222)
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
ccooper@cooperkirk.com
bbarnes@cooperkirk.com
nmoss@cooperkirk.com

William S. Consovoy (#20397)
Cameron T. Norris (bar number not yet assigned)
Alexa R. Baltes (pro hac vice forthcoming)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com
cam@consovoymccarthy.com
lexi@consovoymccarthy.com

*Counsel for Foundation for Individual Rights in Education*

*Counsel for Speech First, Inc. and Independent Women's Law Center*