**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| KNOW YOUR IX, *et al.*, <br><br>     Plaintiffs, <br><br>     v. <br><br> ELISABETH D. DEVOS, *in her official capacity as Secretary of Education, et al.*, <br><br>     Defendants. | No. 1:20-cv-01224-RDB |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................ 2

I.      Statutory Background and Prior OCR Guidance .......................................... 2

II.     The Rule ........................................................................................................... 3

        A.      Obligation to Respond to Sexual Harassment ...................................... 3

        B.      A Fair and Reliable Grievance Process ................................................. 5

III.    Plaintiffs' Lawsuit .......................................................................................... 8

LEGAL STANDARD ........................................................................................................ 8

DISCUSSION .................................................................................................................... 9

I.      Know Your IX Lacks Standing ................................................................... 10

        A.      Know Your IX Has Not Adequately Pleaded An Injury-In-Fact ........ 10

        B.      Know Your IX Has Not Established Causation Or Redressability ...... 16

II.     COPAA Lacks Standing ............................................................................... 19

III.    GGE Lacks Standing .................................................................................... 22

IV.     SSAIS Lacks Standing ................................................................................. 25

V.      Plaintiffs' Remaining Allegations Fail To Establish Standing ................... 26

CONCLUSION ................................................................................................................ 28

# TABLE OF AUTHORITIES

## CASES

*Already, LLC v. Nike, Inc.*,
  568 U.S. 85 (2013) ................................................................................................ 20

*Am. Canoe Ass'n v. Murphy Farms, Inc.*,
  326 F.3d 505 (4th Cir. 2003) ............................................................................... 26

*Amalgamated Clothing & Textile Workers Union, AFL-CIO, CLC v. BRLR, Inc.*,
  No. 2:91-cd-00607, 1993 WL 561879 (M.D.N.C. Nov. 19, 1993) ......................... 23

*Beck v. McDonald*,
  848 F.3d 262 (4th Cir. 2017) ................................................................................. 8

*Buchanan v. Consol. Stores Corp.*,
  125 F. Supp. 2d 730 (D. Md. 2001) ........................................................... 14, 16, 23

*Carrero v. Farrelly*,
  310 F. Supp. 3d 542 (D. Md. 2018) ........................................................................ 9

*Chambliss v. Carefirst, Inc.*,
  189 F. Supp. 3d 564 (D. Md. 2016) ...................................................................... 11

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ................................................................................................ 27

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ........................................................................... 11, 15, 17, 27

*Clay v. Fort Wayne Cmty. Sch.*,
  76 F.3d 873 (7th Cir. 1996) .................................................................................. 20

*Comcast Corp. v. Nat'l Ass'n of Af. Am.-Owned Media*,
  140 S. Ct. 1009 (2020) ......................................................................................... 26

*Competitive Enter. Inst. v. NHTSA*,
  901 F.2d 107 (D.C. Cir. 1990) .............................................................................. 13

*Davis v. Monroe Cty. Bd. of Educ.*,
  526 U.S. 629 (1999) ............................................................................................... 1

*Doe v. Allee*,
  30 Cal. App. 5th 1036 (2019) ............................................................................... 18

*Doe v. Baum*,
  903 F.3d 575 (6th Cir. 2018) ........................................................................... 18, 21

*Doe v. Brandeis Univ.*,
   177 F. Supp. 3d 561 (D. Mass. 2016) ................................................................... 18

*Doe v. Oberlin Coll.*,
   963 F.3d 580 (6th Cir. 2020) ................................................................... 18, 21

*Doe v. Univ. of Scis.*,
   961 F.3d 203 (3d Cir. 2020) ................................................................... 18

*Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*,
   28 F.3d 1268 (D.C. Cir. 1994) ................................................................... 14

*Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers*,
   141 F.3d 71 (3d Cir. 1998) ................................................................... 12

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,
   204 F.3d 149 (4th Cir. 2000) ................................................................... 17

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ................................................................... 9

*Gest v. Bradbury*,
   443 F.3d 1177 (9th Cir. 2006) ................................................................... 20

*Guilford Coll. v. McAleenan*,
   389 F. Supp. 3d 377 (M.D.N.C. 2019) ................................................................... 24

*Habeas Corpus Res. Ctr. v. U.S. Dep't of Justice*,
   816 F.3d 1241 (9th Cir. 2016) ................................................................... 21

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ................................................................... 9, 13

*Heap v. Carter*,
   112 F. Supp. 3d 402 (E.D. Va. 2015) ................................................................... 16

*Holland v. Consol Energy, Inc.*,
   781 F. App'x 209 (4th Cir. 2019) ................................................................... 11

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ................................................................... 10

*Int'l Primate Prot. League v. Inst. for Behavioral Research, Inc.*,
   799 F.2d 934 (4th Cir. 1986) ................................................................... 27

*Knowledge Ecology Int'l v. Nat'l Inst. of Health*,
   Civ. No. PJM 18-1130, 2019 WL 1585285 (D. Md. Apr. 11, 2019) ................................ *passim*

*Lane v. Holder*,
    703 F.3d 668 (4th Cir. 2012) ................................................................ *passim*

*Long Term Care Partners, LLC v. United States*,
    516 F.3d 225 (4th Cir. 2008) ................................................................ 9

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................ *passim*

*Md. Highways Contractors Assn'n v. Maryland*,
    933 F.2d 1246 (4th Cir. 1991) ................................................................ 10, 22

*Md. Shall Issue, Inc. v. Hogan*,
    963 F.3d 356 (4th Cir. 2020) ................................................................ 13, 16

*N.Y. Reg'l Interconnect, Inc. v. FERC*,
    634 F.3d 581 (D.C. Cir. 2011) ................................................................ 19

*Nat'l Audubon Soc'y, Inc. v. Wheeler*,
    163 F. App'x 594 (9th Cir. 2006) ................................................................ 21

*Nat'l Treasury Emps. Union v. United States*,
    101 F.3d 1423 (D.C. Cir. 1996) ................................................................ 16

*Peterson v. Bd. of Governors of Fed. Reserve Sys.*,
    51 F. Supp. 3d 72 (D.D.C. 2014) ................................................................ 22

*Renal Physicians Ass'n v. HHS*,
    489 F.3d 1267 (D.C. Cir. 2007) ................................................................ 22

*Richmond, Fredericksburg & Potomac R.R. Co. v. United States*,
    945 F.2d 765 (4th Cir. 1991) ................................................................ 8

*S. Walk at Broadlands Homeowners Ass'n v. OpenBand at Broadlands, LLC*,
    713 F.3d 175 (4th Cir. 2013) ................................................................ 9, 10, 23

*Shield Our Constitutional Rights & Justice v. Hicks*,
    Civ. A. No. DKC 09-0940, 2009 WL 3747199 (D. Md. Nov. 4, 2009) ................................................................ 24

*Sierra Club v. Morton*,
    405 U.S 727 (1972) ................................................................ 16, 23

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976) ................................................................ 10, 14

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ................................................................ 9, 10, 18

*Turlock Irrigation Dist. v. FERC*,
  786 F.3d 18 (D.C. Cir. 2015) ............................................................................ 14

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
  454 U.S. 464 (1982) ........................................................................................... 26

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ............................................................................................. 9

*Wikimedia Found. v. Nat'l Sec. Agency*,
  857 F.3d 193 (4th Cir. 2017) ............................................................................... 8

## STATUTES

5 U.S.C. § 704 ......................................................................................................... 20

20 U.S.C. § 1092 ....................................................................................................... 3

20 U.S.C. § 1681 ....................................................................................................... 1

20 U.S.C. § 1687 ....................................................................................................... 4

28 U.S.C. § 1391 ..................................................................................................... 22

34 U.S.C. § 12291 ..................................................................................................... 3

## RULES

Fed. R. Civ. P. 12 ..................................................................................................... 8

## REGULATIONS

34 C.F.R. § 106.2 ..................................................................................................... 4

34 C.F.R. § 106.6 ..................................................................................................... 5

34 C.F.R. § 106.30 ............................................................................................. 3, 4, 5

34 C.F.R. § 106.44 ......................................................................................... 4, 5, 15

34 C.F.R. § 106.45 ........................................................................................... *passim*

66 Fed. Reg. 5512–01 (Jan. 19, 2001) ..................................................................... 2

83 Fed. Reg. 61,462 (Nov. 29, 2018) ....................................................................... 3

85 Fed. Reg. 30,026 (May 19, 2020) ............................................................ 3, 13, 19

**OTHER AUTHORITIES**

2020 Regs Rapid Response, Association of Title IX Administrators,
   https://atixa.org/r3/ ................................................................................................................ 12

2020 Title IX Regulations, SUNY,
   https://system.suny.edu/sci/news/5-19-20-title-ix-regulations/index.html ............................. 12

Am. Coll. of Trial Lawyers, *White Paper on Campus Sexual Assault
   Investigations* (Mar. 2017),
   https://www.actl.com/docs/default-source/default-document-library/position-statements-
   and-white-papers/task_force_allegations_of_sexual_violence_white_paper_final.pdf ............ 2

*Dear Colleague Letter from Assistant Secretary for Civil Rights* (Sept. 22, 2017),
   https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf. ................... 3

*Dear Colleague Letter from Assistant Secretary for Civil Rights* (Apr. 4, 2011),
   https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf ................................ 2

Erwin Chemerinsky, Federal Jurisdiction § 2.3.3 (6th Ed.)......................................................... 27

Jeannie Suk Gersen, *How Concerning Are the Trump Administration's New Title IX
   Regulations?*, The New Yorker (May 16, 2020),
   https://www.newyorker.com/news/our-columnists/how-concerning-are-the-trump-
   administrations-new-title-ix-regulations ..................................................................................... 3

Michael Powell, *Trump Overhaul of Campus Sex Assault Rules Wins Surprising
   Support*, N.Y. Times (June 25, 2020),
   https://www.nytimes.com/2020/06/25/us/college-sex-assault-rules.html ......................... 25, 26

OCR Webinar on Due Process Protections under the New Title IX Regulations,
   https://youtu.be/48UwobtiKDI ................................................................................................. 12

OCR Webinar on New Title IX Protections Against Sexual Assault,
   https://youtu.be/i-BCnhUsJ4s ................................................................................................... 12

*Open Letter from Members of the Penn Law School Faculty* (Feb. 18, 2015),
   http://media.philly.com/documents/OpenLetter.pdf .................................................................... 3

*Questions and Answers (Q&A) on Title IX and Sexual Violence* (Apr. 29, 2014),
   https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf ................................... 2

Summary of Major Provisions of the Department of Education's Title IX Final Rule,
   https://www2.ed.gov/about/offices/list/ocr/docs/titleix-summary.pdf ...................................... 12

## INTRODUCTION

Title IX of the Education Amendments of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Yet while the Supreme Court has held that sexual harassment and sexual assault may constitute unlawful sex discrimination, *see, e.g.*, *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999), the United States Department of Education (ED) has never before issued regulations that treat such acts as unlawful sex discrimination.

The Rule that Plaintiffs challenge is a landmark step in ED's efforts to ensure that schools receiving federal funding do not tolerate sexual harassment, including sexual assault and other sex-based offenses. It clearly defines behavior that constitutes sexual harassment under Title IX and sets forth fair procedures for addressing such misconduct, thus bringing clarity and enforceability to a field that was once solely the province of a series of unclear, unenforceable guidance. The Rule obligates schools to ensure that any person may report sexual harassment in person, or by mail, phone, or e-mail. It obligates schools to take all sexual harassment allegations seriously, including by offering supportive measures to complainants (that is, alleged victims) promptly upon becoming aware of allegations of harassment. The Rule gives complainants (including, as appropriate, a complainant's parent or guardian) more control over how and whether a school investigates a complainant's allegations by requiring the school's Title IX Coordinator to explain to a complainant the option of filing a formal complaint and to assure the complainant that supportive measures are available with or without a formal complaint. Where complainants (or a school's Title IX Coordinator) elect to file formal complaints of sexual harassment, the Rule obligates schools to investigate the allegations in those complaints thoroughly and objectively, and to provide remedies to complainants when allegations are proven, while ensuring that both parties

1

have clear procedural rights to meaningfully participate in the grievance process.  The Rule thus provides clarity for all involved, so that there is no doubt what schools are obligated to do in response to sexual harassment that jeopardizes a person's equal educational access.

While Plaintiffs evidently would prefer that ED adopt a different rule (or no rule at all), they have failed to establish Article III standing to assert their claims.  Their allegations are insufficient to demonstrate organizational standing, as their supposed harms are speculative and represent at best mere budgetary choices, rather than a frustration of their missions coupled with a drain on their resources.  And Plaintiffs cannot show either that the Rule caused their alleged harms or that the relief they seek is likely to redress those harms, particularly as the Rule regulates recipients of federal funding (i.e., schools), not Plaintiffs.  Accordingly, the Court lacks jurisdiction over Plaintiffs' claims, and the Court should dismiss the Complaint in its entirety.

## BACKGROUND

## I.      Statutory Background and Prior OCR Guidance

ED has never before issued regulations identifying sexual harassment as unlawful sex discrimination under Title IX or obligating schools to address sexual harassment.  ED's Office for Civil Rights (OCR) has instead issued guidance over the years explaining how it believed schools should resolve allegations of sexual harassment (including sexual assault).  *See, e.g.*, 66 Fed. Reg. 5512–01 (Jan. 19, 2001); *Dear Colleague Letter (DCL) from Assistant Secretary for Civil Rights* (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf; *Questions and Answers (Q&A) on Title IX and Sexual Violence* (Apr. 29, 2014), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

The latter two documents were widely criticized for ignoring students' rights and producing unreliable outcomes.  *E.g.*, Am. Coll. of Trial Lawyers, *White Paper on Campus Sexual Assault Investigations* (Mar. 2017), https://www.actl.com/docs/default-source/default-document-

library/position-statements-and-white-papers/task_force_allegations_of_sexual_violence_white_paper_final.pdf; *Open Letter from Members of the Penn Law School Faculty* (Feb. 18, 2015), http://media.philly.com/documents/OpenLetter.pdf.   Students found responsible under these guidance documents regularly won lawsuits against their schools.  *See* Jeannie Suk Gersen, *How Concerning Are the Trump Administration's New Title IX Regulations?*, The New Yorker (May 16, 2020), https://www.newyorker.com/news/our-columnists/how-concerning-are-the-trump-administrations-new-title-ix-regulations.  In September 2017, OCR withdrew the 2011 DCL and the 2014 Q&A and announced that it would engage in future rulemaking on the subject.  *DCL from Assistant Secretary for Civil Rights* (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

## II.     The Rule

ED released its proposed rule on November 29, 2018.  83 Fed. Reg. 61,462 (Nov. 29, 2018) (NPRM).  The final Rule was released publicly on ED's website on May 6, 2020, and formally published in the Federal Register on May 19, 2020.  85 Fed. Reg. 30,026 (May 19, 2020) (Rule). The Rule contains the following key provisions:

### A.     Obligation to Respond to Sexual Harassment

The Rule defines sexual harassment actionable under Title IX to mean (1) a recipient's employee conditioning an educational benefit or service upon a person's participation in unwelcome sexual conduct; or (2) unwelcome sexual conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity; or (3) sexual assault, dating violence, domestic violence, or stalking (as defined in the Clery Act, 20 U.S.C. § 1092(f), and the Violence Against Women Act, 34 U.S.C. § 12291(a)).  34 C.F.R. § 106.30(a).

3

A recipient must respond to sexual harassment when (1) it has actual knowledge of sexual harassment or allegations of sexual harassment (2) that occurred within its education program or activity (3) against a person in the United States. *Id.* § 106.44(a). "Actual knowledge" includes notice "to a recipient's Title IX Coordinator or any official of the recipient who has authority to institute corrective measures on behalf of the recipient." *Id.* § 106.30(a). Recognizing the unique circumstances of K-12 students, actual knowledge also includes notice to "any employee of an elementary and secondary school." *Id.* Title IX and existing regulations define a recipient's "program or activity" to include "all of the operations of" a school. *See* 20 U.S.C. § 1687; 34 C.F.R. 106.2(h). For purposes of addressing sexual harassment, the Rule further specifies that an "education program or activity" includes events, locations, and circumstances over which the recipient exercises substantial control, as well as buildings owned or controlled by student organizations officially recognized by a postsecondary institution. 34 C.F.R. § 106.44(a). A recipient violates Title IX when its response to harassment is deliberately indifferent, meaning clearly unreasonable in light of the known circumstances. *Id.*

The Rule obligates recipients to take specific actions in order to meet the deliberate indifference standard. A recipient's Title IX Coordinator must promptly contact the complainant to discuss the availability of supportive measures, consider the complainant's wishes with respect to supportive measures, and inform the complainant of the availability of supportive measures with or without the filing of a formal complaint. Supportive measures are "non-disciplinary, non-punitive individualized services" provided free of charge to the complainant and are "designed to restore or preserve equal access to the recipient's education program or activity without unreasonably burdening the other party, including measures designed to protect the safety of all parties or the recipient's educational environment, or deter sexual harassment." *Id.* § 106.30(a). Supportive measures may also be provided to a respondent (that is, an alleged perpetrator), but

supportive measures *must* be offered to a complainant.  The recipient's Title IX Coordinator must also explain to the complainant how to file a formal complaint, *id.* § 106.44(a), and exercise discretion as to whether to sign a formal complaint in situations where the complainant chooses not to file, *id.* at § 106.30(a) (defining "formal complaint").[1]

### B.     A Fair and Reliable Grievance Process

Where a complainant files (or the Title IX Coordinator signs) a formal complaint of sexual harassment, the Rule mandates a consistent, transparent grievance process to resolve the sexual harassment allegations fairly and accurately.  34 C.F.R. § 106.45.  The grievance process must "[i]nclude reasonably prompt time frames for conclusion," *id.* § 106.45(b)(1)(v), and its principal features are summarized below.

**No Discipline Before A Determination of Responsibility.**  A grievance process must "provid[e] remedies to a complainant where a determination of responsibility for sexual harassment has been made against the respondent." *Id.* § 106.45(b)(1)(i).  Recipients must "follow[] a grievance process that complies with this section before the imposition of any disciplinary sanctions." *Id.*[2]

**Determinations Based on Evidence.**  The Rule requires "an objective evaluation of all relevant evidence," *id.* § 106.45(b)(1)(ii); provides that "credibility determinations may not be based on a person's status as a complainant, respondent, or witness," *id.*; and requires that Title IX Coordinators, investigators, decision-makers, and facilitators of any informal resolution "not have a conflict of interest or bias" for or against complainants or respondents. *Id.* § 106.45(b)(1)(iii).

---

[1] Where state law permits parents or guardians to act on behalf of a minor child, they may file a formal complaint or otherwise act under the Rule.  34 C.F.R. § 106.6(g).

[2] Schools may immediately remove respondents on an emergency basis where appropriate. *Id.* § 106.44(c).

Questions and evidence about the complainant's prior sexual behavior is not relevant, with limited exceptions. *Id.* § 106.45(b)(6)(i)-(ii).

**Written Notice.**  Upon receipt of a formal complaint, a recipient must provide both parties written notice that includes "[n]otice of the recipient's grievance process" and "[n]otice of the allegations of sexual harassment potentially constituting sexual harassment as defined in § 106.30, including sufficient details known at the time and with sufficient time to prepare a response before any initial interview." *Id.* § 106.45(b)(2)(i)(A)-(B).

**Investigations.**  A recipient must investigate the allegations of every formal complaint. *Id.* § 106.45(b)(3)(i).[3]  In doing so, a recipient must "[p]rovide an equal opportunity for the parties to present witnesses, including fact and expert witnesses, and other inculpatory and exculpatory evidence." *Id.* § 106.45(b)(5)(ii).  It may not "restrict the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence." *Id.* § 106.45(b)(5)(iii). A recipient must send the parties and their advisors an electronic or hard copy of evidence that is directly related to the allegations, with ten days for the parties to review and respond. *Id.* § 106.45(b)(5)(vi).  A recipient must then send the parties and their advisors a copy of the investigative report summarizing relevant evidence, with ten days to review and respond. *Id.* § 106.45(b)(5)(vii).  The Rule permits (but does not require) schools to facilitate informal resolution of formal complaints, if the parties voluntarily agree and the allegations do not concern harassment of a student by an employee. *Id.* § 106.45(b)(9).

---

[3] A recipient must dismiss a formal complaint where "the conduct alleged in the formal complaint would not constitute sexual harassment as defined in § 106.30 even if proved, did not occur in the recipient's education program or activity, or did not occur against a person in the United States." *Id.* § 106.45(b)(3)(i).  Such a dismissal, however, is only for purposes of Title IX and "does not preclude action under another provision of the recipient's code of conduct." *Id.*

**Hearings.**   Absent informal resolution, postsecondary institutions must conduct live hearings with cross-examination.   *Id.* § 106.45(b)(6)(i).   While cross-examination "must be conducted directly, orally, and in real time," it may be conducted only "by the party's advisor of choice and never by a party personally[.]"  *Id.*  At the request of either party, it must be conducted remotely, using technology permitting simultaneous audio and video.  *Id.*  Before each answer, "the decision-maker(s) must first determine whether the question is relevant and explain any decision to exclude a question as not relevant."  *Id.*  Recipients other than postsecondary institutions (including K-12 schools) may, but need not, provide for *any* hearing—though they must "afford each party the opportunity to submit written, relevant questions that a party wants asked of any party or witness, provide each party with the answers, and allow for additional, limited follow-up questions from each party."  *Id.* § 106.45(b)(6)(ii).

**Standard of Evidence.**   A school may elect "whether the standard of evidence to be used to determine responsibility [in its grievance process] is the preponderance of the evidence standard or the clear and convincing evidence standard," provided that the same standard applies (1) for claims against students as against employees, and (2) to all formal complaints of sexual harassment.  *Id.* § 106.45(b)(1)(vii); *see also id.* § 106.45(b)(7)(i).  At all times, "the burden of proof and the burden of gathering evidence sufficient to reach a determination regarding responsibility rest[s] on the recipient and not on the parties."  *Id.* § 106.45(b)(5)(i).  Decision-makers must issue a written determination explaining the result and rationale as to each allegation and send the written determination simultaneously to both parties.  *Id.* § 106.45(b)(7).

**Appeal Rights.**   A recipient "must offer both parties an appeal from a determination regarding responsibility, and from a recipient's dismissal of a formal complaint or any allegations therein," on the bases of procedural irregularity, newly discovered evidence, or bias or conflict of

interest, that affected the outcome of the matter.  *Id.* § 106.45(b)(8)(i).  Appeals may be offered on

other bases if they are offered equally to both parties.  *Id.* § 106.45(b)(8)(ii).

### III.   Plaintiffs' Lawsuit

Plaintiffs Know Your IX, Council of Parent Attorneys and Advocates, Inc. (COPAA), Girls

for Gender Equity (GGE), and Stop Sexual Assault in Schools (SSAIS) filed this lawsuit on May

14, 2020, asserting that certain provisions of the Rule contravene the Administrative Procedure

Act (APA).  Compl. for Decl. & Inj. Relief ¶¶ 142-46, ECF No. 1 (Compl.).  Plaintiffs seek an

order declaring that the Rule violates the APA, as well as vacatur of the Rule and unspecified

injunctive relief.  *Id.* at 44-45.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) permits a defendant to challenge the court's

subject-matter jurisdiction.  "A defendant may challenge subject-matter jurisdiction in one of two

ways: facially or factually."  *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017).  "In a facial

challenge, the defendant contends that a complaint simply fails to allege facts upon which subject

matter jurisdiction can be based," *id.* (citation omitted), and "the plaintiff is afforded the same

procedural protection that exists on a motion to dismiss" under Rule 12(b)(6), *Wikimedia Found.*

*v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citation omitted).  When a defendant

challenges the factual basis for subject-matter jurisdiction, the plaintiff bears the burden of proving

it exists.  *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th

Cir. 1991).  "In determining whether jurisdiction exists, the district court is to regard the pleadings'

allegations as mere evidence on the issue, and may consider evidence outside the pleadings without

converting the proceeding to one for summary judgment."  *Id.*  The moving party should prevail

"if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as

a matter of law."  *Id.*  "A challenge to a plaintiff's standing 'implicates th[e] court's subject matter

jurisdiction.'"  *Carrero v. Farrelly*, 310 F. Supp. 3d 542, 545 (D. Md. 2018) (quoting *Long Term Care Partners, LLC v. United States*, 516 F.3d 225, 230 (4th Cir. 2008)).

## DISCUSSION

Plaintiffs bear the burden of establishing standing, "an essential and unchanging part of the case-or-controversy requirement of Article III."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  "To seek injunctive relief, a plaintiff must show that [it] is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action . . . ; and it must be likely that a favorable judicial decision will prevent or redress the injury."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).  The "threatened injury must be certainly impending to constitute injury in fact," for allegations of "possible future injury do not satisfy . . . Art. III."  *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (citation omitted).

An organization asserting standing in its own right (organizational standing) must adequately allege the standing requirements that apply to individuals.  *S. Walk at Broadlands Homeowners Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)).  The injury-in-fact requirement demands that the organization allege facts plausibly showing (a) an impairment of the organization's ability to advance its purposes, combined with (b) a "'consequent drain on the organization's resources.'"  *Id*. at 183 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *see also Knowledge Ecology Int'l v. Nat'l Inst. of Health*, Civ. No. PJM 18-1130, 2019 WL 1585285 (D. Md. Apr. 11, 2019).  But "an injury to organizational purpose, without more, does not provide a basis for standing."  *S. Walk*, 713 F.3d at 183.  Nor does a diversion of funds constitute an injury when that diversion results from an organization's "own budgetary choices."  *Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012) (citation omitted).

In contrast, under the doctrine of associational standing, an organization seeks to establish standing "'as [a] representative[] of [its] members who have been injured in fact, and thus could have brought suit in their own right.'" *S. Walk*, 713 F.3d at 183-84 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976)). To avail itself of this doctrine, an organization must adequately allege that "(1) [the organization's] members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit." *Md. Highways Contractors Assn'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). As the Fourth Circuit noted in *Southern Walk*, "to show that its members would have standing, an organization must 'make specific allegations establishing that at least one *identified member* had suffered or would suffer harm.'" 713 F.3d at 184 (quoting *Summers*, 555 U.S. at 498).

Because Plaintiffs have failed to demonstrate either type of standing, the Court must dismiss their Complaint for lack of subject-matter jurisdiction.

## I.       Know Your IX Lacks Standing

Plaintiffs claim that ED's promulgation of the Rule has hindered Know Your IX's mission and daily operations. Compl. ¶¶ 124-30. According to Plaintiffs, Know Your IX anticipates needing to field an increased number of calls, conduct additional trainings, and develop educational materials about the Rule. *Id.* ¶¶ 126-30. Plaintiffs further allege that these activities will divert resources from some of its planned projects. *Id.* ¶¶ 127, 130. These allegations, however, are insufficient to establish any element of standing.

### A.       Know Your IX Has Not Adequately Pleaded An Injury-In-Fact

As an initial matter, it is not apparent that Know Your IX, which is a "survivor-and-youth-led project of Advocates for Youth," Compl. ¶ 22, is an entity that may sue in its own name. Know

Your IX does not appear to have any corporate form, nor is it the type of unincorporated association that has sometimes been found capable of suing in its own name.  Instead, Know Your IX is a "project" of an organization that "works directly with high school and college students in multiple capacities[.]"  *Id.* ¶ 124.  It is far from certain whether such a "project" is even considered an *organization* for standing purposes.

In any case, Plaintiffs' allegations of injury are too speculative to satisfy Article III. Plaintiffs speculate that Know Your IX will have to divert funds because of an increase in "calls and training requests[,]" *id*. ¶ 126, or to "recreat[e] its library of educational materials[,]" *id.* ¶ 128. Plaintiffs acknowledge that this theory is grounded solely in Know Your IX's "expect[ation.]"  *Id.* ¶¶ 126, 128.  "When the plaintiff alleges an injury based on future harm, 'the threatened injury must be *certainly impending* to constitute injury in fact.'"  *Chambliss v. Carefirst, Inc.*, 189 F. Supp. 3d 564, 569 (D. Md. 2016) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)); *see also Holland v. Consol Energy, Inc.*, 781 F. App'x 209, 211 (4th Cir. 2019) ("'Imminence' means that the injury is '*certainly* impending,' or that there is a 'substantial risk' of future harm." (citation omitted)).  This requirement "ensure[s] that the alleged injury is not too speculative for Article III purposes."  *Lujan*, 504 U.S. at 564 n.2.  "Where the alleged injury requires a lengthy chain of assumptions, including 'guesswork as to how independent decisionmakers will exercise their judgment,' the injury is too speculative to be 'certainly impending.'"  *Chambliss*, 189 F. Supp. 3d at 569 (quoting *Clapper*, 568 U.S. at 413).

Know Your IX's alleged injury depends upon just such a chain of assumptions, including that (1) third parties will have questions regarding the Rule's provisions; (2) those third parties will determine that they cannot answer those questions themselves; (3) those third parties will desire to have their questions answered in the near term; (4) of the universe of government agencies, individuals, and organizations that might be able to answer those questions or provide

trainings and educational materials, including ED[4] and recipients,[5] *see* Compl. ¶ 124 (referencing the "resources and connections" of "different stakeholders"), the third parties will contact Know Your IX; (5) Know Your IX will not receive any additional funding from any source, such that resources earmarked for other projects will need to be diverted to fielding such calls and requests, and to recreating educational materials to address specific questions; and (6) responding to calls from students "will be more onerous and time-intensive" than in the past, *id.* ¶ 126.  Such an attenuated theory is not a sufficient basis to find Article III standing.  *Cf. Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers*, 141 F.3d 71, 77 (3d Cir. 1998) ("The [plaintiff] was unable to say when such measures might be undertaken or when funds might actually be expended in support of this educational effort.  These inchoate plans for future programs are insufficient to demonstrate injury for purposes of Article III.").

Nor can Plaintiffs advance their argument by alleging that "Know Your IX experienced an uptick in inquiries from students" after ED rescinded guidance in 2017; that "[i]n anticipation of the Rule, Know Your IX received a spike in training requests for Spring 2020"; or that "before the Rule's release, Know Your IX had to dedicate time to developing resources in anticipation of the final Rule."  Compl. ¶¶ 125, 128.  Plaintiffs have not provided any details about the number or nature of these pre-Rule requests, *id.* ¶ 125, or about the amount of time spent developing these

---

[4] *See, e.g.*, OCR Webinar on Due Process Protections under the New Title IX Regulations, https://youtu.be/48UwobtiKDI; OCR Webinar on New Title IX Protections Against Sexual Assault, https://youtu.be/i-BCnhUsJ4s; Summary of Major Provisions of the Department of Education's Title IX Final Rule, https://www2.ed.gov/about/offices/list/ocr/docs/titleix-summary.pdf.

[5] The State University of New York (SUNY) has created a "Joint Guidance" project to help schools comply by the effective date, including a guide to "14 Things To Do Before 8/14."  2020 Title IX Regulations, SUNY, https://system.suny.edu/sci/news/5-19-20-title-ix-regulations/index.html; *see also* 2020 Regs Rapid Response, Association of Title IX Administrators, https://atixa.org/r3/ (providing a model policy).

pre-Rule resources, *id.* ¶ 128, such that it is impossible to draw any inferences about the effect of those activities on Know Your IX's pre-Rule operations.   More importantly, Plaintiffs do not explain why or how those pre-Rule activities bear on Know Your IX's post-Rule activities.   In fact, they overlook the possibility that stakeholders previously sought input from Know Your IX due to the uncertainty in the regulatory environment; now that the Rule has been issued, that uncertainty has significantly decreased.  *See* Rule at 30,030 (explaining that ED issued the Rule in part because "the Department has determined that Department guidance is insufficient to provide clear direction" regarding "how recipients must respond to allegations of sexual harassment").   And Plaintiffs do not explain why Know Your IX can no longer utilize previously created "materials about which provisions of the Rule are mandatory or permissive . . . and a guide for individuals looking to shortly file a complaint."  Compl. ¶ 128.

Even if Plaintiffs could establish a certainly impending uptick in phone calls and training requests, Plaintiffs have not established that any such uptick would cause injury to Know Your IX's organizational interests.   The Complaint is devoid of any details regarding not only the volume of expected outreach, training, and educational materials, but also any anticipated reduction in Know Your IX's "advocacy" and "efforts related to COVID-19 and institutions' moves to distance learning."  *Id.* ¶¶ 126-27.   Accordingly, Plaintiffs have not demonstrated a diversion of "significant" resources or a "drain on the organization's resources" in response to the Rule.  *See Havens*, 455 U.S. at 379; *accord Md. Shall Issue, Inc. v. Hogan*, 963 F.3d 356, 362 (4th Cir. 2020) (affirming dismissal for lack of standing where plaintiff "did not allege that it had expended resources as a result of [the challenged statute], nor did it explain a way in which SB-707 'perceptibly impaired' its activities" (quoting *Havens*, 455 U.S. at 379)); *Competitive Enter. Inst. v. NHTSA*, 901 F.2d 107, 123 (D.C. Cir. 1990) ("[Plaintiffs] have failed to show how the lack

of that assessment from NHTSA has significantly harmed their ability to educate and inform the public about highway safety.").

Plaintiffs' allegations also suggest that any diversion of resources "'results not from any actions taken by [ED], but rather from [Know Your IX's] own budgetary choices.'" *Lane*, 703 F.3d at 675 (quoting *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994)). As the Fourth Circuit has explained, an organization cannot establish an injury in fact merely because it "decides to spend its money on educating members, responding to member inquiries, or undertaking litigation in response to legislation." *Id.* To the contrary, such activities are "abstract concern[s] with a subject that could be affected by an adjudication." *Id.* (quoting *Simon*, 426 U.S. at 40); *see also Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) ("[T]he expenditure of resources on advocacy is not a cognizable Article III injury."); *Knowledge Ecology Int'l*, 2019 WL 1585285, at *6 ("KEI has not alleged the diversion of any other resources with any specificity, nor has it alleged that the proposed license has made its advocacy role more difficult. Indeed, KEI's core purpose as an organization is pursuing precisely the type of advocacy it undertook here[.]"); *Buchanan v. Consol. Stores Corp.*, 125 F. Supp. 2d 730, 737-38 (D. Md. 2001). Plaintiffs advance precisely such an abstract theory of injury based on Know Your IX's decisions to educate callers and respond to training requests in response to the Rule. *See* Compl. ¶¶ 126-27, 130.

Know Your IX's budgeting decisions appear to confirm the self-inflicted nature of the harm it alleges. For instance, Plaintiffs indicate that Know Your IX may need to conduct "additional trainings, particularly online trainings for national audiences, explaining the Rule and its implications for students wanting to report sexual harassment and assault." *Id.* ¶ 126. But they do not explain why Know Your IX cannot record a single training session and make that session available online to interested persons. *See id.* Nor do Plaintiffs explain why Know Your IX must

14

curtail providing information to students about what to do if recipients "delay[] . . . resolving outstanding complaints" or "fail[] to provide[] or to facilitate the provision of[] supportive measures[,]" *id.* ¶ 127, as those are topics addressed by the Rule and can readily be included in online training sessions that Know Your IX has supposedly planned. *See* 34 C.F.R. §§ 106.44(a) (mandating that recipients offer supportive measures), 106.45(b)(1)(v) (discussing time frames for conclusion of grievance process). Similarly, while Know Your IX believes that it "must devote increased resources to training, to minimize the risk that some students' bona fide complaints will be dismissed for failure to meet the challenged provisions' standards," Compl. ¶ 126, it fails to acknowledge that the Rule contains safeguards to minimize that risk. *E.g.*, 34 C.F.R. § 106.45(b)(8) (describing requirements related to appeals of dismissed complaints). And as noted above, ED has made available a large volume of training and assistance, such that Know Your IX need not "shift a significant amount of time to recreating its library of educational materials[,]" Compl. ¶ 128. Any harm resulting from these potential diversions of funds is thus "self-inflicted" and insufficient to confer standing. *See Clapper*, 568 U.S. at 419.

Nor have Plaintiffs adequately pleaded a sufficient diversion of resources by asserting that "[t]o respond to the increase in student outreach, to conduct trainings, and to create educational materials about the final Rule, Know Your IX will need to forgo many of its planned activities for 2020." Compl. ¶ 130. Again, Plaintiffs can only speculate that such efforts, which are grounded in Know Your IX's own budgetary decisions rather than the Rule, will be required. Moreover, the specific examples mentioned by Plaintiffs do not shore up these shortcomings. First, Plaintiffs contend that Know Your IX will no longer hold "Fall 2020 regional trainings focused on building local resource networks for students[.]" *Id.* Left unanswered, of course, is whether Know Your IX would in fact hold such trainings in the current pandemic environment. *See id.* And while Plaintiffs contend that "members of the Know Your IX team will reduce the time and effort spent

on" creating new educational resources, they fail to explain with any specificity why this "reduc[tion]" precludes or even impairs completion of this project.  *See id.*[6]

Know Your IX's alleged harm also "do[es] not cut to the core of the organization's mission like in *Havens*."  *Heap v. Carter*, 112 F. Supp. 3d 402, 417 (E.D. Va. 2015) (citing *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996)).  Indeed, it is clear that Know Your IX's principal activities of outreach, training, and education will continue unabated after the adoption of the Rule.  *See* Compl. ¶¶ 124-30.  "Any resources [Know Your IX will] spen[d] on [these activities] therefore[] seem very much in line with [its] core mission rather than a diversion of resources away from it."  *Knowledge Ecology Int'l*, 2019 WL 1585285, at *6; *see also Buchanan*, 125 F. Supp. 2d at 737 (holding allegation that policy frustrated organization's mission "falls far short of [the injury] asserted in either *Havens* or *BMC*, where not only were the organizations' programs themselves allegedly harmed by the defendants' actions but also the defendants' alleged illegal actions were 'at loggerheads with the plaintiffs' stated mission'" (citation omitted)).

Thus Plaintiffs argue in essence only that the Rule has dealt Know Your IX "a setback to its social interests."  *Md. Shall Issue*, 963 F.3d at 362 (citation omitted).  Such an injury "is no more than a mere disagreement with the policy decisions of [ED], which is insufficient to meet the constitutional threshold for an injury in fact."  *Id.*; *see also Sierra Club v. Morton*, 405 U.S 727, 739 (1972).

---

[6] Plaintiffs also allege that "[i]n order to meet the increased work demands presented by the Rule's challenged provisions, Advocates for Youth will have to spend time that it otherwise would not have to applying for additional grants for Know Your IX and engaging in greater fundraising efforts so as to hire additional Know Your IX staff to lead the trainings that are now necessary." Compl. ¶ 129.  Such efforts appear to be based on the same speculative allegations that fail to constitute a direct organizational injury, for the reasons described above.

**B.      Know Your IX Has Not Established Causation Or Redressability**

In addition to an injury in fact, Article III requires a plaintiff to establish "a causal connection between the injury and the conduct complained of[.]"  *Lujan*, 504 U.S. at 560-61 (citation omitted).  The Complaint does not contain allegations sufficient to demonstrate that the Rule has caused Know Your IX's claimed injury.

As the Supreme Court has explained, "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult" to establish.  *Id.* at 562 (citation omitted).  In those circumstances, "it becomes the burden of the plaintiff to adduce facts showing that those choices [of regulated third parties] have been or will be made in such manner as to produce causation and permit redressability of injury."  *Id.* (citation omitted).  Plaintiffs have failed to do so here, where Know Your IX's standing ultimately depends on the future actions of recipients, students, and perhaps other interested third parties.  For this reason alone, Plaintiffs cannot meet the traceability requirement of standing.  Further, as explained above, to the extent Know Your IX's alleged injuries are self-inflicted, they are not fairly traceable to ED's conduct.  *See Clapper*, 568 U.S. at 418.

Additionally, insofar as Know Your IX "seeks to accomplish [its] goal through[] legal rights education [and] training," Compl. ¶ 22, the Rule's mere promulgation cannot itself be construed as a cause of Know Your IX's injury.  Rather, to demonstrate causation, Plaintiffs must show that "there is a genuine nexus between [Know Your IX's] injury and [ED's] *alleged illegal conduct*."  *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000) (emphasis added).  Plaintiffs' theory of standing, however, focuses instead on the release of the Rule.  *See* Compl. ¶ 126 ("Know Your IX expects the number of call and training requests to increase further now that the Rule has been released."); *id.* ¶ 128 ("With the Rule now issued, Know Your IX expects to shift a significant amount of time to recreating its library of

17

educational materials."). These allegations fall short of meeting this requirement, as they do not demonstrate a sufficient link between the provisions of the Rule that allegedly contravene the APA and Know Your IX's supposed injury.

The inadequacy of Plaintiffs' allegations is only highlighted by the plausible alternative explanation for any increase in calls or training requests, as well as any revisions to educational materials: the numerous developments in the Title IX arena over the past few years. Independent of ED's rulemaking activities, for example, numerous courts have issued decisions related to sexual harassment under Title IX about which Know Your IX's allegedly nationwide stakeholders may wish to learn more. *See, e.g.*, *Doe v. Univ. of Scis.*, 961 F.3d 203, 214-15 (3d Cir. 2020); *Doe v. Oberlin Coll.*, 963 F.3d 580, 586-87 (6th Cir. 2020); *Doe v. Baum*, 903 F.3d 575, 578 (6th Cir. 2018); *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 606 (D. Mass. 2016); *Doe v. Allee*, 30 Cal. App. 5th 1036 (2019). Yet Plaintiffs do not explain why the Rule, rather than these other sources, has caused Know Your IX's alleged harm.

Similarly, Plaintiffs cannot establish that it is "likely that a favorable judicial decision will prevent or redress [Know Your IX's alleged] injury." *Summers*, 555 U.S. at 493. A favorable decision could redress the harm allegedly suffered by Know Your IX only if it would prevent the expected increase in calls, requests, and educational materials from materializing. *See* Compl. ¶¶ 126, 128. Plaintiffs, however, do not even attempt to argue that such a result is likely; nor can they, given the aforementioned developments in the Title IX arena that would likely be of interest to Know Your IX's stakeholders. For example, Plaintiffs seek to set aside 34 C.F.R. § 106.45, Compl. ¶ 144, which in part requires postsecondary institutions to adjudicate formal complaints through a live hearing that includes cross-examination of parties and witnesses. Yet the Third and Sixth Circuits have mandated the use of such procedures, *Univ. of Scis.*, 961 F.3d at 214-15; *Baum*, 903 F.3d at 578, which would apply to postsecondary recipients within those jurisdictions

regardless of whether the Rule is vacated.  Additionally, vacatur would not decrease the likelihood that students would have questions about the status of their preexisting Title IX complaints, and how those complaints are being handled during the current pandemic.  *See* Compl. ¶ 127.  Plaintiffs have therefore failed to establish that Know Your IX has standing to challenge the Rule.

## II.      COPAA Lacks Standing

COPAA contends that it has associational standing to assert its claims.  *Id*. ¶¶ 131-34.  Its theory depends upon one unidentified purported member, a Michigan-based attorney who litigates in Title IX proceedings and advocates for special education students.  *Id.* ¶ 131.  In light of ED's issuance of the Rule, this attorney allegedly expects to handle fewer, more complicated Title IX cases in court, and as a result "she will have to take on fewer cases in her other practice areas."  *Id.* ¶¶ 132-34.  Here too Plaintiffs have failed to demonstrate standing.

First, "[Plaintiffs'] theory stacks speculation upon hypothetical upon speculation, which does not establish an 'actual or imminent' injury."  *N.Y. Reg'l Interconnect, Inc. v. FERC*, 634 F.3d 581, 587 (D.C. Cir. 2011) (quoting *Lujan*, 504 U.S. at 560).  Plaintiffs claim that "[b]ecause of the changes in the Rule, student complainants will face more hurdles and be less likely to succeed in the Title IX administrative proceedings."  Compl. ¶ 132.  But that assertion is both conclusory and conjecture.  In fact, the Rule's provisions are designed to *facilitate* reporting of sexual harassment and improve the accuracy of Title IX proceedings.  *E.g.*, Rule at 30,067, 30,311-14.  And even if Plaintiffs could identify such a student complainant, it remains entirely speculative that the student complainant would retain the Michigan attorney referenced by Plaintiffs, or that the circumstances of this imagined student complainant would prompt the attorney to "focus more on seeking relief in court[,]" Compl. ¶ 133, or that the case would be so resource-intensive that the attorney "will have to take on fewer cases in her other practice areas[,]" *id.* ¶ 134.  As the Supreme Court has instructed, "the fact that" plaintiffs "may base decisions on 'conjectural or hypothetical'

speculation does not give rise to the sort of 'concrete' and 'actual' injury necessary to establish Article III standing." *Already, LLC v. Nike, Inc*., 568 U.S. 85, 97 (2013).[7]

Nor can Plaintiffs establish that the Michigan attorney has suffered an injury sufficient to give her Article III standing to sue in her own right.  Plaintiffs assert that her "anticipate[d]" shift in workload is "troubling," Compl. ¶ 134, but "amorphous psychological injuries [are] insufficient to confer standing." *Clay v. Fort Wayne Cmty. Sch*., 76 F.3d 873, 877 n.4 (7th Cir. 1996); *see also Gest v. Bradbury*, 443 F.3d 1177, 1182 (9th Cir. 2006) ("[F]eelings of frustration . . . are not sufficiently concrete to constitute the 'injury-in-fact' required for Article III standing." (citations omitted)).  However "troubled" *COPAA* may be that the Michigan attorney will handle fewer special education cases, Plaintiffs nowhere allege that the Michigan attorney *personally* will suffer any concrete injury attributable to the Rule.  They do not allege, for example, that her expected increase in complicated cases will result in less revenue or otherwise cause her financial injury.  Instead, the crux of COPAA's theory is that an attorney is injured under Article III whenever the composition of her docket shifts from one type of case to another.  *See* Compl. ¶¶ 131-34.  While Plaintiffs submit that shift may affect COPAA's ability to fulfill its mission, it is not a legally cognizable injury *to the attorney*, which in turn dooms COPAA's associational standing.

Compounding these deficiencies is the fact that COPAA's argument ultimately hinges on an attorney's desire to assist her clients in a regulatory environment that she prefers.  Attorneys do not suffer a concrete injury simply because they "take measures to protect their clients' rights or alter their litigation strategy amid legal uncertainty." *Habeas Corpus Res. Ctr. v. U.S. Dep't of Justice*, 816 F.3d 1241, 1250 (9th Cir. 2016).  "Taken to its logical conclusion, this theory of injury

---

[7] The speculative nature of the alleged injury also raises the possibility that a client represented by the Michigan attorney may have an adequate alternative remedy in a court—namely, a lawsuit against the client's school—which would also lead to dismissal of any APA claims under 5 U.S.C. § 704.

would permit attorneys to challenge any governmental action or regulation when doing so would make the scope of their clients' rights clearer and their strategies to vindicate those rights more easily selected." *Id.* No authority allows for subject-matter jurisdiction under these circumstances. *Id.* at 1250-51. *Cf. Nat'l Audubon Soc'y, Inc. v. Wheeler*, 163 F. App'x 594, 595-96 (9th Cir. 2006) (explaining that the burdens of complying with a law do not constitute an injury sufficient for Article III standing). Indeed, if any person who adjusted his or her behavior in response to a law had standing to challenge it, the "case or controversy" requirement of Article III would be a nullity.

Additionally, Plaintiffs have failed to demonstrate that the injury allegedly suffered by the single COPAA member is fairly traceable to the Rule. As with Know Your IX, the alleged injury to the Michigan attorney is based on the independent actions of students and recipients—not ED— and Plaintiffs have not carried their burden to set forth allegations that the choices of these third parties "have been or will be made in such manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 562 (citation omitted). Further, insofar as the supposed injury to the Michigan attorney is based on a changing legal landscape that the attorney finds difficult to navigate, Compl. ¶¶ 132-34, Plaintiffs make no effort to explain why recent judicial decisions about student misconduct proceedings—including those issued by the Sixth Circuit, which has jurisdiction over Michigan—are not the source of the Michigan attorney's supposed harm. *See, e.g.*, *Oberlin Coll.*, 963 F.3d at 586 (holding student sufficiently pleaded that "university reached 'an erroneous outcome in a student's disciplinary proceeding because of the student's sex'" (citation omitted)); *Baum*, 903 F.3d at 578 (mandating that public universities allow respondents the opportunity to cross-examine the complainant and adverse witnesses during a live hearing).

21

The allegations set forth in Plaintiffs' Complaint likewise fail to establish that granting their requested relief is likely to redress the Michigan attorney's alleged injury.  Plaintiffs' theory falters at the starting gate, as they omit any allegations that may ground a finding of redressability. *See Renal Physicians Ass'n v. HHS*, 489 F.3d 1267, 1276, 1278 (D.C. Cir. 2007) (explaining that "causation does not inevitably imply redressability[,]" and allegations regarding causation do not excuse a plaintiff from "mak[ing] factual allegations showing that the relief it seeks will be likely to redress its injury").  Rather, only "substantial guesswork," *Peterson v. Bd. of Governors of Fed. Reserve Sys.*, 51 F. Supp. 3d 72, 74 (D.D.C. 2014), could lead to the conclusion that vacatur of the Rule—as opposed to myriad other factors and uncertainties inherent to solo legal practice—will affect the type, number, and complexity of cases handled by the attorney, *see* Compl. ¶¶ 132-34.

Accordingly, because the sole COPAA member referenced by Plaintiffs would not have standing to sue in her own right, COPAA lacks associational standing.  *See Md. Highways Contractors*, 933 F.2d at 1251.  The Court should therefore grant ED's motion as to Plaintiff COPAA.[8]

## III.    GGE Lacks Standing

GGE also lacks standing.  Boiled down, its theory is simple:  because the Rule is bad policy, GGE will lobby state and local governments to adopt different policy.  *See* Compl. ¶ 136 ("GGE will need to dedicate additional staff time and resources to advocate at the local and state levels for measures that are proven to prevent the occurrence of sexual harassment and assault, . . . and educating NYC school district administrators about their continued obligations to provide

---

[8] Plaintiffs claim that "[v]enue in this judicial district is proper under 28 U.S.C. § 1391(e) because [COPAA] has its principal place of business in this judicial district."  Compl. ¶ 20.  Plaintiffs do not allege that any other Plaintiff resides in this district, or that there is any other basis for venue in this district.  *See id.*; *see also id.* ¶¶ 22-25.  Because COPPA lacks standing, venue is improper, even if the remaining Plaintiffs can demonstrate this Court's subject-matter jurisdiction over their claims (which they cannot).

educational environments free from sex discrimination under more protective state and local policies.").

Plaintiffs' allegations may describe a pure "injury to organizational purpose," *S. Walk*, 713 F.3d at 183, but the Supreme Court has long held that a "mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself" to confer standing. *Sierra Club*, 405 U.S. at 739; *accord, e.g.*, *Knowledge Ecology Int'l*, 2019 WL 1585285, at *4 ("Generally, the injury to the organization must be something more than an affront to the organization's mission; 'institutional goals and purposes cannot sustain federal standing absent some other injury.'" (quoting *Amalgamated Clothing & Textile Workers Union, AFL-CIO, CLC v. BRLR, Inc.*, No. 2:91-cd-00607, 1993 WL 561879, at *3 (M.D.N.C. Nov. 19, 1993)); *Buchanan*, 125 F. Supp. 2d at 737 (no injury where challenged policy did not have "any concrete effect" on plaintiff's programs). Because GGE does not allege that anything about the Rule has "made its advocacy role more difficult," its standing theory fails. *See Knowledge Ecology*, 2019 WL 1585285, at *6.

To be sure, GGE alleges that because it does not like the Rule, it will "dedicate additional staff time and resources" to policy advocacy. Compl. ¶ 136. But while, in some circumstances, "a diversion of resources might harm the organization by reducing the funds available for other purposes," *Lane*, 703 F.3d at 675, that theory is unavailable to GGE for at least three reasons.

*First*, while GGE alleges that it will have to "dedicate additional staff time and resources" *to* policy advocacy, Compl. ¶ 136, it nowhere alleges that it will have to *divert* resources *from* other priorities. The law in this Circuit is clear that an organization's "mere expense" does not amount to an Article III injury absent allegations that funds have been diverted from other priorities. *See, e.g.*, *Lane*, 703 F.3d at 675; *Knowledge Ecology*, 2019 WL 1585285, at *4 (allegations must "establish generally what the organization had to forego"); *Guilford Coll. v.*

23

*McAleenan*, 389 F. Supp. 3d 377, 388 (M.D.N.C. 2019) (even though plaintiff had invested resources in response to challenged activity, "there are no allegations by the AFT to reflect whether such investment constitutes a diversion of resources *away from other advocacy activity*" (emphasis added)); *Shield Our Constitutional Rights & Justice v. Hicks*, Civ. A. No. DKC 09-0940, 2009 WL 3747199, at *5 (D. Md. Nov. 4, 2009) (plaintiffs lacked standing because they "fail to allege any specific facts to substantiate" allegation that they suffered injury as a result of having to divert resources).  Because the Complaint does not allege that GGE will not be able to perform its ordinary activities, its diversion of resources theory fails.

*Second*, even if GGE had alleged that it had diverted resources away from its core work to engage in policy advocacy, that allegation would not establish standing.  Any such diversion of resources would "'result[] not from any actions taken by [ED], but rather from [GGE's] own budgetary choices.'"  *Lane*, 703 F.3d at 675 (citation omitted); *see supra* Part I (explaining that a choice to engage in policy advocacy cannot ground standing under Article III).  GGE's attempt to leverage its policy advocacy into an injury does "not comport with the case or controversy requirement of Article III of the Constitution."  *Lane*, 703 F.3d at 675.

*Third* and finally, increased expenditures on policy advocacy cannot be an Article III injury to GGE because such advocacy is part of its core mission.  *See* Compl. ¶ 24 ("GGE furthers its mission locally and nationally through direct service, *policy advocacy and organizing*, and culture change." (emphasis added)).  Such expenditures are thus "very much in line with [GGE's] core mission rather than a diversion of resources away from it."  *Knowledge Ecology*, 2019 WL 1585285, at *6.  Put simply, GGE cannot allege that its organizational mission is impeded by engaging in policy advocacy while simultaneously alleging that such advocacy "furthers its mission," Compl. ¶ 24.

For related reasons, Plaintiffs fail to establish that any injury is caused by the Rule or would be redressed by an order vacating the Rule.  With respect to causation, GGE's decision to engage in policy advocacy plainly was not caused by the Rule; it is how GGE "furthers it mission."  *Id.* Nor would vacating the Rule redress any injury; if the Rule were vacated, GGE presumably would continue to engage in such policy advocacy.  Indeed, Plaintiffs do not even squarely allege that if the Rule were vacated, GGE would no longer advocate for policies like "comprehensive sex education with an emphasis on consent," *id.* ¶ 136.  GGE satisfies none of the requirements of standing.

## IV.    SSAIS Lacks Standing

SSAIS's standing allegations fare no better.  Its theory is that because ED has issued a new rule, SSAIS must now "dedicate a substantial amount of time to analyzing the Rule . . . , assessing existing or needed state or local parallel protections . . . , recreating educational materials, and providing technical assistance[.]"  *Id.* ¶ 138.  As a result, SSAIS will allegedly lack the resources to pursue some of its anticipated projects and advocacy efforts for 2020.  *Id.* ¶ 139.

SSAIS's standing theory satisfies neither injury nor causation.  With respect to injury, the tasks that SSAIS alleges it will undertake in response to the Rule fall within its core purpose.  *See id.* ¶ 137 ("SSAIS personnel *regularly* advise and provide technical assistance . . . ." (emphasis added)).  SSAIS thus merely alleges that as a result of the Rule, it will choose to prioritize some of its regular work over other regular work.  But because SSAIS can continue to perform its "regular[]" functions unimpeded following publication of the Rule, it has suffered no injury.  *See Knowledge Ecology*, 2019 WL 1585285, at *6.  Indeed, if SSAIS had suffered an injury by reading the Rule and telling people what it says, it would be difficult to see why newspapers—which have also devoted resources to describing the Rule, *see, e.g.*, Michael Powell, *Trump Overhaul of Campus Sex Assault Rules Wins Surprising Support*, N.Y. Times (June 25, 2020),

https://www.nytimes.com/2020/06/25/us/college-sex-assault-rules.html, and which also have finite resources—would not also suffer an injury on the same theory. In actuality, neither SSAIS nor *The New York Times* suffers an Article III injury by the publication of a new regulation that simply permits the organization to perform its "regular[]" work of telling people about it. *See* Compl. ¶ 137.

Nor is any alleged injury to SSAIS actually caused by the legal violations that Plaintiffs allege. Plaintiffs' theory is not that ED lacked authority to issue any rule, but that ED committed specific APA violations in the course of promulgating this specific rule. Yet even if ED issued a rule that SSAIS conceded was legally flawless, it presumably *still* would analyze the rule, assess whether it wanted to advocate for additional state or local protections, update educational materials, and provide technical assistance. *See id.* ¶ 138. It follows that the alleged APA violations are not the legal cause of SSAIS's alleged injury. *Cf. Comcast Corp. v. Nat'l Ass'n of Af. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020) (defining but-for causation: "a plaintiff must demonstrate that, but for the defendant's unlawful conduct, its alleged injury would not have occurred."). Because SSAIS does not allege that it "has suffered some actual or threatened injury *as a result of the putatively illegal conduct of the defendant*," *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982) (emphasis added)), it fails to satisfy standing's causation requirement.

## V.     Plaintiffs' Remaining Allegations Fail To Establish Standing

Finally, Plaintiffs offer a catch-all theory of standing, asserting they "have already had to divert staff time and resources from their core work in order to draft comments to the Proposed Rule, organize comment-writing efforts, meet with Office of Information and Regulatory Affairs personnel, prepare to challenge the Rule in court, and/or prep for the Rule's aftermath." Compl.

¶ 141.   According to Plaintiffs, such efforts "represent shifts from the organizations' typical activities."  *Id.*  But these allegations are insufficient to salvage Plaintiffs' theory of standing for at least two reasons.

First, as set out above, Plaintiffs have not adequately pleaded that the Rule will itself cause a certainly impending injury sufficient to ground standing under Article III.  Plaintiffs' decision to submit comments in opposition to the Rule and bring this lawsuit are thus classic self-inflicted injuries that cannot give rise to standing.  *See, e.g.*, *Clapper*, 568 U.S. at 402 (plaintiffs "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending"); *Lane*, 703 F.3d at 675 (rejecting standing for "an organization that decides to spend its money . . . undertaking litigation in response to legislation"); *Int'l Primate Prot. League v. Inst. for Behavioral Research, Inc.*, 799 F.2d 934, 938 (4th Cir. 1986) (describing litigation costs as part of the "response to the contested conduct, not part of the conduct itself" and therefore insufficient to establish standing).

Second, this theory of standing fails because it describes alleged injuries that have already occurred and are therefore not redressable by the relief requested.  Plaintiffs in this case seek declaratory and injunctive relief under the APA.  *See* Compl. at 44-45.  To have standing to seek such relief, Plaintiffs must show that they are at imminent risk of *future injury*, for neither an injunction nor a declaratory judgment can redress harms that have already occurred.  *See, e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) ("Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury . . . ."); Erwin Chemerinsky, Federal Jurisdiction § 2.3.3 (6th Ed.) (noting that "lower courts consistently have applied *Lyons* to prevent standing in suits seeking declaratory judgments where standing for injunctive relief would be unavailable").  None of the prospective relief Plaintiffs seek in this case will bring back the time and money they spent commenting on the Rule and preparing to challenge it in court, which

27

represents a second and wholly independent reason to reject this theory of Plaintiffs' standing. And if Plaintiffs are truly concerned that their continued prosecution of this litigation will cause them Article III injury, such an injury would be most directly redressed by the relief sought in this motion to dismiss.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss.

Dated: July 31, 2020

Respectfully submitted,

ETHAN P. DAVIS
Acting Assistant Attorney General

DAVID M. MORRELL
Deputy Assistant Attorney General

CARLOTTA P. WELLS
Assistant Branch Director

*/s/Stuart J. Robinson*

STEVEN A. MYERS
Senior Trial Counsel
STUART J. ROBINSON
BENJAMIN T. TAKEMOTO
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
Ben Franklin Station, P.O. Box No. 883
Washington, DC 20044
Phone: (415) 436-6635
Fax: (415) 436-6632
E-mail: stuart.j.robinson@usdoj.gov

*Attorneys for Defendants*