**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

KNOW YOUR IX, a project of Advocates for
Youth, et al.,

                              Plaintiffs,

-against-

ELISABETH D. DEVOS, in her official
capacity as United States Secretary of
Education, et al.,

                              Defendants.

Civil Action No. 1:20-cv-1224-RDB

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................1

**A.**    Plaintiffs challenge Rule provisions that depart from decades of consistent agency interpretations of harassment claims under Title IX and other civil rights laws. ...............1

**B.**    Plaintiffs brought a targeted challenge to the provisions of the Rule that interfere with their abilities to operate as they had historically run. .........................................................4

LEGAL STANDARD...............................................................................................................14

ARGUMENT .........................................................................................................................15

    **A.**    Like the organization in *Havens Realty*, Know Your IX, a project of Advocates for Youth, has standing to sue...............................................................................................18

        **i.**    Know Your IX has established concrete and imminent injuries that directly interfere with its ability to function............................................................................................18

        **ii.**    The Rule caused Know Your IX's injuries, and the requested remedies are likely to relieve them. ......................................................................................................24

    **B.**    COPAA, which has interests at stake in this litigation, has standing to sue on behalf of its injured member.................................................................................................26

        **i.**    The Rule has had a detrimental impact on member's legal practice.........................26

        **ii.**    The sought relief will likely reduce the member's pocketbook and docket injuries, which are caused by the Rule. ...............................................................................29

        **iii.**    The member need not participate in this APA action involving the civil rights of students with disabilities—the focus of COPAA. ........................................................30

    **C.**    The frustration of GGE's mission and resource-drain grant it standing. .......................31

        **i.**    The Rule's interference with GGE's operations establishes injury...........................31

        **ii.**    The Court can likely remedy GGE's injury, caused by the Rule. ............................32

    **D.**    SSAIS has standing because it is changing its core identity to continue furthering its mission post-Rule.................................................................................................33

        **i.**    The Rule stymies SSAIS's original mission and operations. ....................................33

        **ii.**    SSAIS's injuries are traceable to the Rule and redressable by the Court..................35

CONCLUSION......................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akers v. Md. State Educ. Ass'n*,
  376 F. Supp. 3d 563 (D. Md. 2019) .......................................................................14

*Al Shimari v. CACI Premier Tech., Inc.*,
  840 F.3d 147 (4th Cir. 2016) ...............................................................................14

*Am. Coll. of Obstetricians & Gynecologists v. U.S. Food & Drug Admin.*
  _ F. Supp. 3d _, 2020 WL 3960625 (D. Md. July 13, 2020) ...................................15

*Bostic v. Schaefer*,
  760 F.3d 352 (4th Cir. 2014) .........................................................................14, 25

*Casa De Md., Inc. v. Trump*,
  414 F. Supp. 3d 760 (D. Md. 2019), *rev'd on other grounds and remanded*,
  2020 WL 4664820 (4th Cir. Aug. 5, 2020)...........................................17, 23, 26, 34

*CASA de Md., Inc. v. Trump*,
  _ F.3d _, 2020 WL 4664820 (4th Cir. Aug. 5, 2020) ...........................15, 21, 22, 27

*Casa De Md. v. U.S. Dep't of Homeland Sec.*,
  284 F. Supp. 3d 758 (D. Md. 2018), *aff'd in part, vacated in part on other*
  *grounds, rev'd in part on other grounds*, 924 F.3d 684 (4th Cir. 2019)...........................26, 32

*Clapper v. Amnesty International USA*,
  568 U.S. 398 (2013)............................................................................................24

*Commonwealth of Pa. v. DeVos*,
  No. 20-cv-01468-CJN (D.D.C. 2020).....................................................................21

*Concerned Citizens of Carderock v. Hubbard*,
  84 F. Supp. 2d 668 (D. Md. 2000) ........................................................................18

*Deal v. Mercer Cty. Bd. of Educ.*,
  911 F.3d 183 (4th Cir. 2018) .................................................................... *passim*

*El Rescate Legal Services, Inc. v. Exec. Office of Immigration Review*,
  959 F.2d 742 (9th Cir. 1991) ................................................................................28

*Equal Rights Ctr. v. Abercrombie & Fitch Co.*,
  767 F. Supp. 2d 510 (D. Md. 2010).........................................................18, 32, 36

*Equal Rights Ctr. v. Post Props., Inc.*,
    633 F.3d 1136 (D.C. Cir. 2011) ...................................................................22

*Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.*,
    28 F.3d 1268 (D.C. Cir. 1994) .....................................................................22

*Friends for Ferrell Parkway, LLC v. Stasko*,
    282 F.3d 315 (4th Cir. 2002) ......................................................................17

*Friends of Lubavitch v. Balt. Cty.*,
    421 F. Supp. 3d 146 (D. Md. 2019) .............................................................14

*Guild v. Securus Techs., Inc.*,
    No. 1:14-CV-366-LY, 2015 WL 10818584 (W.D. Tex. Feb. 4, 2015)..................28

*Habeas Corpus Resource Center v. U.S. Department of Justice*,
    816 F.3d 1241 (9th Cir. 2016) ....................................................................28

*Harrison v. Spencer*,
    _ F. Supp. 3d _, 2020 WL 1493557 (E.D. Va. Mar. 27, 2020) .............................23

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) .................................................................... *passim*

*Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*,
    892 F.3d 613 (4th Cir. 2018) ......................................................................14

*Int'l Refugee Assistance Project v. Trump*,
    857 F.3d 554 (4th Cir. 2017), *vacated and remanded on other grounds*, 138 S.
    Ct. 353 (2017) ........................................................................................15

*Kadel v. Folwell*,
    _ F.3d _, 2020 WL 1169271 (M.D.N.C. Mar. 11, 2020)......................................10

*Knowledge Ecology Int'l v. Nat'l Insts. of Health*,
    No. PJM 18-1130, 2019 WL 1585285 (D. Md. Apr. 11, 2019) .......................15, 16

*Kravitz v. U.S. Dep't of Commerce*,
    366 F. Supp. 3d 681 (D. Md. 2019) ......................................................17, 26, 32

*Landsdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at
    Lansdowne, LLC*,
    713 F.3d 187 (4th Cir. 2013) .................................................................26, 31

*Lane v. Holder*,
    703 F.3d 668 (4th Cir. 2012) ...........................................................22, 23, 24, 32

*Larson v. Valente*,
    456 U.S. 228 (1982)..................................................................................32

*Mayor & City Council of Balt. v. Trump*,
    416 F. Supp. 3d 452 (D. Md. 2019) ............................................16, 20, 29

*Md. Shall Issue, Inc. v. Hogan*,
    963 F.3d 356 (4th Cir. 2020) ...............................................................23

*Miller v. Brown*,
    462 F.3d 312 (4th Cir. 2006) ...............................................................14

*Nat'l Fair Hous. All. v. Bank of Am., N.A.*,
    401 F. Supp. 3d 619 (D. Md. 2019).......................................................22

*Nat'l Fed'n of the Blind v. U.S. Dep't of Educ.*,
    407 F. Supp. 3d 524 (D. Md. 2019)..........................................14, 25, 27, 28, 34

*O.A. v. Trump*,
    404 F. Supp. 3d 109 (D.D.C. 2019) ................................................17, 25

*Retail Indus. Leaders Ass'n v. Fielder*,
    475 F.3d 180 (4th Cir. 2007) ..........................................................17, 31

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands,
    LLC*,
    713 F.3d 175 (4th Cir. 2013) ...............................................................15

*SAMi—Systematic Analysis Mgmt., Inc. v. Omnivere Acquisitions, LLC*,
    No. RDB-19-2904, 2020 WL 1863292 (D. Md. Apr. 14, 2020) ...........................31

*Sierra Club v. U.S. Dep't of the Interior*,
    899 F.3d 260 (4th Cir. 2018) ..........................................................16, 32

*Stone v. Trump*,
    400 F. Supp. 3d 317 (D. Md. 2019).......................................................24

*SurvJustice Inc. v. DeVos*,
    No. 18-cv-00535-JSC, 2018 WL 4770741 (N.D. Cal. Oct. 1, 2018) .........24, 27, 28

*Torres v. U.S. Dep't of Homeland Sec'y*,
    411 F. Supp. 3d 1036 (C.D. Cal. 2019) ...................................................28

*Waterford Citizens' Ass'n v. Reilly*,
    970 F.2d 1287 (4th Cir. 1992) ...............................................................18

*White Tail Park, Inc. v. Stroube*,
    413 F.3d 451 (4th Cir. 2005) ...............................................................21

**Statutes**

28 U.S.C. § 1406(a) ...................................................................................................31

**Other Authorities**

83 Fed. Reg. 61,462 (2018) ...............................................................................3, 20, 29

David Eggert & Ed White, *Michigan State Reaches $500M Settlement for 332
     Victims of Larry Nassar*, Chi. Trib. (May 16, 2018) .............................................27

## INTRODUCTION

Plaintiffs Know Your IX, a project of Advocates for Youth; Council of Parent Attorneys and Advocates, Inc.; Girls for Gender Equity; and Stop Sexual Assault in Schools (collectively, "Plaintiffs") are nonprofits dedicated to eliminating the barriers created by sexual violence and harassment to equal educational access through carefully crafted education, resource and service support, and advocacy on behalf of students who have experienced sexual harassment and assault. The new Title IX regulations on the subject, recently promulgated by the U.S. Department of Education (ED), Secretary Betsy DeVos, and Acting Assistant Secretary for Civil Rights Kimberly Richey (collectively, "Defendants"), have stymied Plaintiffs' missions and disrupted their abilities to operate. Numerous provisions of the Rule narrow schools' responsibilities to prevent and address problems of sexual harassment and assault. As a result of the Rule's sweeping changes to Title IX law, Plaintiffs have had to change their work to accomplish their missions and accommodate the needs of the individuals they are dedicated to serving.

At present, the Court need not determine the ultimate impact that the Title IX standards have on schoolgrounds and campuses nationwide. To resolve Defendants' motion to dismiss, the Court need only assess whether Plaintiffs' missions and activities are, and will continue to be, impeded by the Rule. Because Plaintiffs have shown ample operational harm caused by the Rule and the Court's ability to remedy that harm, they establish Article III standing to challenge the Rule. Accordingly, this Court should deny Defendants' motion to dismiss.

## BACKGROUND

**A.    Plaintiffs challenge Rule provisions that depart from decades of consistent agency interpretations of harassment claims under Title IX and other civil rights laws.**

On May 14, 2020, Plaintiffs filed the present Administrative Procedure Act (APA) action seeking declaratory and injunctive relief. As summarized below, Plaintiffs challenged as contrary

to law, arbitrary and capricious, and an abuse of discretion the following provisions, as well as their cumulative impact: (1) the significantly narrowed definition of sexual harassment to which institutions must respond; (2) the heightened requisite notice to institutions; (3) the extension of the deliberate indifference standard to administrative proceedings; and (4) the authorization—and at times requirement—to use the "clear and convincing evidence" standard in formal disciplinary proceedings. Compl. ¶¶ 142–46. Collectively, these challenged provisions create a new Title IX regime that will reduce student reporting of sexual harassment and assault. They also disincentivize schools from taking preventative, effective responses to sexual harassment and assault in education. *Id.* ¶¶ 112–15. And the provisions materially differ from decades of ED's interpretations of Title IX, as well as from longstanding interpretations of the other civil rights laws ED administers. *Id.* ¶¶ 68–72, 83–86, 92–93, 95, 101–02, 104–05, 109–10.

**Definition of Sexual Harassment.** Plaintiffs challenge the Rule's new definition of harassment, which, in its catchall subpart, requires that unwelcome conduct "be so severe, pervasive, *and* objectively offensive that it effectively denies a person equal access to the recipient's education program or activity." § 106.30(a) (emphasis added). Educational institutions are now required to dismiss Title IX complaints alleging conduct that, on their face, do not meet this new, more restrictive definition. § 106.45(b)(3)(i). The Rule's express preemption provision bars use of Title IX procedures to handle complaints of sexual harassment that satisfy a broader state or local definition. § 106.6(h).

In addition, Plaintiffs challenge the Rule's mandate that schools dismiss complaints alleging harassment that that did not occur in the United States or in ED's interpretation of the school's "education program or activity." In essence, the Rule directs schools to dismiss complaints premised on conduct that (a) transpired at a school's campus abroad or study abroad

2

program, or (b) off campus or school property regardless whether the harassment or assault is interfering with a student's ability to continue their education. §§ 106.44(a), 106.45(b)(3)(i).[1] While not creating a bright-line geographic test other than in the context of study abroad programs, this standard indisputably functionally excludes huge swaths of off-campus/schoolgrounds sexual harassment from being investigated or addressed through the formal complaint process, even when the conduct has ongoing effects on students' access to equal educational opportunities. *See* Compl. ¶¶ 76–82; NPRM, 83 Fed. Reg. 61,462, 61,487 n.27 (2018).

**Notice Requirement.** Plaintiffs also challenge the Rule's new notice provision, which provides that colleges and universities may investigate sexual harassment *only* if the complaints are brought to the attention of a handful of designated officials. §§ 106.30(a), 106.44(a). Complaints made to individuals outside these select few—even if they are campus security officers, professors, or athletic coaches—do not trigger the institution's Title IX investigation procedures and attendant responsibilities. *See* Compl. ¶¶ 87–97.

**Deliberate Indifference Standard.** Plaintiffs additionally challenge the Rule's use of the deferential "deliberate indifference" standard for establishing an educational institution's administrative liability for inadequately responding to sexual harassment. Compl. ¶¶ 98–102. Under this standard, a school is liable "only if its response to sexual harassment is clearly unreasonable in light of the known circumstances." § 106.44(a). The Rule permits institutions to act in unreasonable ways, so long as their (in)actions do not meet the heightened standard of

---

[1] The Rule defines "education program or activity" as "locations, events, or circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs, and also includes any building owned or controlled by a student organization that is officially recognized by a postsecondary institution." § 106.44(a).

"deliberate indifference," and it eliminates schools' obligation to address hostile environments beyond the effects on an individual complainant or respondent. *See* Compl. ¶¶ 103–05.

**Standard of Proof.** Lastly, Plaintiffs challenge the Rule's authorization of the use of, and in some instances mandated use of, a "clear and convincing evidence" standard of proof for evaluating a sexual harassment complaint. § 106.45(b)(1)(vii). The "preponderance of the evidence" standard provides for equitable treatment and resolution for complainants and respondents, while the "clear and convincing evidence" standard places a thumb on the respondent's side of the scales, permitting schools to refuse to act and to withdraw supportive measures even on complaints in which it is more likely than not that the complainant's allegations are true.[2] *See* Compl. ¶¶ 106–11.

**B.     Plaintiffs brought a targeted challenge to the provisions of the Rule that interfere with their abilities to operate as they had historically run.**

Plaintiffs are all nonprofit organizations that directly or through their members dedicate substantial time and energy to assisting students who experience sexual harassment and assault continue their educations. Compl. ¶¶ 22–25. Ensuring equal educational access is core to all Plaintiffs' missions. *See id.* To that end, the organizations or their members advocate on behalf of and/or provide services to K–12 and higher-education students who have been affected by sexual harassment and violence in education. *Id.* Plaintiffs all raised concerns regarding the proposed Rule in comments that Defendants failed to adequately address. *Id.* ¶ 15.

**Know Your IX, a Project of Advocates for Youth.** Know Your IX is a project of Advocates for Youth, an education and advocacy nonprofit. Compl. ¶ 22. Advocates for Youth is

---

[2] Plaintiffs are not challenging the requirement that Title IX investigations include hearings or any provisions concerning how the hearings must be held.

dedicated to expanding young people's access to sexual health information and services. *Id.* Know Your IX's mission is "to stop gender violence and discrimination from being a barrier to educational attainment, to give students resources that will enable them to hold their educational institutions accountable for addressing gender violence and harassment, and to raise the voices and experiences of survivors to dispel myths and stereotypes about sexual assault and harassment." Ex. A, Declaration of Sage Carson ("Carson Decl.") ¶ 3. Advancing solutions that do not rely on the criminal legal system is a core part of Know Your IX's work since its focus is on how educational institutions can, and ought, to act to prevent and respond to sexual assault and harassment in its midst. *Id.* ¶ 5.

Know Your IX's programmatic work falls into three categories: "educating college and high school students about their legal rights to safe educations free from gender-based harms"; "training, organizing, and supporting student survivor activists demanding that their educational institutions address gender violence and discrimination"; and "advocating for policy changes at specific institutions and before state and federal agencies to ensure meaningful systemic action." *Id.* ¶ 6. Contrary to Defendants' insinuation, legal education has never been Know Your IX's end goal. As Sage Carson, Manager of Know Your IX, explains:

> We teach students not about the letter of Title IX law so that they can recite it at a later time, but as part of our organizing and advocacy training work. We train students how to create campaigns, pull together and effectively work in coalitions, and engage in direct action in the specific context of building institutional accountability for responding to and interrupting sexual assault and harassment at schools and campuses. Thus, Know Your IX's legal education work related to Title IX is not an end goal in and of itself.

*Id.* ¶ 7.

The new Rule's impact on Know Your IX manifests itself in multiple ways. Because the Rule excludes some sexual assaults or harassment from what could even give rise to an

administrative complaint under Title IX, and reduces the degree of OCR affirmative involvement in educational institutions' responses to such incidents, the statute no longer serves the function for which Know Your IX used it. As a result, for students shut out of their schools' Title IX processes because they, for instance, experienced an assault outside of school-controlled property, Know Your IX must determine whether and how high school and college students could use state civil laws and the Clery Act as reporting and investigation tools. *Id.* ¶ 10. For survivors whose complaints receive superficial investigation by or yield ineffective remedies from school officials, Know Your IX must identify "substitute methods of enforcement whether alternate government entities, direct action campaigns, or creative advocacy to ensure that gender-based violence and harassment that interferes with students' education is not ignored because student survivors can no longer avail themselves of Title IX's protections and remedies." *Id.* And, of course, given the Rule's drastic overhaul of Title IX's provisions and procedures, Know Your IX will have to replace or revise virtually every one of its education and training materials. *Id.* ¶ 31.

Even though Know Your IX "was never intended to be nor has ever functioned as an organization whose *primary* function was to promote civic engagement or undertake policy analysis," the organization has had to reimagine its core identity in anticipation of and in response to the Rule. *Id.* ¶ 9. Unavoidably, Know Your IX has engaged in much more of this type of work, first after ED released the NPRM and then again after it published the final Rule, in order to continue pursuing its mission. *Id.* ¶¶ 9, 11–16, 26, 29–30. Know Your IX can only train students on whether and how to use Title IX or ED in efforts to obtain greater accountability and responsiveness from their schools, one of Know Your IX's essential functions, if it understands the changes being proposed and adopted. Know Your IX is run by mostly high school and college students; it is not a legal services organization or a policy shop staffed with attorneys or policy

experts. *Id.* ¶ 2. Nevertheless, because the NPRM revealed that ED planned to drastically relieve educational institutions of their affirmative obligations under Title IX and to dramatically reduce ED's oversight of those institutions, Know Your IX had to take on new types of work to continue advancing its mission. This work included, for the first time, becoming involved in the notice and comment process, including creating trainings and systems that allowed for 6,000 survivors, teachers, and other allies to submit comments through the project's portal. *Id.* ¶¶ 12–16.

To complete the work necessitated by the Rule, Know Your IX was required to expend hours of staff and volunteer time and to incur unplanned expenses. After ED released the Notice of Proposed Rulemaking (NPRM), Know Your IX expended hours, with "organizers and student volunteers [going] through over 70 peer-reviewed research studies, white papers, and law journal articles about the prevalence, reporting, impact, prevention, and institutional responses to sexual harassment and violence in the education setting and draft[ing] a 48-page document as a result to inform individuals submitting comments to the NPRM." *Id.* ¶ 13. The results of this review and analysis were used in three ways, all designed to promote the responsibility of educational institutions in preventing and addressing gender violence and harassment by affecting through notice-and-comment the federal policy that ultimately would be promulgated: (1) to create a standalone website about proposed revisions to the Rule called "Hands Off IX"; (2) in trainings with partner organizations; and (3) in materials explaining the implications for those wanting to pursue Title IX complaints. *Id.* ¶¶ 13–16. Again, this kind of administrative advocacy was never a core part of Know Your IX's work. Know Your IX was required to engage in this work because the proposed Rule posed a threat to its basic ability to help survivors access education and hold their schools accountable for creating environments that provide equal educational opportunity.

To fund and complete the work necessitated by the Rule, Know Your IX has had to reallocate resources internally, repurpose previously planned projects and events, and forego preexisting plans. *Id.* ¶¶ 17–25, 32–35. 29. Take for example Know Your IX's COVID-19-related work. Since the onset of the pandemic, Know Your IX had prioritized work identifying and educating survivors and students about preventing and responding to sexual harassment and assault in the remote learning and virtual classroom settings. *Id.* ¶¶ 18–23. Among other things, the organization had planned to hold remote and webcasted programs in the fall about the ongoing need for schools to provide supportive services and respond to sexual assault and harassment even in remote learning environments and how students could continue to organize and engage in direct action to pressure their institutions to meet survivors' needs. *Id.* ¶¶ 22–23. Such work is core Know Your IX programming that directly advances its mission. However, Know Your IX now must use those sessions to instead talk about how to obtain Title IX relief and to urge institutions to take actions that are no longer required or encouraged under the Rule's changes to the Title IX regulatory framework. *Id.* Thus, as a result of the Rule, Know Your IX cannot engage in its foundational work of helping students navigate the obstacles created by sexual assault and harassment in the predominantly digital or remote learning environment.

**Council of Parent Attorneys and Advocates, Inc.** Plaintiff the Council of Parent Attorneys and Advocates, Inc. ("COPAA") is a nonprofit membership organization comprised of 2,600 dues-paying parents, attorneys, and advocates of children with disabilities, as well as dedicated students. Compl. ¶ 23. COPAA's mission is to protect and enforce the legal and civil rights of students with disabilities and their families. *Id.* It works towards this end by educating, training, and providing technical assistance to professionals and laypersons alike. *Id.* Some of

COPAA's attorney and advocate members represent complainants and respondents, including students with disabilities, in Title IX processes. *Id.*

One of COPAA's members, Elizabeth Abdnour, establishes COPAA's standing in this action. *See* Compl. ¶¶ 131–34; Ex. B, Declaration of Elizabeth Abdnour ("Abdnour Decl.") ¶ 1. Ms. Abdnour is the Founder and Principal of Elizabeth Abdnour Law, PLLC, and specializes in representing survivors of sexual harassment and assault in Title IX proceedings and representing students with disabilities. *Id.* ¶ 2. The new Rule has already caused, and threatens to cause additional, reductions in the work Ms. Abdnour can do to help victims and survivors of sexual harassment, assault, and discrimination. *Id.* ¶¶ 3–4. Additionally, the Rule has already put a drain on Abdnour Law's financial resources and will continue to cause injury to its activities. *Id.*

The smaller amount of work is the direct result of the Rule's intended reduction in the number of actionable claims of sexual harassment or assault that may be brought under Title IX, whether for school-based investigations, agency administrative proceedings, or litigation. For example, the Rule's new definition of sexual harassment will significantly limit the complaints Ms. Abdnour will be able to file with ED's Office of Civil Rights ("OCR") as the Rule's new definition of sexual harassment is much more restrictive than it has been. *Id.* ¶ 5. Similarly, the Rule's bar on a school addressing claims arising from study abroad programs will impact Ms. Abdnour's work. *Id.* ¶¶ 7–8. To date, Ms. Abdnour has worked on a number of cases involving sexual harassment or assault that occurred during a study abroad program, and but-for the Rule change, she anticipates that these cases would have continued. *Id.* ¶ 7. Relatedly, Ms. Abdnour has handled numerous cases in which the harassment or assault did not occur directly in a school's program or activity, yet it still negatively affected the survivor's education. *Id.* ¶ 8. The Rule relieves schools of their responsibility to address misconduct like sexual assault at a student or

professor's non-university-owned home, even though such harassment can be expected to be detrimental to a survivor's ability to continue with their education. *Id.*

In the past few months, Ms. Abdnour has declined Title IX cases that she would have previously taken on, because she lacks capacity to undertake as many representations, given the increased amount of effort each individual case now requires, or because these actions would lack the potential to prevail under the Rule. *Id.* ¶¶ 9–12. For financial and capacity reasons caused by the Rule, Ms. Abdnour has had to turn away survivors with limited financial means who, in the past, she would have provided limited represented to on a contingency basis or pro bono before OCR. *Id.* Finally, Ms. Abdnour has already had to limit her special-education intake, as well as education intake related to COVID-19-related issues due to the increased amount of time required by her Title IX cases and her ethical obligations to preexisting clients. *Id.* ¶ 4. She has already declined seven special education cases that she would likely have otherwise accepted since March 1, 2020 due to resource limitations caused by the Rule. *Id.*

**Girls for Gender Equity.** Plaintiff Girls for Gender Equity ("GGE") is a nonprofit with a mission to create opportunities for, and to remove systemic barriers from, the development of cisgender[3] and transgender girls and non-binary youth of color. Compl. ¶ 24. This mission includes ending gender-based and racialized violence within schools. *Id.* ¶¶ 135–36. GGE works locally and nationally, engaging in participatory action research, youth-centered programming, movement building, and policy advocacy to remove barriers to and create opportunities for young people to live self-determined lives. *Id.* ¶ 24; Ex. C, Declaration of Ashley Sawyer ("Sawyer Decl.") ¶ 3.

---

[3] "A cisgender individual is 'a person whose gender identity corresponds with the sex the person had or was identified as having at birth.'" *Kadel v. Folwell*, _ F.3d _, 2020 WL 1169271, at *2 n.2. (M.D.N.C. Mar. 11, 2020) (quoting Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/cisgender (last visited Mar. 9, 2020)).

Gender-based violence and harassment are barriers to self-development and harm young people's sense of self and empowerment. "GGE believes that schools should be places that accept and support students to succeed and that policy solutions must address the needs of students who have historically been marginalized." *Id.* ¶ 4. Accordingly, a "core part" of GGE's work aims to end gender-based and racialized violence in schools, ensure that they adopt policies responsive to student needs, and equip students to support one another in the process. *Id.*

For over a decade, GGE has engaged in groundbreaking youth engagement and leadership development programs through its work with students to improve school responsiveness to gender violence and harassment in the largest school district in the country, the New York City Public Schools. *Id.* ¶ 5. GGE has overseen two participatory research processes involving NYC Public School students that confirmed the prevalence of sexual harassment amongst students and the inadequacies of school responses, including school pushout of survivors. *Id.* ¶¶ 6–9.

GGE has also brought together young people impacted by gender-based violence and provided programming that helped them "develop tools and opportunities to locally implement their policy recommendations, including those related to Title IX" and "to engage in self-care and healthy relationship practices following sexual abuse." *Id.* ¶ 10; *see also id.* ¶¶ 12–13. Moreover, groups in seven other cities have replicated some of GGE's initiatives. *Id.* ¶ 12.

In addition to giving students the tools to advocate for themselves, GGE has engaged in its own local advocacy efforts. In New York City, the nonprofit's "multi-year organizing efforts culminated in 2019 in secured funding for the district to hire seven more Title IX coordinators, where previously the school district employed only one." *Id.* ¶ 11. Coming off this victory, GGE had planned to continue its efforts engaging young people in programs that equipped them to advocate for local changes. *Id.* ¶ 16. But this work is hampered by the Rule, which eliminates

incentives for schools to protect students and prevent harassment before it occurs. *Id*. ¶ 17. In fact, GGE has had to abandon its past plan and instead work to develop a special project with an external organization to place pressure on the New York City school system. *Id*. ¶ 19. The Rule conceives of Title IX purely as a tool to resolve interpersonal disputes rather than one to address hostile educational environments, the latter of which is more consistent with how the young people GGE serves describe the impact of sexual harassment. *Id*. ¶ 18. In order to continue addressing the needs of this population, GGE has increased staff time focused on efforts to prevent harassment, including efforts to obtain resources for wraparound school climate supports. *Id*. ¶¶ 20–21.

**Stop Sexual Assault in Schools.** Plaintiff Stop Sexual Assault in Schools ("SSAIS") is a nonprofit education and advocacy organization based in Lacey, Washington, with a nationwide network of student and professional advisors and volunteers. Compl. ¶ 25. SSAIS was founded in 2015 after the founders' daughter was raped during an offsite high school field trip. Ex. D, Declaration of Joel Levin ("Levin Decl.") ¶ 2. Accordingly, SSAIS was born as a result of its founders' recognition of the urgent need for educating students, families, educators, and administrators about honoring and protecting the rights of all students to an education free from sexual violence. *Id.* ¶ 3. A founding principle, therefore, of SSAIS, is to help survivors of sexual assault and harassment in K–12 schools, especially where the incidents took place off-school grounds, through providing education and resources, primarily about Title IX's protections. *Id.* ¶¶ 4–5.

To achieve its mission, SSAIS provides resources to students, families, and schools that "fill the gap between how schools should respond to reported sexual misconduct and what they actually say and do." *Id.* ¶ 7. SSAIS has historically designed educational resources for national distribution to address sexual assault in schools for students, parents, and K–12 school staff. *Id.*

¶ 6. One of SSAIS's most wide-reaching and comprehensive resources is its website, which is designed to serve as a one-stop resource students, families, and schools about sex-based discrimination, including sexual harassment in K–12 schools. *Id.* ¶ 8. SSAIS has been contacted by website visitors from jurisdictions across the country about how valuable the site is. *Id.*

Before the changes to the Rule, SSAIS's website resources did not have to provide details of state and local laws, since over the last 20 years those policies generally aligned with federal guidance. *Id.* ¶ 8. That is no longer so owing to the Rule. *Id.* Because of the Rule, families will not—and do not—know how to negotiate laws at the various tiers (school district, state, federal), which vary by district and state. *Id.* ¶ 9. As a result, going forward, the scope of SSAIS's work as a direct result of the new Rule has to change. It cannot simply update its materials to include descriptions of Title IX that reflect the provisions of the new Rule (which it will also have to do). *Id.* ¶ 10.

To continue functioning as the organization was conceived, SSAIS now needs to extensively research and distill varied state laws and develop strategies for advocating within them. *Id*. ¶ 15. In addition, SSAIS must find and develop a new network of relationships with new organizations conversant in the applicable state law causes of action for referrals to protect and vindicate the rights of survivors of sexual assault and harassment. *Id.* This alters the original character of SSAIS's operational focus and tremendously drains SSAIS's already limited resources. *Id.* ¶ 16.

As a result of the changes to the Rule, SSAIS now has no choice but to allocate its limited resources to, among other things: seeking funding to create new educational videos; editing existing video clips to comport with new Rule provisions; majorly overhauling its website; revising and updating its survivor toolkits and fact sheets. *Id.* ¶ 17.

SSAIS had a number of other projects scheduled to go forward before the enactment of the new Rule that can no longer be pursued. *Id.* ¶ 18. These initiatives and projects included, among others, the creation of multilingual materials and the formation of Students Against Sexual Harassment (SASH) clubs nationwide. *Id.*

## LEGAL STANDARD

Standing is an essential component of Article III's case-or-controversy requirement and, thus, a federal court's jurisdiction. *See Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006). Subject matter jurisdiction challenges, including on standing grounds, can proceed "facially or factually." *Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 620 (4th Cir. 2018). Although facial challenges only require consideration of the complaint's properly pled allegations, factual challenges may require the Court to look at "evidence outside the pleadings." *Al Shimari v. CACI Premier Tech., Inc.*, 840 F.3d 147, 154 (4th Cir. 2016); *accord Akers v. Md. State Educ. Ass'n*, 376 F. Supp. 3d 563, 569 (D. Md. 2019). In response to a factual challenge, plaintiffs need only supply facts that support subject matter jurisdiction by a preponderance of the evidence. *Friends of Lubavitch v. Balt. Cty.*, 421 F. Supp. 3d 146, 160–61 (D. Md. 2019); *Akers*, 376 F. Supp. 3d at 569. And "[t]he court should grant a Rule 12(b)(1) motion based on a factual challenge to subject matter jurisdiction 'only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.'" *Nat'l Fed'n of the Blind v. U.S. Dep't of Educ.*, 407 F. Supp. 3d 524, 530 (D. Md. 2019) (internal citation omitted).

For jurisdictional purposes, "the Supreme Court has made it clear that 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (quoting *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)). Thus, once the Court finds that just one of the four Plaintiffs has standing, it need not analyze Defendants' arguments regarding the remaining

Plaintiffs. *See, e.g.*, *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 586 (4th Cir. 2017), *vacated and remanded on other grounds*, 138 S. Ct. 353 (2017) (analyzing only whether one plaintiff had standing); *Am. Coll. of Obstetricians & Gynecologists v. U.S. Food & Drug Admin.*, _ F. Supp. 3d _, 2020 WL 3960625, at *8 (D. Md. July 13, 2020) (same).

## ARGUMENT

An organization can satisfy Article III's case-or-controversy requirements by showing that it has standing to sue in its own right (organizational standing) or on behalf of at least one of its members (representational or associational standing). *See S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182–85 (4th Cir. 2013). Plaintiffs Know Your IX, SSAIS, and GGE have adequately alleged organizational standing, and Plaintiff COPAA has adequately alleged associational standing. These allegations are set out in the Complaint and further supported through the declarations appended to this motion. Defendants cannot point to any evidence that controverts the facts set forth therein. Accordingly, Defendants' motion to dismiss must be denied.

An organizational plaintiff demonstrates standing in the same way as an individual plaintiff: by showing that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *CASA de Md., Inc. v. Trump*, _ F.3d _, 2020 WL 4664820, at *8, *10 (4th Cir. Aug. 5, 2020) (internal citation omitted). For organizational standing purposes, injury-in-fact exists "when a defendant's actions impede [the organization's] efforts to carry out its mission." *Id.* (quoting *Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012)). Where the injury to the plaintiff organization's "ability to advance its institutional purposes is paired with a consequent drain on organizational resources," Article III's injury-in-fact requirement is satisfied so long as this diversion of resources is "pled with enough specificity" and alleges "generally what the organization had to forego."

15

*Knowledge Ecology Int'l v. Nat'l Insts. of Health*, No. PJM 18-1130, 2019 WL 1585285, at *4 (D. Md. Apr. 11, 2019); *see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (noting that a "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests"). "That the alleged injury results from the organization's noneconomic interest in encouraging [a policy outcome] does not effect the nature of the injury suffered, . . . and accordingly does not deprive the organization of standing." *Havens Realty*, 455 U.S. at 379 n.20 (citation omitted). Thus, "there can be no question that the organization has suffered injury in fact" where an organization's operations have been "perceptibly impaired," even though the organization's mission is established to achieve a "noneconomic interest." *Id.* at 379 & n.20.

To satisfy the traceability requirement, the organization "must show that the challenged action is 'in part responsible . . .'" for its alleged injury. *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 283 (4th Cir. 2018) (internal citation omitted). "[T]he defendant's conduct need not be the last link in the causal chain," and the requirement is satisfied where the organization's injury results from the "determinative or coercive effect" that defendant's conduct had on a third party's actions. *Mayor & City Council of Balt. v. Trump*, 416 F. Supp. 3d 452, 486 (D. Md. 2019) (quoting *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018); and *Landsdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 197 (4th Cir. 2013)).

The burden to establish redressability is "not onerous," and Plaintiffs do not need to show that every injury will be relieved by a favorable outcome. *Deal v. Mercer Cty. Bd. of Educ.*, 911 F.3d 183, 189 (4th Cir. 2018). "Rather, plaintiffs 'need only show that they personally would benefit in a tangible way from the court's intervention.'" *Id.* (internal citation omitted)). Where an

agency action caused an organizational plaintiff's injury, finding that action invalid often satisfies the redressability prong. *See, e.g.*, *Casa De Md., Inc. v. Trump*, 414 F. Supp. 3d 760, 773–74 (D. Md. 2019), *rev'd on other grounds and remanded*, 2020 WL 4664820 (4th Cir. Aug. 5, 2020) ("The alleged injury also can be redressed by Plaintiffs' proposed relief of setting aside the Rule as unlawful and enjoining DHS from enforcing the Rule."); *see also O.A. v. Trump*, 404 F. Supp. 3d 109, 145 (D.D.C. 2019) (noting that plaintiffs need only "establish an injury in fact . . . that would be redressed by the invalidation of the Rule").

Alternatively, an organization may bring suit on behalf of one of its members under a theory of associational or representational standing where: "(1) its members would otherwise have standing to sue as individuals; (2) the interests at stake are germane to the group's purpose; and (3) neither the claim made nor the relief requested requires the participation of individual members in the suit." *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002). With respect to the first prong, the organization need identify only a single member who would have standing to sue. *E.g.*, *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 186 (4th Cir. 2007). On the second prong, "an interest is 'germane' to an organization's purpose if the lawsuit would 'reasonably tend to further the general interests that individual members sought to vindicate in joining the association and . . . bears a reasonable connection to the association's knowledge and experience.'" *Kravitz v. U.S. Dep't of Commerce*, 366 F. Supp. 3d 681, 741 (D. Md. 2019) (omission in original) (internal citation omitted). Finally, where the organizational plaintiff seeks declaratory and injunctive relief but not money damages, courts typically deem the claim capable of being litigated without the individual member's involvement. *See, e.g.*, *Retail Indus. Leaders Ass'n*, 475 F.3d at 187 (acknowledging that an action seeking "a declaratory judgment and injunctive relief[ are] the type of relief for which associational standing was originally

recognized"). Even where some participation is required of the member, standing is not defeated so long as that person's involvement is not indispensable to the case's resolution. *See, e.g.*, *Equal Rights Ctr. v. Abercrombie & Fitch Co.*, 767 F. Supp. 2d 510, 525 (D. Md. 2010).

Plaintiffs Know Your IX, SSAIS, and GGE each satisfy the requirements of organizational standing, and COPAA meets the prerequisites for associational standing, as detailed below.

### A. Like the organization in *Havens Realty*, Know Your IX, a project of Advocates for Youth, has standing to sue.

Know Your IX, a project of Advocates for Youth, has more than sufficiently shown injuries caused by the Rule that judicial relief can mitigate.[4]

### i. Know Your IX has established concrete and imminent injuries that directly interfere with its ability to function.

The Rule's provisions directly frustrate Know Your IX's mission. As previously described, Know Your IX's purpose is to end sexual violence and harassment as an impediment to education, equip students with knowledge and skills to obtain meaningful responses to such violence and harassment from their schools, and bring greater attention to the actual experiences of survivors to combat common stereotypes. *See discussion supra II* and Carson Decl. ¶¶ 3–6. Because the Rule reduces the number and types of conduct or events that may be investigated by schools in Title IX proceedings through its narrowed definition of "sexual harassment" and effective exclusion of off-campus incidents, the Rule reduces the number of survivors who will be eligible for remedies

---

[4] Defendants' unsupported suggestion that Know Your IX may not be an "organization" capable of bringing suit is specious. There is no requirement that organizational plaintiffs assume any particular corporate form. *See, e.g.*, *Waterford Citizens' Ass'n v. Reilly*, 970 F.2d 1287, 1288 n.1, 1290 (4th Cir. 1992) (holding that "a nonprofit unincorporated group of village residents" "me[]t[] the test for organizational standing"); *Concerned Citizens of Carderock v. Hubbard*, 84 F. Supp. 2d 668, 670, 672 n.5 (D. Md. 2000) (finding no standing problem for a plaintiff that was "a private, unincorporated association of property owners").

to help them complete their education that are only available through these proceedings. The number of survivors who can access Title IX remedies is further depressed by the Rule's requirement that schools dismiss complaints that are facially insufficient to meet the definition of sexual harassment. Separately, the Rule's imposition of the "clear and convincing" standard of proof in Title IX proceedings makes it more difficult for survivors to prevail even when their complaints are reviewed and, once again, denies them even those who establish that they more likely than not were sexually assaulted or harassed remedies that would permit them to access their education. All of these provisions stand in the way of Know Your IX's additional goal of bringing greater attention to survivors' actual experiences and ensure their stories are not buried, because they result in the literal dismissal of survivors' narrative complaints. Likewise, the Rule's "deliberate indifference" standard of school liability gives little weight to whether and to what extent impacted students are able to continue their education in the aftermath of sexual harassment or assault, obfuscating and minimizing survivors' lived experiences. Thus, Defendants' claim that the Rule's impairment of Know Your IX is self-inflicted is simply incorrect and based on a gross misunderstanding of the organization's mission and activities.

In addition to running at cross-purposes with Know Your IX's objectives, the Rule has a twofold practical impact on the organization's operations. First, the Rule requires a fundamental change in how Know Your IX prepares students to engage in school-based advocacy and to support survivors. The Rule's anemic school response requirements and failure to mandate preventative measures mean that Know Your IX must identify new tools that it can point to when organizing students and equipping them with skills and ideas on how to engage in successful campaigns at their individual schools. Where the Department of Education previously served as a government-backed enforcement mechanism, Know Your IX is having to "find substitute methods of

enforcement whether alternate government entities, direct action campaigns, or creative advocacy to ensure the gender-based violence and harassment that interferes with students' educations is not ignored because student survivors can no longer avail themselves of Title IX's protections or remedies as a result of the Rule." Carson Decl. ¶ 10. Second, the new Rule requires that Know Your IX discard and redraft virtually every document, training plan, or other resource it used because they heavily pegged accountability standards to Title IX's substantive provisions. This requires a huge reallocation of staff time and budget, away from activities that it had planned to embark on this year. *See discussion supra*.

Defendants attempt to disaggregate Know Your IX's allegations of injury, casting past mission-based setbacks and expenditures as irrelevant, and the inherently unrealized nature of future work as conjectural. Their arguments ignore that Know Your IX outlines an ongoing impact to their work, such as the need to recreate educational materials explaining the provisions of the final Rule in order to continue functioning. "[O]ngoing injuries are, by definition, *actual* injuries for purposes of Article III standing." *Deal*, 911 F.3d at 189 (emphasis in original). Moreover, Know Your IX's upcoming harms are probable and imminent. *See Mayor & City Council of Balt.*, 416 F. Supp. 3d at 485 (recognizing that allegations of certainly impending injuries or a substantial risk of harm are sufficiently "imminent"). The troubling consequences of the Rule are not conjectural but were ED's *intended result* according to its Notice of Proposed Rulemaking, which anticipated that the regulations would result in 32% fewer investigations of sexual harassment in higher education. 83 Fed. Reg. at 61,487; *see Mayor & City Council of Balt.*, 416 F. Supp. 3d at 489 (rejecting allegations of speculation where City's theory of standing aligns with the "predictable effect of Government action on the decisions of third parties" (internal citation omitted)).

Defendants further contend that some of Know Your IX's activities are unnecessary because, in its view, the Rule provides clarity to students and does not jeopardize the dismissal of bona fide complaints. Plaintiffs vehemently disagree with this characterization of the Rule's challenged provisions. School and college officials have submitted declarations in other litigation challenging the Rule that describe the confusion the Rule causes and the convoluted implementation that will result. *See, e.g.*, Decl. of Assistant Comm'r AbdulSaleem Hasan (Ex. 59) ¶¶ 33–37, Decl. of Linda Hoos (Ex. 63) ¶¶ 33–45, Decl. of Karyn Lynch (Ex. 71) ¶¶ 25, 41, ECF No. 22-3, *Commonwealth of Pa. v. DeVos*, No. 20-cv-01468-CJN (D.D.C. June 23, 2020). Regardless, an inquiry into how the Rule's provisions will operate is inappropriate at this time. "The standing doctrine, of course, depends not upon the merits." *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 460 (4th Cir. 2005). "If a plaintiff's legally protected interest hinged on whether a given claim could succeed on the merits, then 'every unsuccessful plaintiff will have lacked standing in the first place.'" *Id.* at 461 (internal citation omitted).

The Rule's harms to Know Your IX's mission and ability to function satisfy the injury-in-fact requirements as recently addressed by the Fourth Circuit Court of Appeals in *dicta* in *CASA de Maryland, Inc. v. Trump*, _ F.3d _, 2020 WL 4664820, at *8 (4th Cir. Aug. 5, 2020). Affirming the lower court's conclusion that the lawsuit could proceed, albeit on the basis of the individual plaintiffs' standing and not the organizational plaintiff's alleged injuries, the court reiterated that an organization's "unilateral and uncompelled response to the shifting needs of its members cannot manufacture an Article III injury." *Id.* at *9. Thus, the lower court had erred in finding that the agency regulation at issue in that litigation, a Department of Homeland Security rule that defined "public charge" for purposes of admissibility determinations, "impeded CASA's efforts to carry out its mission because the organization was forced to reallocate resources." *Id.* at *8. The relevant

organizational injury as set forth by the Supreme Court in *Havens Realty*, according to the panel majority,[5] "is measured against a group's ability to *operate* as an organization, not its theoretical ability to *effectuate* its objectives in its ideal world." *Id.* at *9 (emphasis in original).

Here, Plaintiff Know Your IX has a far narrower mission than did CASA. As the district court recounted, CASA's mission was "to create a more just society by building power and improving the quality of life in low-income immigrant communities," and it offered "social, health, job training, employment, and legal services to immigrant communities" in furtherance of that mission. *Casa De Md., Inc.*, 414 F. Supp. 3d at 771 (internal citations omitted). Know Your IX, in contrast, is *exclusively* dedicated to helping students hold their educational institutions responsible for adequately responding to sexual violence and harassment. Unlike the more-generalist organization CASA, Know Your IX engages in education, training, and advocacy activities to accomplish this specific end, rather than seeking to help students generally or even empower student survivors more broadly by, say, providing counseling, finding safe housing, identifying accessible health care providers, or assisting in filing complaints with law enforcement. While an organization with a broader range of activities could absorb the impact of agency action by

---

[5] Plaintiffs maintain that Judge King's dissenting opinion in *CASA* reflects the better reading of *Havens Realty*, which expressly recognized that a "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Id.* at *32 (King, J., dissenting) (quoting *Havens Realty*, 455 U.S. at 379). Additionally, *Lane*, on which the *CASA* panel majority relies, in turn relied on a D.C. Circuit case that has subsequently been "cabined." *Nat'l Fair Hous. All. v. Bank of Am., N.A.*, 401 F. Supp. 3d 619, 627 n.2 (D. Md. 2019). Contrary to *Lane*'s reading of *Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.*, 28 F.3d 1268, 1276–77 (D.C. Cir. 1994), the D.C. Circuit understands *BMC*'s injury analysis as "focused on whether [plaintiffs] undertook the expenditures in response to, and to counteract, the effects of the defendants' alleged discrimination rather than in anticipation of litigation"; the standing inquiry did not "depend on the voluntariness or involuntariness of plaintiffs' expenditures." *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011). Regardless, Plaintiffs' alleged harms satisfy the injury-in-fact standard under either the *CASA* majority or dissent's framing.

focusing more on some of its services than other, Know Your IX must morph into a different type of advocacy organization because of ED's actions; the Rule has altered Know Your IX's ability to operate as it was created.

To that end, Defendants' reliance on *Lane v. Holder*, 703 F.3d 668 (4th Cir. 2012), in support of their argument that Know Your IX's injuries do not meet the definition of Article III standing requirements, is misguided. Unlike in *Lane*, Know Your IX is not an organization that engages only in "know your rights" programming or government-facing advocacy concerning any particular law or administrative policy, as described above. In addition, to the extent the *Lane* decision was driven by the lack of specificity or particularity surrounding the alleged harm to the plaintiff organization—especially the lack of allegations regarding harm to mission—the injuries inured to Know Your IX have been set forth in detail and with illustrative examples. *See also Harrison v. Spencer*, _ F. Supp. 3d _, 2020 WL 1493557, at *8 (E.D. Va. Mar. 27, 2020) (finding sufficient, in contrast to the non-specification allegations in *Lane*, an organization's fielding increased requests for legal assistance and resulting delays for other projects, which went towards the core of the organization's mission, in order "to serve the needs of those who had requested help"); *cf. Md. Shall Issue, Inc. v. Hogan*, 963 F.3d 356, 362 (4th Cir. 2020) (finding that plaintiff lacked organizational standing where it "did not allege that it had expended resources as a result of" a state law, "nor did it explain a way in which [the law] 'perceptibly impaired' its activities" (citing *Havens Realty*, 455 U.S. at 379)).

Similarly misplaced are Defendants' citations to *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), for their theory that Know Your IX's injuries are self-inflicted. The Court in *Clapper* held that plaintiffs' preemptive measures to ensure confidential communications with their clients, although burdensome, would not suffice. *Id.* at 416. But key to that conclusion was

that the future harm plaintiffs were reacting to—that their clients would be surveilled under a particular statutory provision, and that the plaintiffs' communications would be intercepted—was too speculative to be deemed "certainly impending." *Id.* at 401–02, 416. The determination of lack of imminence of future injury was deeply grounded in the specific facts of that case. *See id.* at 411–14. As Know Your IX has alleged, its injuries are ongoing—not speculative—as are the measures it is taking to mitigate their injuries. *See generally* Carson Decl. ¶¶ 9–35.

A recent decision regarding a challenge to ED's 2017 rescission and guidance is also instructive. One of the plaintiffs, SurvJustice Inc., was an advocacy organization similar to Know Your IX. *SurvJustice Inc. v. DeVos*, No. 18-cv-00535-JSC, 2018 WL 4770741, at \*4 (N.D. Cal. Oct. 1, 2018). SurvJustice adequately pled frustration of organizational mission where it articulated observing a decrease in student-filed campus and OCR complaints in light of ED's 2017 Title IX Guidance. *Id.* at \*6–\*7. And the group sufficiently established a diversion necessitated by the policy's harm to its mission where it alleged that it increased the number of know your rights trainings held, devoted significant personnel time to understanding new Title IX policy to better advise and advocate for students, and spent additional time and resources in remonstrating with school officials. *Id.* at \*7–\*8.

> **ii.     The Rule caused Know Your IX's injuries, and the requested remedies are likely to relieve them.**

Defendants claim that Know Your IX needs to allege a link "between provisions of the Rule that allegedly contravene the APA" and their injury. Defs.' Br. at 18. But case law is clear that standing requirements—including causation and redressability—need only be established "for each *claim* and for each *form* of relief sought." *Stone v. Trump*, 400 F. Supp. 3d 317, 338 (D. Md. 2019) (emphasis added); *accord Bostic*, 760 F.3d at 370 ("The standing requirement applies to

each *claim* that a plaintiff seeks to press." (emphasis added)). Here, Plaintiffs bring a single APA claim for which they seek declaratory and injunctive relief.

Plaintiffs must demonstrate how the *Rule* has caused a redressable injury, without needing to tie each harm to a particular provision in a 2,000-page document. *See, e.g.*, *Nat'l Fed'n of the Blind*, 407 F. Supp. 3d at 533 (finding causation satisfied because had ED "not adopted" the manual containing challenged provisions, "Plaintiffs would not have suffered this injury"); *see also O.A.*, 404 F. Supp. 3d at 142 (noting that plaintiffs need only "establish an injury in fact that is fairly traceable to *the challenged Rule*" (emphasis added)). Plaintiffs have shown but-for the Rule they would not suffer their injuries. It makes no difference that Know Your IX was not "the object of [the] government policy" at issue in this litigation. *See Casa De Md. v. U.S. Dep't of Homeland Sec.*, 284 F. Supp. 3d 758, 771 (D. Md. 2018), *aff'd in part, vacated in part on other grounds, rev'd in part on other grounds*, 924 F.3d 684, 701 n.14 (4th Cir. 2019) (internal citation omitted). The Rule's "coercive effect" on educational institutions, including the ceiling set on what harassment they can treat under Title IX processes, is sufficiently causally related to Know Your IX's injuries. *Landsdowne on the Potomac Homeowners Ass'n, Inc.*, 713 F.3d at 197; *Kravitz*, 366 F. Supp. 3d at 741 ("[T]he risk of future injury may satisfy Article III's injury and causation requirements even if steps on the causal chain still stand between a defendant's conduct and the plaintiff's injury when the case is filed.").

So too with redressability, Defendants misstate what is legally required. *See, e.g.*, *Nat'l Fed'n of the Blind*, 407 F. Supp. 3d at 534–36 (describing the redressability standard, in a challenge to provisions of an ED manual, as asking whether there is a "likelihood that the injury can be redressed by a favorable ruling providing injunctive or declaratory relief")). Plaintiffs need not show that judicial relief will replenish their already spent time and resources, or that their impacted

operations will definitively and immediately revert back to pre-Rule times—impossibilities in any APA challenge. They only need to show that the frustration of their mission and subsequent diversion of resources is likely to cease. *See Deal*, 911 F.3d at 189–90; *Casa De Md., Inc.*, 414 F. Supp. 3d at 773–74.[6] Here both conditions are met, based on the facts described above.

### B.  COPAA, which has interests at stake in this litigation, has standing to sue on behalf of its injured member.

COPAA member Elizabeth Abdnour has standing to sue in her own right, which gives rise to COPAA's associational standing. The Rule's impact on Ms. Abdnour's legal practice meets the injury-in-fact requirements of being concrete and particularized because it causes a material drain on her time and financial resources, impairs her ability to obtain favorable results for her clients, and hampers the mission of her legal practice. Given that the Rule contains non-discretionary and self-executing provisions now in effect, the harm to Ms. Abdnour is ongoing and directly traceable to the Rule. Should the court find the challenged provisions of the Rule to be arbitrary and capricious, the harm to Ms. Abdnour would be alleviated. And the interests at stake in this action— the civil rights of students, including those with disabilities—are germane to COPAA's purpose and do not require the participation of any COPAA members.

### i.  The Rule has had a detrimental impact on member's legal practice.

Ms. Abdnour was moved to found Abdnour Law with the specific intent to support "victims of sexual harassment or discrimination K–12 and higher education." Abdnour Decl. ¶ 2. She did so after serving as a Title IX investigator at Michigan State University during the investigation of

---

[6] The Fourth Circuit did not address the district court's discussion of redressability. *See CASA de Md., Inc.*, 2020 WL 4664820, at *8–*10.

Larry Nassar, who sexually abused hundreds, including many Olympic gymnasts.[7] *Id.* The Rule has resulted in significant tangible harm to Ms. Abdnour.

Several Rule provisions will require Ms. Abdnour to expend more resources to achieve favorable results for her clients. For instance, as explained above, the Rule creates a new restrictive definition of sexual harassment and mandates that schools dismiss claims that do not, on their face, meet it. *Id.* ¶ 5. As a result, she is filing fewer OCR complaints on behalf of students and will likely obtain fewer successes when she does. *Id.* ¶¶ 9, 11–12. As a result of the Rule's effective ban on commencing investigations of harassment that occurred off-campus, Ms. Abdnour will have to turn away individuals whom she would have previously represented. *Id.* ¶¶ 7–8. Ms. Abdnour anticipates that her ongoing and future Title IX work will involve more resource-intensive litigation, which results in representing fewer Title IX clients, fewer clients on a contingency or pro bono basis, and fewer special education clients. *Id.* ¶¶ 3–4, 9–12.

*SurvJustice Inc.* and *National Federation of the Blind* are instructive. Legal advocates had standing to challenge ED's 2017 Title IX policy changes that, among other things, "made it more difficult to obtain beneficial outcomes" for plaintiffs' clients. *SurvJustice Inc.*, 2018 WL 4770741, at *6–*7. One plaintiff sufficiently established an injury-in-fact where it devoted staff time to reviewing and understanding the policy in order to better advise clients, thus reducing the time available to provide legal services and to work on ongoing litigation. *Id.* at *7–*8; *see also El Rescate Legal Services, Inc. v. Exec. Office of Immigration Review*, 959 F.2d 742, 748 (9th Cir. 1991) (holding organization that offered legal advice to "assist Central American refugee clients"

---

[7] David Eggert & Ed White, *Michigan State Reaches $500M Settlement for 332 Victims of Larry Nassar*, Chi. Trib. (May 16, 2018), https://www.chicagotribune.com/sports/college/ct-spt-michigan-state-larry-nassar-settlement-20180516-story.html.

obtain asylum suffered injury in fact where "their efforts to obtain asylum and withholding of deportation in immigration court proceedings" were frustrated by defendant's policy and required a diversion of resources).[8] The injuries found to be sufficient in *SurvJustice* bear striking similarities to the injuries alleged by Ms. Abdnour. In *National Federation of the Blind*, civil rights advocacy groups, including COPAA, challenged provisions of an ED case processing manual. *Id.* 407 F. Supp. 3d at 527–28. The court deemed plaintiffs adequately injured where a policy change added "obstacles to a successful OCR complaint, to the point that Plaintiffs" had to advise their members "on more expensive alternative complaint mechanisms such as federal lawsuits." *Id.* at 533. Similarly, Ms. Abdnour has to upend her Title IX docket to focus more on pursuing litigation, which is both time and resource-intensive.

Even though these cases found standing on behalf of legal organizations rather than individual attorneys, the analysis is equally applicable. *See, e.g.*, *Torres v. U.S. Dep't of Homeland Sec'y*, 411 F. Supp. 3d 1036, 1054 (C.D. Cal. 2019) (finding that a lawyers association adequately pled associational standing where it alleged its members lost time traveling to meet clients and "could represent more clients were it not for the [communication] difficulties alleged"); *Guild v. Securus Techs., Inc.*, No. 1:14-CV-366-LY, 2015 WL 10818584, at *4–*5 (W.D. Tex. Feb. 4, 2015), *accepted and adopted*, 2015 WL 11237655 (W.D. Tex. Mar. 23, 2015) (holding that a

---

[8] Defendant's authority, *Habeas Corpus Resource Center v. U.S. Department of Justice*, 816 F.3d 1241 (9th Cir. 2016), is readily distinguishable. That case involved organizational plaintiffs who provided legal counsel and representation to capital defendants and prisoners. *Id.* at 1246. The Attorney General promulgated a set of regulations, as statutorily required, to certify that certain state procedures complied with the law. *Id.* at 1244–45. The plaintiffs challenged only the regulations, arguing that the uncertainty in the certification process generated uncertainty for their clients, which caused plaintiffs' uncertainty in advising their clients. *Id.* at 1246, 1249. The Ninth Circuit held that the regulation in question was too attenuated from the adverse effect on the lawyers' ability to obtain positive outcomes to generate their organizational standing. *Id.* at 1250–51. It does not, however, hold that lawyers may not achieve standing with injuries grounded in the fact that an agency action renders their practice more burdensome and less lucrative.

lawyers guild had standing to sue on behalf of its criminal defense attorney members whose business relationships with their clients, including the time necessary to consult with them, was impacted by defendants' conduct).

The decrease in investigations and OCR investigations as a result of the Rule is indisputable. The Department of Education itself predicted that preventing institutions of higher education from investigating sexual assault and harassment unless a formal complaint is filed will result in 32% fewer investigations. 83 Fed. Reg. at 61,487. The agency anticipated an even greater decrease will result from the Rule's elimination of sexual assault or harassment that occurs outside the United States or outside an institution's "education program or activity" from the category of complaints that institutions are permitted to investigate. *Id.* Given that Ms. Abdnour's legal practice is heavily focused on representing individuals in Title IX matters, she is directly experiencing and will continue to be directly impacted by this decrease. The alterations to Ms. Abdnour's Title IX docket are quintessential injuries supporting standing.

### ii. The sought relief will likely reduce the member's pocketbook and docket injuries, which are caused by the Rule.

Ms. Abdnour's injuries can be fairly traced to the Rule. Agency action can cause a cognizable injury even when the agency action regulates intermediate actors and not the organization itself. *See Mayor & City Council of Balt.*, 416 F. Supp. 3d at 486 (citations omitted). Here, while ED does not regulate legal service organizations, the complaint resolution procedures it requires educational institutions to follow directly impact those who participate in the complaint process. Legal service providers have no option but to operate within the parameters set by ED. Moreover, the directly regulated entities cannot take actions that would blunt the impact of the Rule on Ms. Abdnour. For example, in determining whether a Title IX investigation or

adjudication is allowed, the regulated entity must follow the Rule's narrowed definition of sexual harassment and proscription against hearing complaints about sexual assault or harassment that takes place while a student is in a study abroad program. Causation in this case is satisfied because the injury to Ms. Abdnour is "produced by [the] determinative or coercive effect" of ED's rulemaking "upon the action of someone else," namely educational institutions. *Landsdowne on the Potomac Homeowners Ass'n, Inc.*, 713 F.3d at 197 (alteration in original) (internal omitted).[9]

Moreover, Plaintiffs' requested relief will address Ms. Abdnour's injuries. If the challenged provisions of the Rule are found to be arbitrary and capricious, Ms. Abdnour's practice will likely not experience a resulting decline in the number of individuals she can represent or the number of individuals for whom she can obtain relief. *See Deal*, 911 F.3d at 189.

### iii.  The member need not participate in this APA action involving the civil rights of students with disabilities—the focus of COPAA.

Defendants do not, and cannot, dispute that the last two prongs of the associational standing analysis are met here. The interests at stake are clearly germane to COPAA's purpose, and the adjudication of Plaintiffs' APA claim on the merits does not require Ms. Abdnour's participation.

COPAA's mission is "to protect and enforce the legal and civil rights of students with disabilities and their families," Compl. ¶ 23, which includes the right under Title IX to be free from sex discrimination in school. Moreover, students with disabilities are disproportionately subjected to sexual assault and harassment, in addition to being less likely to report or be believed when they do report. *See id.* ¶¶ 8, 33, 36, 39. Given that the proposed regulations threaten interests at the heart of COPAA's mission, COPAA submitted a comment on the Rule. *Id.* ¶¶ 15, 141.

---

[9] The Sixth Circuit decisions that Defendants cite as possible sources of Ms. Abdnour's harm are irrelevant, as those cases focus on grievance procedures not at issue in Plaintiffs' APA challenge.

Because this lawsuit would tend to further the interest that motivated COPAA members joining the organization—vindicating the civil rights of students with disabilities—the interest is germane to COPAA's purpose. *See Kravitz*, 366 F. Supp. 3d at 741; *Casa De Md.*, 284 F. Supp. 3d at 771. Finally, Ms. Abdnour's participation is irrelevant to the adjudication of this APA action, which seeks the quintessential relief for associational standing. *See Retail Indus. Leaders Ass'n*, 475 F.3d at 187; *Equal Rights Ctr.*, 767 F. Supp. 2d at 525.[10]

## C.    The frustration of GGE's mission and resource-drain grant it standing.

### i.    The Rule's interference with GGE's operations establishes injury.

Contrary to Defendants' assertions, the Rule will frustrate GGE's core mission. Rather than incentivize schools to address and prevent the rampant sexual harassment afflicting students, especially girls and gender nonconforming youth of color, it will free schools of obligations to ensure they are providing safe learning environments. For that reason, GGE has been compelled to develop a new special project with an external partner to place pressure on the New York City Department of Education and to push for resources focused on preventing sexual harassment and assault in schools. Sawyer Decl. ¶¶ 19–21. Defendants suggest that GGE's engaging in additional policy advocacy to increase preventative measures in order to counteract the harmful federal policy on Title IX cannot suffice as an injury because policy advocacy is a core tool in the organization's work. But that is beside the point. GGE does not engage in policy advocacy for its own sake, or to keep others updated on the current state of the law, but to achieve specific strategic objectives

---

[10] Only Plaintiff COPAA resides in the District of Maryland. Should the Court determine that COPAA lacks standing, Plaintiffs request that the Court, in the interest of justice, exercise its discretion to transfer this action to a district where venue is proper. *See* 28 U.S.C. § 1406(a); *see, e.g.*, *SAMi—Systematic Analysis Mgmt., Inc. v. Omnivere Acquisitions, LLC*, No. RDB-19-2904, 2020 WL 1863292, at *4 (D. Md. Apr. 14, 2020) (finding "[t]ransfer, not dismissal, . . . appropriate," given the Fourth Circuit's reading of Section 1406(a) to allow transfer "for any reason which constitutes an impediment to a decision on the merits in the transferor district but would not be an impediment in the transferee district" (internal citation omitted)).

necessary to its mission. One of GGE's objectives is to pressure "the NYC Department of Education to develop a clear reporting pathway for students who experience school-based sexual harassment or assault." *Id.* ¶ 16. Because of the Rule, GGE cannot achieve this objective without different and additional advocacy—for which it must devote more staff time. *Id.* ¶¶ 19–20; c*ompare id.* ¶ 3 ("We engage in . . .policy advocacy to remove barriers to and create opportunities young people to live self-determined lives."); *and id.* ¶ 16 (describing "map[ping] out an advocacy campaign"); *with Lane*, 703 F.3d at 671 (describing non-profit organization's *purpose* as "education, research, publishing and legal action focusing on the Constitutional right to privately own and possess firearms, and the consequences of gun control").

Thus, that GGE must change as a result of the Rule its operations to engage in advocacy that is both quantitatively and qualitatively different than what was planned is a concrete and specific injury. "Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Havens Realty*, 455 U.S. at 379.

### ii.    The Court can likely remedy GGE's injury, caused by the Rule.

Because the Rule has diminished schools' federal obligations to prevent and respond to harassment, it has thwarted GGE's prior and planned approach to making NYC schools a safe, harassment-free environment for students and resulted in a consequent drain on its staff time and resources. The relief sought by this litigation would restore tools to GGE's advocacy toolbelt, free up staff time that has been diverted, and allow it to direct its resources as it sees fit. *See Deal*, 911 F.3d at 189–90; *Casa De Md., Inc.*, 414 F. Supp. 3d at 773–74; *Sierra Club*, 899 F.3d at 285 ("Petitioners' injuries are redressable because granting the requested relief would at least mitigate, if not eliminate, the alleged harm."); *see also Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will

relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury." (emphasis in original)).

**D.    SSAIS has standing because it is changing its core identity to continue furthering its mission post-Rule.**

Defendants' arguments for why SSAIS lacks standing are equally unavailing. SSAIS has described the direct impact the Rule will have on its mission and ability to operate going forward.

**i.    The Rule stymies SSAIS's original mission and operations.**

The new Rule undermines SSAIS's mission by creating two tiers of sexual misconduct policy: one for Title IX and another for harassment that is not covered by Title IX. It is the two-tier system caused by the new Rule that impairs SSAIS's mission because it creates a confusing and contradictory policy landscape. Levin Decl. ¶ 9. This shift also requires a complete overhaul of SSAIS's informational and training materials. *Id.* ¶ 17. Before the Rule was changed, SSAIS's materials were up-to-date and explained and relied on ED's Title IX guidance over the past 20 years—the same guidance that informed state and district-level school administrators. *Id.* ¶ 7. But now, to remain operational, SSAIS must engage in the resource-draining task of recreating itself as an expert in state and local policies. *Id.* ¶¶ 15–17.

Defendants dispute that the Rule's impact on SSAIS satisfies injury for standing purposes by equating it to the Rule's impact on journalists who would have to read up on its provisions. Defendants' comparison is inapt and misapprehends the Rule's consequences for SSAIS. SSAIS is not simply reporting what happened with passage of the Rule or summarizing its contents. SSAIS will also have to find entirely new tools and create new resources to provide to families and students seeking to remediate the effects of sexual assault or harassment. With the disconnect created by the Rule between Title IX and state and local requirements, SSAIS must revise its website resources—not purely for informational purposes, but because SSAIS aims to help

families and students navigate investigative, remedial, and supportive avenues for survivors, and the Rule's changes will require that people look beyond Title IX for such mechanisms. Like in *National Federation of the Blind*, "Plaintiffs are not merely in the business of advising the public about potential changes in the law; rather, they affirmatively engage in advising" students, their families, and educators about whether and how to proceed with potential Title IX cases. *See* 407 F. Supp. 3d at 532; *cf. id.* at 532–33 (recognizing that updating training materials, conducting retrainings, and altering recommendations and advice on the efficacy of OCR complaints as an adequate injury where, like in *Havens Realty*, the activities required a reallocation of resources that could have furthered the organization's mission in other ways). Unlike the journalist, whose career is not derailed by a change in the law, SSAIS will have to identify and implement new strategies, which will require a large expenditure of resources beyond that which would have been necessary but-for the Rule, in order to attain its core objective: helping survivors of sexual assault and harassment in K–12 schools by filling knowledge and resource gaps among students, parents, and K–12 school staff. Levin Decl. ¶¶ 4–5, 7.

Finally, contrary to Defendants' incorrect reassurances, SSAIS will have to alter their planned activities in the upcoming year. *See id.* ¶ 18. Such changes are clearly sufficient to support a diversion of resources theory of organizational standing. *See Equal Rights Ctr.*, 798 F. Supp. 2d at 722, 725 (in order to counteract the defendant's actions, plaintiff had to divert resources from, *inter alia*, its efforts to develop a civil rights alliance and expand its fair employment and public accommodations programs). Here as in *Havens Realty*, that SSAIS's "injury results from the organization's noneconomic interest[s]" has no impact on its standing. 455 U.S at 379 n.20.

34

      ii.    **SSAIS's injuries are traceable to the Rule and redressable by the Court.**

Defendants collapse their same objections to SSAIS's injury into their causation and redressability arguments. They say that SSAIS would have been providing technical assistance, learning about the rule, and advocating for parallel protections regardless of their (dis)agreement with the Rule's contents. While clever, the government ignores the fact that the reallocation is the result of a regulation that threatens the organization's operations and thus requires a change in their activities.

### CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.

Dated: August 24, 2020               Respectfully Submitted,

                            */s/ Anjana Samant*_____
                            Joshua Sohn (*admitted pro hac vice*)
                            Daniel Lewkowicz (*admitted pro hac vice*)
                            Stroock & Stroock & Lavan LLP
                            180 Maiden Lane
                            New York, New York 10038
                            Phone: (212) 806-5400
                            Fax: (212) 806-6006
                            jsohn@stroock.com
                            dlewkowicz@stroock.com

                            Jennesa Calvo-Friedman (*admitted pro hac vice*)
                            Rebecca A. Ojserkis (*admitted pro hac vice*)
                            Sandra S. Park (*admitted pro hac vice*)
                            Anjana Samant (*admitted pro hac vice*)
                            Hilary Ledwell (*admitted pro hac vice*)
                            Ria Tabacco Mar (*admitted pro hac vice*)
                            American Civil Liberties Union Foundation
                            Women's Rights Project

125 Broad Street 18th Floor
New York, New York 10004
Phone: (212) 549-2644
Fax: (212) 549-2580
jcalvo-friedman@aclu.org
rojserkis@aclu.org
spark@aclu.org
asamant@aclu.org
hledwell@aclu.org
rmar@aclu.org

Seamus Curley (Bar # 21172)
Stroock & Stroock & Lavan LLP
1875 K Street NW
Washington, DC 20006-1253
Phone: (202) 739-2889
Fax: (202) 739-2895
scurley@stroock.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 24, 2020, I caused a copy of the foregoing opposition and accompanying documents to be electronically served upon all parties receiving CM/ECF notices in this case.

*/s/ Anjana Samant*
Anjana Samant