IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **KNOW YOUR IX**, *et al.*, | * | |
| v. | * | **Civil Action No. RDB-20-01224** |
| **ELISABETH D. DEVOS**, *in her official Capacity as Secretary of Education, et al.*, | * | |
| | * | |
| **Defendants.** | | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

In May of 2020, the U.S. Department of Education promulgated a rule seeking to define sexual harassment under any education program receiving federal financial assistance. Plaintiffs Know Your Title IX, Council of Parent Attorneys and Advocates, Inc., Girls for Gender Equity, and Stop Sexual Assault in Schools filed a lawsuit on May 14, 2020, asserting that certain provisions of this new rule violated federal law. Specifically, they contend that those provisions of the Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance regulation, 85 Fed. Reg. 30,026 (May 19, 2020) (to be codified at 34 C.F.R. pt. 106) ("Rule"), contravene the Administrative Procedures Act ("APA"). (Compl. For Decl. & Inj. Relief ¶¶ 142-46, ECF No. 1.) Plaintiffs seek an order declaring the Rule violates the APA, as well as vacatur of the Rule and injunctive relief as appropriate. (*Id.* at 45-46.) Defendants, Elisabeth D. Devos, U.S. Secretary of Education, Kenneth L. Marcus, Assistant Secretary for Civil Rights at the Department of Education, and the U.S. Department of Education have filed a Motion to

Dismiss Plaintiffs' Complaint on the grounds that each of the Plaintiffs lack standing.[1] Three of the Plaintiffs have no independent Article III standing. Supreme Court precedent provides that in a case of multiple Plaintiffs, only one must establish standing. Thus, all four Plaintiffs in this case must look to the standing of the lead Plaintiff Know Your Title IX, which has not adequately alleged facts to establish its standing to bring this action. Accordingly, for the reasons that follow, Defendants' Motion to Dismiss is GRANTED and Plaintiffs' Complaint is DISMISSED WITHOUT PREJUDICE.

## BACKGROUND

Title IX of the Education Amendments of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has held that sexual harassment and sexual assault may constitute unlawful sex discrimination. *See, e.g., Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999). In May 2020, the U.S. Department of Education ("ED") promulgated a rule that clearly defines behavior constituting sexual harassment under Title IX, as well as sets forth procedures for addressing such misconduct. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) (to be codified at 34 C.F.R. pt. 106) ("Rule"). This is the first time the ED has issued regulations that treat such acts as unlawful sex discrimination as well.

---

[1] The pending Motion to Intervene as Defendants (ECF No. 20) by the Foundation for Individual Rights in Education, the Independent Women's Law Center, and Speech First, Inc. is DENIED AS MOOT in light of this Court's Dismissal of this case.

Plaintiffs Know Your Title IX, a project for Advocates for Youth; Council of Parent Attorneys and Advocates, Inc. ("COPAA"); Girls for Gender Equity ("Gender Equity"); and Stop Sexual Assault in Schools ("SSAIS") (collectively, "Plaintiffs") challenged the promulgation of the Rule.  The Plaintiffs are nonprofits dedicated to eliminating the barriers created by sexual violence and harassment to equal educational access through education, resource and service support, and advocacy on behalf of students who have experienced sexual harassment and assault.  (*See* Compl. For Decl. & Inj. Relief ¶¶ 22-25, ECF No. 1.)  The Plaintiffs filed suit against the ED and Secretary Elisabeth DeVos and Assistant Secretary for Civil Rights Kenneth L. Marcus, in their official capacities, in May 2020, arguing that the Rule "radically reduced the responsibility of schools to respond to complaints of sexual harassment and assault, creating an arbitrary and wholly unexplained disparity between its treatment of sex discrimination on the one hand, and race, national origin, and disability discrimination on the other."  (Compl. For. Decl. & Inj. Relief ¶ 1, ECF No. 1.)

The ED has previously issued various "guidance" explaining how it believed schools should resolve allegations of sexual harassment (including sexual assault).  *See, e.g.*, 66 Fed. Reg. 5512-01 (Jan. 19, 2001).  In 2014, the ED announced it would engage in rulemaking on the subject.  *Dear Colleagues Letter from Assistant Secretary for Civil Rights* (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.   The ED released its proposed rule on November 29, 2018.  83 Fed. Reg. 61,462 (Nov. 29, 2018) (NPRM).  The final Rule was released publicly on the ED's website on May 6, 2020, and it was formally published in the Federal Register on May 19, 2020.  85 Fed. Reg. 30,026 (May

3

19, 2020). The Plaintiffs allege that the Rule includes several provisions that are contrary to both the language and spirit of Title IX, and not only depart significantly from consistent past practice, but create a "double standard" in which educational institutions have dramatically different obligations to respond to different forms of discrimination. (Compl. For. Decl. & Inj. Relief ¶ 11, ECF No. 1.) The unlawful provisions, the Plaintiffs allege, include:

a. Redefining sexual harassment to exclude many instances of misconduct that currently fall within the ED's definition, and that continue to fall under the ED's definition of harassment based on race, national origin, and disability (34 C.F.R. § 106.30(a))

b. Excluding off-campus incidents from the definition of sexual harassment (*Id.* § 106.44(a))

c. Limiting the category of school officials who are obligated to report allegations of sexual harassment (*Id.* § 106.30(a))

d. Permitting and in some cases requiring a clear and convincing evidence standard in sexual harassment hearings (*Id.* § 106.45(b))

e. Imposing a deliberate indifference standard on schools charged with preventing and ending sexual harassment (*Id.* § 106.2(h))

The Plaintiffs complain that these provisions are arbitrary and capricious and an abuse of discretion under the APA. 5 U.S.C. § 706(2). On July 31, 2020, the Defendant filed a Motion to Dismiss, arguing that all four Plaintiffs lack standing to bring this suit. (*See* ECF No. 34-1.)

## STANDARD OF REVIEW

Article III of the U.S. Constitution limits the jurisdiction of federal courts to actual "Cases" and "Controversies." U.S. Const. art. III, § 2. One element of this case and controversy requirement is that plaintiffs must demonstrate that they have standing to sue.

4

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). Rule 12(b)(1) of the Federal Rules of Civil Procedure permits a defendant to challenge the court's subject matter jurisdiction over the plaintiff's suit. Under Rule 12(b)(1), the plaintiff bears the burden of proving, by preponderance of evidence, the existence of subject matter jurisdiction. *See Demetres v. E. W. Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015).

"A defendant may challenge subject-matter jurisdiction in one of two ways: facially or factually." *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017). A facial challenge involves the allegation "that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). Accordingly, the plaintiff is "afforded the same procedural protection as she would receive under a Rule 12(b)(6) consideration," wherein "the facts alleged in the complaint are taken as true," and the defendant's challenge "must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Id.* By contract, in a factual challenge, the defendant argues "that the jurisdictional allegations of the complaint [are] not true," providing the trial court the discretion to "go beyond the allegations of the complaint and in an evidentiary hearing determine if there are facts to support the jurisdictional allegations." *Id.* (first alteration in original) (quoting *Adams*, 697 F.2d at 1219). Thus, with a factual challenge, "the presumption of truthfulness normally accorded a complaint's allegations does not apply." *Id.* The Court should only grant a Rule 12(b)(1) motion based on a factual challenge to subject matter jurisdiction if the facts are not in dispute and the moving party is entitled to prevail as a matter of law. *See Na'tl Fed'n of the Blind v. U.S. Dep't of Educ.*, 407 F. Supp. 3d 524, 530 (D.

Md. 2019) (internal citations omitted).  In this case, the Government challenges standing "on the pleadings," therefore this Court will "accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party."  *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018).

## ANALYSIS

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies."  U.S. Const. art. III, § 2.  The doctrine of standing gives meaning to these constitutional limits by "identify[ing] those disputes which are appropriately resolved through the judicial process."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."  *Clapper*, 568 U.S. at 408.  To establish Article III standing and invoke federal jurisdiction, a plaintiff must show (1) an "injury in fact," (2) a sufficient "causal connection between the injury and the conduct complained of," and (3) a "likelihood" that the injury "will be redressed by a favorable decision."  *Susan B. Anthony List*, 157-58 (quoting *Lujan*, 504 U.S. at 560-61).  The party invoking federal jurisdiction bears the burden of establishing standing.  *Id.* at 158.  "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation."  *Lujan*, 504 U.S. at 561.  At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to

dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883-89 (1990)).

The Court's standing decisions make clear that "standing is not dispensed in gross." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). To the contrary, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Id.* However, this does not mean that in the case of multiple plaintiffs, each plaintiff must prove his own standing. "[T]he Supreme Court has made it clear that 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (quoting *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)); *see also Town of Chester, N.Y. v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650-51 (2017); *Horne v. Flores*, 557 U.S. 433, 445 (2009) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 491-94) ("Here, as in all standing inquires, the critical question is whether at least one petitioner has 'alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction.'"). Therefore, in this case, this Court must find at least one plaintiff with standing in order for the Plaintiffs' case to survive the Defendants' Motion to Dismiss. If it does so, this Court need not analyze Defendants' arguments regarding the remaining Plaintiffs. *See Am. Coll. of Obstetricians & Gynecologists v. U.S. Food & Drug Admin.*, 2020 WL 3960625, at *8 (D. Md. July 13, 2020) (analyzing only whether one plaintiff has standing).

There are two specific types of standing relevant to this case: *organizational* standing and *associational* standing. *Organizational* standing provides that an organization may claim standing in its own right by adequately alleging the standing requirements as they apply to

individuals, namely that the organization itself has suffered an injury in fact that is fairly traceable to the challenged action of the defendant and is likely redressable by a favorable decision from the court. *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013). By contrast, *associational* standing (sometimes called "representational standing") allows an organization to establish standing "only as [a] representative[ ] of [its] members who have been injured in fact, and thus could have brought suit in their own right." *Id.* at 183-84 (quoting *Simon v. E. Ky. Welfare Rts.*, 426 U.S. 26, 40 (1976)). To plead associational standing:

> an organization must allege that '(1) its own members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit.'

*Id.* at 184 (quoting *Summers*, 555 U.S. at 498). The Supreme Court has clarified that to show that its members would have standing, an organization must "make specific allegations establishing that at least one *identified member* had suffered or would suffer harm." *Summers*, 555 U.S. at 498.

Three of the Plaintiffs in this case have no independent Article III standing. Specifically, COPAA, Gender Equity, and SSAIS have no independent Article III standing and must look to the standing of Know Your Title IX. That lead Plaintiff has not adequately alleged facts to establish its standing to bring this action.

### I. Council of Parent Attorneys and Advocates, Inc. ("COPAA")

COPAA is a nonprofit membership organization that aims to protect and enforce the legal and civil rights of students with disabilities and their families. (Compl. For Decl. & Inj. Relief ¶ 23, ECF No. 1.) Through the provision of education, training, and technical

assistance to professionals and laypersons, COPAA works to secure high-quality educational services for students with disabilities and to promote excellence in special education advocacy. (*Id.*) Some of COPAA's attorneys and advocate members represent complainants and respondents, including students with disabilities, in Title IX processes. (*Id.*)

COPAA alleges *associational* standing, arguing that it has standing as an organization on the basis of its representation of one of its members, who was injured in fact and, therefore, could have brought suit in her own right. (*Id.* at ¶¶ 131-34.) The Plaintiffs' Complaint alleges generally that COPAA's members who advocate on behalf of students will be injured by challenged provisions of the Rule. (*Id.* at ¶ 131.) The Complaint then points to a specific member of COPAA, a Michigan attorney later identified as Elizabeth Abdnour, who joined COPAA in 2018. (*Id.*) COPAA provides that Ms. Abdnour's "private practice primarily entails representing K-12 and college students, as well as higher education staff and faculty, in Title IX proceedings and advocating on behalf of K-12 special education students seeking services in their public schools." The Complaint alleges that because changes in the Rule will cause student complaints to face "more hurdles and be less likely to succeed," this attorney will have fewer administrative complaints to file, and the cases she does pursue "will be more difficult and take more time to resolve." (*Id.* at ¶ 132.) The Complaint further alleges that the changes to the Rule will "reduce clients' incentives to pursue administrative relief," forcing Ms. Abdnour to focus her efforts on seeking relief in court. (*Id.* at ¶ 133.) These changes will demand from the attorney "increased time and resources" and prohibit her from taking as many cases. (*Id.* at ¶ 133-34.) The Defendants argue that Ms. Abdnour

would lack standing in her own right, and, therefore, COPAA lacks standing as well. (ECF No. 34-1 at 20.) This Court agrees.

First, the Plaintiff's theory is too speculative and does not establish an "actual or imminent" injury. *Lujan*, 504 U.S. at 560. It relies on numerous assumptions, including how many clients will seek her services; what sorts of claims such individuals might have; and how expensive or difficult the cases she gets may be. Further, even if COPAA's predictions about the effect on Ms. Abdnour's personal legal practice are correct, COPAA's argument seems to "hinge[ ] on an attorney's desire to assist her clients in a regulatory environment that she prefers." (*See* ECF No. 34-1 at 20.) Attorneys do not suffer a recognizable injury in fact under Article III whenever the law causes changes to their docket or "they take measures to protect their clients' rights or alter their litigation strategy amid legal uncertainty." *Habeas Corpus Res. Ctr. v. U.S. Dep't of Just.*, 816 F.3d 1241, 1250 (9th Cir. 2016).

Additionally, even if COPAA's claim for injury is instead characterized as economic, rather than merely a shift in the difficulty or composition of the attorney's law practice, the injury remains speculative, as well as outside the zone of interests that Congress sought to protect in Title IX. Under the APA, a plaintiff must show that she is either "suffering a legal wrong because of agency action" or "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. A party claiming the latter, such as COPAA here, must establish that the injury it complains of "falls within the 'zone of interests' sought to be protected by the statutory provisions whose violation forms the legal basis for his complaint." *Lujan*, 497 U.S. at 883. As the Plaintiffs recognize in their Complaint, Congress's goals in enacting Title IX were to (1) avoid the use of federal

10

resources to support discriminatory practices and (2) provide individual citizens effective protection against those practices. (Compl. For Decl. & Inj. Relief ¶ 17.) Congress was not concerned with the revenue flow of private attorneys. An attorney does not gain standing any time a change in the law causes her legal practice to shift or become less lucrative. Ms. Abdnour does not have a recognizable injury in fact under Article III that would allow her to bring suit in her own right, and therefore, neither does COPAA.

### II. Girls for Gender Equity ("Gender Equity")

Gender Equity is a 501(c)(3) nonprofit corporation founded to create opportunities for, and to remove systematic barriers from, the development of girls (cisgender and transgender) and non-binary youth of color. (Compl. For Decl. & Inj. Relief ¶ 24, ECF No. 1.) It carries out this mission through direct service, policy advocacy and organizing, and cultural change. (*Id.*) Gender Equity claims to have *organizational* standing to bring this suit. The Complaint provides that:

> [g]iven the diminished responsibility under federal law for schools to respond to reports of sexual harassment and assault under the challenged provisions of the final Rule, [Gender Equity] will need to dedicate additional staff time and resources to advocate at the local and state levels for measures that are proven to prevent the occurrence of sexual harassment and assault . . . .

(*Id.* at ¶ 138.) In other words, Gender Equity seems to claim that because the Rule is bad policy, it will have to spend more of its time and resources lobbying to have this policy changed. The United States Court of Appeals for the Fourth Circuit has rejected this type of claim.

In in *Lane v. Holder*, 703 F.3d 668, 671 (4th Cir. 2012), a gun-rights organization whose activities included advocacy as well as "education, research, publishing and legal

11

action," challenged a federal firearm statue. The group alleged that it had suffered an Article III injury because it needed to divert resources in order to help its members navigate the new law, and thus could not spend those funds on other goals. *Id.* The Fourth Circuit held that voluntary "budgetary choices" are not cognizable injuries under Article III. *Id.* at 675. "To determine that an organization that decides to spend its money on educating members, responding to members' inquiries, or undertaking litigation in response to legislation suffers a cognizable injury would be to imply standing for organizations with merely 'abstract concern[s] with a subject that could be affected by an adjudication.'" *Id.* (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26 40 (1976)).

In *CASA de Maryland, Inc. v. Trump*, 971 F.3d 220, 238-41 (4th Cir. 2020) the Fourth Circuit examined *Lane* and held that a voluntary reallocation of resources is insufficient to establish organizational standing. The Fourth Circuit, "to put a finer point on it," explained that "it is not relevant for Article III purposes whether [the plaintiff] felt moved to act in a particular manner." *Id.* at 238. As the Court found, "[m]any statutes and regulations may spur private organizations to react to them in some fashion." *Id.* at 239 (citing *Lujan*, 504 U.S. at 561-62). "[A] voluntary budgetary decision, however well-intentioned, does not constitute Article III injury, in no small part because holding otherwise would give carte blanche for any organization to 'manufacture standing by choosing to make expenditures' about its public policy of choice." *Id.* (quoting *Clapper*, 568 U.S. at 402). Even if Gender Equity's decision to expend more resources to advocate against the ED's new policies is well-intentioned, it is still a voluntary spending decision that does not create a recognizable injury in fact under Article III.

In support of their claim for injury, the Plaintiffs cite this Court's decision in *Knowledge Ecology Int'l v. Nat'l Insts. of Health*, 2019 WL 1585285 (D. Md. Apr. 11, 2019). In that case, Judge Messitte of this Court did in dicta note that a "diversion of resources away from the organization's primary mission in order to address an allegedly improper action may suffice to establish standing." *Id.* at *4. However, as in this case, the plaintiffs, like Gender Equity, could not show such injury. The plaintiffs argued that they had expended resources on their suit against the defendant, National Institute of Health, to advocate against a private license granted by the organization. *Id.* at *6. This Court held that such injury was "the very type of manufactured injury that is not recognized for standing purposes." *Id.* Judge Messitte continued, explaining that the plaintiff's "core purpose" as an organization was "pursuing precisely the type of advocacy it undertook" and that resources spent on litigating the case in front of the court were "very much in line with [the plaintiff's] core mission rather than a diversion of resources away from it." *Id.*

The same is true in the case at hand. Gender Equity claims that its core mission is carried out through policy advocacy. If this Court were to allow a party whose organizational mission is to engage in policy advocacy to claim injury on the basis of a need to engage in that exact activity, *any* advocacy group could find standing to challenge laws when there are changes in policy. To hold in such way would be contradictory to *Knowledge Ecology International*, as well as the longstanding principle that the doctrine of standing limits the jurisdiction of the courts by "identify[ing] those disputes which are appropriately resolved through the judicial process." *Susan B. Anthony List*, 573 U.S. at 157. Gender Equity's alleged injury is "no more than a mere disagreement with the policy decisions" of

13

the ED, *Md. Shall Issue, Inc. v. Hogan*, 963 F.3d 356, 362 (4th Cir. 2020), and therefore, is insufficient to provide Gender Equity with standing to bring this suit.

### III.   Stop Sexual Assault in Schools ("SSAIS")

SSAIS is a nonprofit education and advocacy organization. (Compl. For Decl. & Inj. Relief ¶ 25, ECF No. 1.) Its mission is to prevent sexual harassment and assault in K-12 schools by educating students, families, and schools about K-12 students' right to an education free from sex discrimination. (*Id.*) SSAIS's claims are similar to that of Gender Equity. The Complaint alleges that "[f]ollowing issuance of the Rule, SSAIS must now dedicate a substantial amount of time to analyzing the Rule . . . , assessing existing or needed state or local parallel protections to fill in gaps created by the challenged provisions of the Rule, recreating educational materials, and providing technical assistance to students, families, educators, and journalists." (*Id.* at ¶ 138.) SSAIS claims that such "diversion of resources" will cause SSAIS to "lack the capacity and time to pursue projects it had planned to accomplish in 2020." (*Id.*) It also claims that because of the "confusing and contradictory policy landscape" created by the Rule, it will have to update its informational and training materials and "engage in the resource-draining task of recreating itself as an expert in state and local policies." (ECF No. 38 at 33.)

Again, this Court finds the Plaintiffs' arguments to be in conflict with *CASA de Maryland*. As the Fourth Circuit held, "it is not relevant for Article III purposes whether [the plaintiff] felt moved to act in a particular manner." *CASA*, 971 F.3d at 238. SSAIS's resource reallocations, although they may be motivated by sincere policy preferences, "are

14

not cognizable organizational injuries because no action by the defendant has directly impaired the organization's ability to operate and to function." *Id.* at 239.

Additionally, even if SSAIS could allege some recognizable injury, it cannot show how such injury was caused by the ED's alleged violation of the APA, or how it "will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561. SSAIS's argument is that it has suffered injury by having to read the Rule and tell people what it says. Even if the ED had issued a Rule that SSAIS preferred, it presumably would still need to "dedicate a substantial amount of time to analyzing the Rule . . . , assessing existing or needed state or local parallel protections . . . , recreating educational materials, and providing technical assistance to students, families, educators, and journalists." (*Id.* at ¶ 138.) Further, if the ED's policies were to change as a result of this litigation, SSAIS would then presumably have to once again edit its materials in order to accommodate the changes. Any alleged violations of the APA are not the legal cause of SSAIS's alleged injury. *See Comcast Corp. v. Nat'l Ass'n of Af. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020) (describing but-for causation as the idea that "a plaintiff must demonstrate that, but for the defendant's unlawful conduct, its alleged injury would not have occurred"). There is no remedy this Court can provide to redress SSAIS's harm. SSAIS lacks Article III standing to bring this suit.

**IV.     Know Your Title IX**

Plaintiff Know Your Title IX is a survivor-and-youth project of Advocates for Youth. (*See* Compl. For Decl. & Inj. Relief ¶ 22, ECF No. 1.) The organization's goal is "to empower high school and college students to end sexual and dating violence in their schools" through "legal rights education; training, organizing, and supporting student-

survivor activists; and advocating for campus, state, and federal policy change." (*Id.*) Like Gender Equity and SSAIS, Know Your Title IX argues that it has organizational standing, claiming that the injury it has suffered is one to Know Your Title IX itself. (*See* ECF No. 38 at 18.) Know Your Title IX claims that "[t]he Rule's provisions directly frustrate Know Your Title IX's mission." (*Id.*) The organization claims that the Rule depresses the number of survivors who can access Title IX remedies. (*Id.* at 18-19.) For example, Know Your Title IX claims that the Rule reduces the number and types of conduct or events that may be investigated by schools in Title IX proceedings through both its narrowed definition of "sexual harassment" and effective exclusion of off-campus incidents. (*Id.*) Therefore, the Plaintiffs' claim, the Rule reduces the number of survivors who will be eligible for remedies to help them complete their education that are only available through these proceedings. (*Id.*) Know Your Title IX alleges that because of the resulting overall reduction in complaints, the Rule's provisions "stand in the way of Know Your Title IX's . . . goal of bringing greater attention to survivors' actual experiences and ensur[ing] their stories are not buried." (*Id.*)

In sum, Know Your Title IX alleges that the Rule runs "at cross-purpose" with the organization's objectives. (*Id.*) This general conflict allegedly inflicts practical harm on Know Your Title IX's work as an organization. Know Your Title IX claims that the Rule "requires" the organization to make fundamental changes in the way it prepares students to engage in school-based advocacy and to support survivors, and accordingly, that Know Your Title IX will have to redraft documents and training plans, which will require "a huge reallocation of staff time and budget, away from activities it had planned to embark on this

year." (*Id.* at 20.) It is true that an organization like Know Your Title IX "may suffer an injury in fact when a defendant's actions impede its efforts to carry out its mission." *CASA*, 971 F.3d at 237 (citing *Lane*, 703 F.3d at 674). However, again, this Court finds that the Plaintiffs' arguments are rejected under *Lane* and *CASA de Maryland*. The Fourth Circuit has squarely held that "[r]esource reallocations motivated by the dictates of preference, however sincere, are not cognizable organizational injuries because no action by the defendant has directly impaired the organization's ability to operate and to function." *Id.* at 239.

Know Your Title IX does attempt to distinguish its own case from that of the plaintiffs in *Lane* and *CASA de Maryland*. In the Complaint, Know Your Title IX alleges that in anticipation of the Rule, it received a "spike in training requests" for Spring 2020, and further, that it "expects the number of calls and training requests to increase further now that the Rule has been released." (Compl. For Decl. & Inj. Relief ¶ 126, ECF No. 1.) This claim differs slightly from their other arguments related to Know Your Title IX's frustration of purpose and general voluntary spending changes, but as presently alleged, Know Your Title IX has not sufficiently alleged any facts that reflect and support an increased expenditure of resources as a result of the promulgation of the Rule.

In *SurvJustice Inc. v. DeVos*, No. 18-cv-00535-JSC, 2018 WL 4770741, at *4 (N.D. Cal. Oct. 1, 2018), *order amended on reconsideration*, No. 18-CV-00535-JSC, 2010 WL 1434144 (N.D. Cal. Mar. 29, 2019), the plaintiffs were three non-profit advocacy organizations and, like Know Your Title IX, claimed that an ED action would require a diversion of resources that would impede their various daily operations and frustrate their organizational missions. The court did find standing on such grounds. *Id.* at *6. The plaintiffs argued that, as

organizations that advocated for survivors of sexual harassment, a "chilling effect" on the filing of sexual harassment and sexual violence complaints made it increasingly difficult for them to fulfill their organizational missions. *Id.* While the defendants in *SurvJustice* argued that this chilling effect was merely "subjective" and "speculative," the court noted that the allegations were instead "observed"—the Plaintiffs produced details of decreases in the filing of student complaints *Id.* The plaintiffs further alleged that, when asked, their clients directly attributed their hesitancy in filing to the ED action at issue. *Id.*

In this case, Know Your Title IX has not alleged the same observable change in response to the Rule. The Plaintiffs have not provided any details about the number or nature of the pre-Rule requests (Compl. For Decl. & Inj. Relief ¶ 125, ECF No. 1), nor whether the alleged increase occurred as expected (*Id.* at ¶ 126). At this point, Know Your Title IX's concerns about an increase in the number of calls and training requests that it will receive in reaction to the Rule are merely speculative. While the Supreme Court has held that "threatened injuries" may be sufficient to meet the requirements for injury in fact under Article III, *Clapper*, 568 U.S. at 408, the Supreme Court has also been clear that such threats must be "certainly impending" in order to "ensure that the alleged injury is not too speculative for Article III purposes," *Lujan*, 504 U.S. at 564 n.2. Know Your Title IX has not yet sufficiently alleged any uptick in calls in response to the Rule. Furthermore, under the Fourth Circuit's decisions in *Lane* and *CASA de Maryland*, it would still need to show causation, namely, how such uptick would cause an involuntary reallocation of resources and that the ED's actions "ha[ve] directly impaired the organization's ability to operate and to function." *CASA*, 971 F.3d at 239.

Know Your Title IX's standing theory grounded in the frustration of its mission and diversion of resources cannot create standing for all the Plaintiffs because it is insufficient at this time to meet the injury in fact requirement for Article III standing. Know Your Title IX has not demonstrated that the Rule forced the organization to take action as a matter of law. Its "unilateral and uncompelled response to the shifting needs of its members cannot manufacture an Article III injury." *See id.* at 238.

## CONCLUSION

For the reasons stated above, the Motion to Intervene by Intervenor Defendants Foundation for Individual Rights in Education, Independent Women's Law Center, and Speech First, Inc. (ECF No. 20) is DENIED AS MOOT. Defendants' Motion to Dismiss (ECF No. 34) is GRANTED and this case is DISMISSED WITHOUT PREJUDICE. A Separate Order follows.

Dated: October 20, 2020

/s/
Richard D. Bennett
United States District Judge